## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CRAIG COUTURIER,** | |
| **Plaintiff,** | **CASE NO. 2:19-cv-12497** |
| **v.** | **JUDGE IVAN L.R. LEMELLE** |
| **BARD PERIPHERAL VASCULAR, INC. AND C. R. BARD, INC.,** | **MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT** |
| **Defendants.** | |

## STATEMENT OF MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSES TO PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF HIS MOTION

## RESPONSES TO PLAINTIFF'S STATEMENT OF FACTS[1]

1.      "Plaintiff Craig Couturier, a Louisiana resident, received an implanted Eclipse Filter in May 2011 after he was diagnosed with a pulmonary embolism and gastrointestinal bleeding." **Defendants C. R. Bard Inc. and Bard Peripheral Vascular, Inc. (together "Bard") seek to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

2.      "Mr. Couturier's filter was implanted without complication." **Bard seeks to controvert this fact, which is disputed by Dr. Mena who conceded at his deposition that he implanted the Eclipse™ filter in a tilted fashion in Plaintiff, but then stated that "there's nothing I can do about that."** *See* **Bard's Motion for Summary Judgment at Ex. E, Mena Dep. Tr. at 127:4-14.**

---

[1] *See generally* Bard's Statement of Undisputed Material Facts (Rec. Doc. 122-3), incorporated here by reference and disputing each of Plaintiff's Facts cited in their Partial Motion for Summary Judgment. (Rec. Doc. 102-3).

3.      "The implantation of the Eclipse Filter into Mr. Couturier was appropriate." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

4.      "In October 2016, a broken strut from filter was found in Mr. Couturier's heart." **Bard seeks to controvert this fact, rather, during October 2016 a CT scan of Plaintiff's abdomen and pelvis was performed, and the radiologist reviewing that scan reported that a "linear metallic foreign body" was visualized "along the anterior aspect of the right ventricle and adjacent pericardium."** *See* **Bard's Motion for Summary Judgment at Ex. K, COUTURIERC_NOMC_MDR01049-01055 at COUTURIERC_NOMC_MDR01055.**

5.      Subsequent imaging, and re-review of earlier imaging, demonstrates that the Bard Eclipse filter had also tilted and penetrated Mr. Couturier's IVC, into his vertebra, psoas muscle, diaphragm, and other structures. **Bard seeks to controvert this fact as the implanting physician, Dr. Mena, conceded at his deposition that he implanted the Eclipse™ filter in a tilted fashion in Plaintiff, but then stated that "there's nothing I can do about that." See Bard's Motion for Summary Judgment at Ex. E, Mena Dep. Tr. at 127:4-14.  Further, Dr. Hurst testified that Plaintiff "does not have any current symptoms" "related to the fracture, tilt, and penetration of his filter."** *See* **Bard's Motion for Summary Judgment Ex. J, Hurst Dep. Tr. at 70:4-8.**

6.      "Prior to discovery of the broken strut in his heart, Mr. Couturier's filter failure did not present any symptoms that would have alerted him to the need to seek follow-up medical care for it." **Bard seeks to controvert this fact as it mischaracterizes what was discovered during Plaintiff's scans, rather, during October 2016 a CT scan of Plaintiff's abdomen and pelvis was performed, and the radiologist reviewing that scan reported that a "*linear metallic***

*foreign body*" was visualized "along the anterior aspect of the right ventricle and adjacent pericardium." *See* Bard's Motion for Summary Judgment at Ex. K, COUTURIERC_NOMC_MDR01049-01055 at COUTURIERC_NOMC_MDR01055.

7.  "Bard's warnings for the Eclipse Filter failed to recommend any timeline for removing the Eclipse filter, failed to provide guidelines for imaging follow-up for the filter, and failed to adequately warn physicians and patients—including Mr. Couturier and his implanting physician— that the Eclipse filter had a higher rate of failures—including perforation, fracture and component embolization—than other IVC filters on the market." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context. Further, the Eclipse™ IFU states, again in bold, the following after the Precautions section: Standards and guidelines developed by the Society of Interventional Radiologists recommend that patients with filters (either permanent or retrievable) be tracked and receive "routine follow-up" subsequent to the placement of the device.** *See* **Bard's Motion for Summary Judgment at Ex. I, Eclipse™ IFU, at 2 (Section F)**

8.  "The Eclipse Filter is designed to act as a permanent filter, but can also be removed after implantation, if appropriate." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

9.  "Bard's designated case-specific medical experts have not opined that any violation of the standard of care by Mr. Couturier's treating physicians more likely than not caused Mr. Couturier's filter to fracture." **Bard seeks to controvert this fact to the extent it contains**

immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.

10.    "Bard's designated case-specific medical experts have not opined that any violation of the standard of care by Mr. Couturier's treating physicians more likely than not caused Mr. Couturier's filter to perforate his IVC." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

11.    "Bard's designated case-specific medical experts have not opined that any violation of the standard of care by Mr. Couturier's treating physicians more likely than not caused a fragment of Mr. Couturier's filter to embolize to his heart." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

12.    "Bard's medical experts have not opined that any conduct by Mr. Couturier caused Bard's filter to fracture, perforate his IVC, or undergo component embolization to his heart." **Bard seeks to controvert this fact to the extent it contains immaterial facts and/or creates an incorrect impression by omitting contrary evidence and context.**

13.    "Mr. Couturier was not warned that failing to remove his filter "promptly" after surgery could result in complications such as fracture, perforation, and filter component embolization." **Bard seeks to controvert this fact as Dr. Mena testified that he could not recall seeing Plaintiff for any follow-up after since the implantation surgery in 2011 at any time until 2016, and necessarily could not have had a discussion with him about potential removal of the filter, which was designed to be retrievable, post-implant.** *See* **Bard's Motion for Summary Judgment at Ex. E, Mena Dep. Tr. at 132:24-133:25;** *see also* **Ex. B, Couturier**

**Dep. Tr. at 70:14-16 (testifying "I don't think I did, no" when asked if he visited with Dr. Mena post-implant in 2011).**

## STATEMENT OF FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### *Plaintiff's Life-Threatening Condition Required an Inferior Vena Cava Filter Implant*

1.      Plaintiff presented to the emergency room on May 6, 2011 with complaints of "headaches, nausea and vomiting" after having had headaches for a month, as well as "dark tarry stools" and "coffee-ground emesis." Ex. A, COUTURIERC_NOMC_MDR00677-00679; *see also* Ex. B, Deposition of Craig Couturier dated August 17, 2020 ("Couturier Dep. Tr."), at 149:2-12, 149:23-150:21; 150:25-151:17 (describing aforementioned symptoms).

2.      On May 6, 2011, following a diagnosis of mastoiditis, labyrinthitis, and probable meningitis, Plaintiff received a tympanomastoidectomy, labyrinthectomy, and abdominal fat graft with obliteration of middle ear and mastoid as treatment; his post-operative diagnoses continued to be mastoiditis, labyrinthitis, and meningitis. Ex. C, COUTURIERC_NOMC_MDR00743-00744; *see also* Ex. B (Couturier Dep. Tr.) at 149:13-22; 162:6-163:4 (confirming diagnosis and describing procedure performed by Dr. Gerard Gianoli). An esophagogastroduodenoscopy of the plaintiff then "showed an upper gastrointestinal bleed from a Mallory-Weis tear." Ex. D, COUTURIERC_NOMC_MDR00684-685; *see also* Ex. B, Couturier Dep. Tr. at 152:11-152:22 (confirming gastrointestinal bleed diagnosis); Ex. E, Deposition of Dr. Jose Mena dated November 3, 2020 ("Mena Dep. Tr.") at 58:22-59:10 (confirming that before he had a filter implanted, Plaintiff had, among other things, a "gastrointestinal bleed from a Mallory-Weiss tear in his esophagus," "was bleeding and required multiple transfusions," and "was anemic"); Ex. D, COUTURIER_NOMC_MDR00684-85 (Dr. Jose Mena's May 7, 2011 consultation with Plaintiff

noting "[u]pper gastrointestinal bleeding secondary to Mallory-Weiss tear and gastric ulcerations," among other things,  in the "Impression" section of his notes).

**3.** "[A] CT angiogram of the lungs performed on May 7, 2011 showed pulmonary emboli in [Plaintiff's] left lower lobe."  Ex. D, COUTURIER_NOMC_MDR00684-85; *see also* Ex. E, Mena Dep. Tr. at 58:22-59:10 (confirming that Plaintiff had a "pulmonary embolus" before he received an inferior vena cava filter).

**4.** Dr. Jose Mena conducted a consultation with respect to Plaintiff and the potential implant of an inferior vena cava filter on May 7, 2011; his contemporaneous office notes indicate the following:

> The patient has a pulmonary embolism postoperative day 1 after the labyrinthectomy, mastoidectomy and abdominal fat graft.  He has also developed upper gastrointestinal bleeding secondary to a Mallory-Weiss tear and gastric ulcerations.  The patient cannot be anticoagulated.  He is already anemic and has had to be transfused.  Anticoagulating the patient will only exacerbate this and puts the patient at high risk for severe bleeding.  The patient needs to be protected from further pulmonary emboli.  Duplex scan did not show any evidence of deep venous thrombosis, but this does not mean that he did not have one.  It is quite possible that the deep venous thrombosis is no longer there because it embolized.  Should he develop another one, he would be at significant risk.

Ex. D, COUTURIER_NOMC_MDR00684-85.  It is on this basis that he concluded that 'the safest course of action is to place an inferior vena cava filter at this time." *Id.*

**5.** Dr. Jose Mena testified the following with respect to Plaintiff's indication for an inferior vena cava filter:

> The indication for an inferior vena cava filter in this gentleman was that he had had a pulmonary embolus.  The most common place that it would be coming from is from the lower extremities. The patient had a Mallory-Weiss tear and gastric ulcers and had bleeding -- gastrointestinal bleeding from these problems that caused him to be anemic and required blood transfusion.  And if we anticoagulated the patient, the risk of bleeding would be significant and was therefore contraindicated.  And therefore, to protect him from further pulmonary embolus, I decided that the best course of action was to place an inferior vena cava filter.

Ex. E, Mena Dep. Tr. at 105:21-106:8; *see also id.* at 58:9-59:23 (describing Plaintiff's candidacy for an inferior vena cava filter because he had a "contraindication to anticoagulation," *i.e.*, he could not be on blood thinners given his "very high risk of continued bleeding," and had already had a pulmonary embolism, with a filter being placed to "prevent another embolus") and 111:11-15 (confirming that Plaintiff's "condition for proceeding with the [filter implant] procedure was pulmonary embolism and the contraindication to anticoagulants").

6.     Dr. Mena further testified that he thought Plaintiff needed to be protected from further pulmonary emobli because "anytime you have a pulmonary embolus, you can have significant problems that can even be death"—so he wanted to "prevent another pulmonary embolus from occurring . . . and putting the patient in danger." Ex. E, Mena Dep. Tr. at 95:2-96:10; *see also id.* at 96:11-17 (explaining "it's a risk and can be fatal").

## *A Risk-Benefit Determination Was Made and Informed Consent Given Prior to Filter Placement and Other Related Facts*

7.     Dr. Mena confirmed he performed a risk-benefit analysis in determining whether an inferior vena cava filter implant was appropriate for Plaintiff, as is his typical practice, and that he determined a filter was the "best option available" for Plaintiff. Ex. E, Mena Dep. Tr. at 96:18-97:25.

8.     Dr. Mena reported in his contemporaneous consultation notes dated May 7, 2011 that the "[r]isks and benefits were explained to the patient and his family," and "[t]hey voiced understanding and wished to proceed." Ex. D, COUTURIER_NOMC_MDR00684-85. Dr. Mena confirmed the contents of his contemporaneous notes at his deposition. Ex. E, Mena Dep. Tr. at 98:1-18 (testifying that, with respect to a risk-benefit discussion with Plaintiff, "if I put that in my consultation, then that's what I did"). Dr. Mena also testified that it is his custom and practice to explain risks. *Id*. at 99:3-20

9.      Plaintiff, through his wife, provided all appropriate consent to the implant of an inferior vena cava filter following a discussion with Dr. Mena about the procedure.  *See* Ex. F, COUTURIERC_NOMC_MDR00705-00708 (North Oaks Health System Patient Consent to Medical Treatment or Surgical Procedure and Acknowledgement of Receipt of Medical Information, completed for Plaintiff); Ex. B, Couturier Dep. Tr. at 173:16-178:20 (testifying that his wife signed the consent forms on his behalf, confirming his wife's signature on those forms, and agreeing he had no reason to dispute that Dr. Mena engaged in a discussion regarding the implant procedure before consent was given); Ex. E, Mena Dep. Tr. at 111:20-113:8 (testifying that the consent form was completed after a discussion with Plaintiff and that if Plaintiff's wife signed on his behalf, she would have had full authority to do so); Ex. G, Deposition of Melissa Couturier dated September 2, 2020 ("Spouse Dep. Tr.") at 84:16-86:6 (testifying she signed a consent form on her husband's behalf for Dr. Mena and authenticating her signature on that consent form); 89:11-90:19 (testifying that she understood she was providing informed consent on her husband's behalf by signing the consent form and did so after having a discussion with Dr. Mena).

10.      The consent form signed by Plaintiff's wife on Plaintiff's behalf included various risks associated with inferior vena cava implant procedures, including "heart problems" and "displacement of device requiring retrieval." Ex. F, COUTURIERC_NOMC_MDR00705-00708; *see also* Ex. G, Spouse Dep. Tr. at 99:18-23 (testifying risks of the inferior vena cava procedure were included on the consent form).  Mrs. Couturier further testified she had no reason to doubt that risks were part of the "informed consent process" for the implant procedure performed by Dr. Mena.  *Id.* at 96:18-97:4.

11.     Mrs. Couturier testified that the Eclipse™ filter was implanted in her husband under "emergent conditions" and that Plaintiff's condition could be "life-threatening if he didn't get the treatment." Ex. G, Spouse Dep. Tr. at 209:11-210:2.

12.     On May 7, 2011, following the above-referenced consultation and execution of the appropriate consent forms, Dr. Jose Mena implanted an Eclipse™ inferior vena cava filter in the Plaintiff. Ex. H, COUTURIERC_NOMC_MDR00711-12 (procedure/operative report prepared by Dr. Jose Mena); Ex. E, Mena Dep. Tr. at 8:16-21 (confirming he treated Plaintiff with an Eclipse™ inferior vena cava filter on May 7, 2011).

13.     Dr. Mena is a board-certified vascular and cardiothoracic surgeon who practices at Ochsner Health Center and, at the time of implanting the Eclipse in Plaintiff, had experience implanting inferior vena cava filters, including the Eclipse™, dating back to 2005. Ex. E, Mena Dep. Tr. at 49:18-50:8, 53:21-54:10, 55:14-22.

14.     Dr. Mena testified that he implanted the Bard Eclipse™ inferior vena cava filter in Plaintiff "because that's what was available at the hospital." Ex. E, Mena Dep. Tr. at 75:19-76:20.

15.     Since the Eclipse™ filter was implanted, Plaintiff has not been diagnosed with any blood clot, blood condition, or blockage in any of the arteries in the lungs. Ex. B, Couturier Dep. Tr. at 187:11-23; Ex. G, Spouse Dep. Tr. at 211:6-12.

16.     Prior to the implant, Plaintiff never had any "direct contact or communications with anyone at Bard." Ex. B, Couturier Dep. Tr. at 221:17-20.

17.     Prior to implant, Plaintiff never reviewed Bard's website or patient brochures. *Id*. at 221:21-222:1.

18.     Prior to implant, Plaintiff never "talk[ed] with any Bard sales representatives." *Id*. at 222:2-5.

### *The Instructions For Use For The Eclipse™ Inferior Vena Cava Filter Provided Explicit Warnings and Instructions*

19.    Dr. Mena acknowledged in his deposition that medical device manufacturers provide an Instructions for Use document (an "IFU") with the device which comes in the same box as the device.  Ex. E, Mena Dep. Tr. at 74:23-75:3.

20.    Bard's Eclipse™ Filter is a venous interruption device "designed to prevent pulmonary embolism" and is "designated to act as a permanent filter," but "[w]hen clinically indicated, . . .  may be percutaneously removed after implantation according to the instructions provided under the Optional Removal Procedure" section of the IFU.  Ex. I, February 2010 Eclipse™ (Femoral) Filter Instructions for Use (the "Eclipse™ IFU") at 1.

21.    Eclipse™ IFU expressly states in bold the following after the Device Description:

**IMPORTANT:  Read instructions carefully before using the Eclipse™ Filter.**

Ex. I, Eclipse™ IFU, at 1 (bold in original).

22.    The Eclipse™ IFU includes several indications for use "in the prevention of recurrent pulmonary embolism," including where there is "pulmonary thromboembolism where anticoagulants are contraindicated," "[e]mergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced," and "[c]hronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated."  Ex. I, Eclipse™ IFU, at 1 (Section C).

23.    The Eclipse™ IFU expressly states in bold the following in the Contraindications for Use section:

**WARNING: If the vena cava diameter is greater than 28 mm, do not deploy the Eclipse™ Filter.**

I, Eclipse™ IFU, at 1 (Section D) (bold in original).  It then warns not to implant this filter in

"[p]atients with an IVC diameter larger than 28 mm."  *Id.*  These warnings are reiterated in Section

I (Directions for Use) of the IFU.  *Id.* at 3.

  **24.** The Eclipse™ IFU expressly states in bold the following, among other things, in

the Warnings section:

- **#4: "Do not deploy the filter unless IVC has been properly measured."**

- **#9: "When injecting contrast medium through the dilator, do not exceed the maximum pressure rating of 800 psi."**

- **#11: "Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques."**

- **#12: "Movement, migration or tilt of the filter are known complications of vena cava filters.  Migration of filters to the heart or lungs has been reported.  There have also been reports of caudal migration of the filter.  Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU.  Migration may also be caused by improper deployment, deployment into clots and/or dislodgement due to large clot burdnens."**

Ex. I, Eclipse™ IFU, at 2 (Section E) (bold in original).  Warnings 11 and 12 are reiterated in the

Potential Complications section of the Eclipse™ IFU.  *Id.* at 3; *see also infra* ¶ 24 . Warning 8 is

reiterated in Section I (Directions for Use).  *Id.*

  **25.** The Eclipse™ IFU further states in multiple places that the "retrieval hook" should

be positioned "1 cm below the lowest renal vein," including in Section F (Precautions).  Ex. I,

Eclipse™ IFU, at 1, 2, 3 (Sections A, F, and I).

26.     The Eclipse™ IFU makes clear to the implanter in the Precautions section that "[i]f misplacement, sub-optimal placement, or tilting of the filter occurs, consider immediate removal." Ex. I, Eclipse™ IFU, at 2 (Section F).

27.     The Eclipse™ IFU states, again in bold, the following after the Precautions section:

**Standards and guidelines developed by the Society of Interventional Radiologists recommend that patients with filters (either permanent or retrievable) be tracked and receive "routine follow-up" subsequent to the placement of the device.**

Ex. I, Eclipse™ IFU, at 2 (Section F).

28.     The "Potential Complications" section of the Eclipse™ IFU states that "[p]ossible complications include, but are not limited to, the following," and then includes, among other things:

- "Movement, migration or tilt of the filter are known complications of vena cava filters. Migration of filters to the heart or lungs has been reported.  There have also been reports of caudal migration of the filter.  Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in this IFU.  Migration may also be caused by improper deployment, deployment into clots and/or dislodgement due to large clot burdens";

- "Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques";

- "Perforation or other acute or chronic damage of the IVC wall";

- "Distal Embolization"; and

- "Organ injury"

Ex. I, Eclipse™ IFU, at 3 (Section G).  The "Potential Complications" section of the IFU ends as follows:

> **All of the above complications may be associated with serious adverse events such as medical intervention and/or death.  There have been reports of complications including death, associated with the use of vena cava filters in morbidly obese patients.  The risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ratio for a patient who is at risk of pulmonary embolism without intervention.**

*Id.* (bold in original; the Eclipse™ IFU also placed this warning in a larger font).

29.     The Eclipse™ IFU then states "[t]he risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ratio for a patient who is at risk of pulmonary embolism without intervention." Ex. I, Eclipse™ IFU, at 3 (Section G).

### *Dr. Mena Does Not Remember Reading the Eclipse™ Instructions for Use Before Performing Plaintiff's Implant Procedure on May 7, 2011 and Relied on His Independent Knowledge of The Risks Associated With All Filters*

30.     Dr. Mena testified at his deposition that he could not remember whether he read the Eclipse™ IFU prior to implanting the filter in Plaintiff.  Ex. E, Mena Dep. Tr. at 67:6-67:10; 70:14-22; 74:9-12.

31.     Dr. Mena testified that although he generally reads an IFU when he implants a new device, he "can't tell you I've read 100 percent of them" because "[a] lot of time, the principles are the same thing. So you might use one IVC device, and it might -- the method of deployment is the same like another device, and so you practically deploy the same device. It's just a different design of the filter itself."  Ex. E, Mena Dep. Tr. at 67:19-68:4.  He then added as follows: "to be honest with you, I mean, there are not many IFUs I have to read."  *Id.* at 70:18-19.

32.     When asked whether he read the Eclipse™ IFU before placing the device for the first time, Dr. Mena equivocally stated: "I probably did. But I can't remember, it's so long ago." Ex. E, Mena Dep. Tr. at 68:7-11.

33.     When asked generally about his practice about reading an IFU prior to implanting a filter, Dr. Mena testified that he "sometimes" read the IFU but that "[m]any times I haven't put

it in before but I've seen it deployed before and I don't have to." Ex. E, Mena Dep. Tr. at 68:18-25; *see also id.* at 74:13-22.

34.     Dr. Mena testified in deciding whether to implant a medical device, he "shouldn't rely on the IFU alone" and considers his knowledge, the medical literature, and his experience as well.  Ex. E, Mena Dep. Tr. at 69:24-71:12.

35.     Dr. Mena testified that he was aware of the known complications of all inferior vena cava filters, including fracture, movement, migration, tilt, and perforation, before he implanted the Eclipse™ filter in Plaintiff, and that he was knowledgeable about these risks independent from the IFU for the Eclipse™.  Ex. E, Mena Dep. Tr. at 62:17-64:9; 76:21-83:12. Dr. Mena agreed that these complications applied to all IVC filters and not just Bard filters or the Eclipse filter specifically.  *Id*. at 61:25-64:3.

### *Dr. Mena Failed to Comply with Significant Aspects of the IFU*

36.     Dr. Mena conceded at his deposition that he did not measure Plaintiff's inferior vena cava prior to implanting the Eclipse™ filter in the Plaintiff, and the contemporaneous operative report similarly contains no such measurement.  Ex. E, Mena Dep. Tr. at 117:10-118:3; Ex. D, COUTURIERC_NOMC_MDR00684-00685.

37.     Dr. Mena conceded at his deposition that he could not remember the amount of pressure was used when injecting the contrast medium through the dilator and thus could not confirm if it was more or less than 800 psi; the contemporaneous operative report similarly contains no such reference, and necessarily it is unclear if 800 psi was exceeded or not.  Ex. E, Mena Dep. Tr. at 120:13-18; Ex. D, COUTURIERC_NOMC_MDR00684-00685.

38.     Dr. Mena's contemporaneous operative report states that the Eclipse™ filter was "passed over the guidewire and positioned at the level of L4," which Dr. Mena confirmed at his

deposition means "the fourth lumbar vertebra," *i.e.*, "about where the . . . right and left iliac vein confluences to form the inferior vena cava." Ex. E, Mena Dep. Tr. at 120:19-121:8.

39.     Even Plaintiff's own expert, Dr. Darren Hurst, testified that Dr. Mena did not position the Eclipse™ filter as directed in the IFU with respect to the renal veins:

> Q. And so he placed it out of position, didn't he?
>         MR. MARTIN: Objection. Form.
> A. He placed it in a position where the filter was -- the apex is at the level of the renal veins. The parts of the device that engage in the cava are below the level of the renal veins.
>         BY MR. STRATTON:
> Q. But that's not what this information -- instruction for use says, is it?
> A. That's correct. It does not.

Ex. J, Deposition of Darren Hurst dated February 8, 2021 ("Hurst Dep. Tr.") at 49:22-50:8.

40.     Dr. Mena conceded at his deposition that he implanted the Eclipse™ filter in a tilted fashion in Plaintiff, but then stated that "there's nothing I can do about that." Ex. E, Mena Dep. Tr. at 127:4-14.

41.     Dr. Mena testified that he could not recall seeing Plaintiff for any follow-up after the implantation surgery in 2011 at any time until 2016, and necessarily could not have had a discussion with him about potential removal of the filter, which was designed to be retrievable, post-implant.  Ex. E, Mena Dep. Tr. at 132:24-133:25; *see also* Ex. B, Couturier Dep. Tr. at 70:14-16 (testifying "I don't think I did, no" when asked if he visited with Dr. Mena post-implant in 2011).

### *The Linear Metallic Object in Plaintiff's Right Ventricle Is Stable*

42.     On October 13, 2016, approximately five-and-a-half years after his implant surgery, Plaintiff presented at the emergency department with complaints of abdominal pain for

which his treaters determined were the byproduct of colitis. Ex. K, COUTURIERC_NOMC_MDR01049-01055 at COUTURIERC_NOMC_MDR01055.

43.    During the aforementioned emergency room visit, a CT scan of the abdomen and pelvis was performed, and the radiologist reviewing that scan reported that a "linear metallic foreign body" was visualized "along the anterior aspect of the right ventricle and adjacent pericardium." *Id*.

44.    For the first time since the implant surgery in 2011, Dr. Mena met with Plaintiff on November 9, 2016, about the findings seen on the above-referenced CT scan results. Ex. L, COUTURIERC_OHCOO_MDR00005-13 at COUTURIERC_OHCOO_MDR00009-10; *see also* Ex. E, Mena Dep. Tr. at 133:8-21 (explaining that he did not treat Mr. Couturier further after the implant procedure until his 2016 presentation to the emergency room and colitis diagnosis).

45.    During this November 9, 2016 office visit, Dr. Mena recommended that an echocardiogram be undertaken to evaluate the foreign object embedded in the heart visualized on the CT imaging, noted that he "thinks this is a chronic thing and it happened sometime ago," and noted the potential options for next steps, including to "leave it alone [] since we think that this is a chronic event and is not causing any problems at this time." *Id.*; Ex. L, COUTURIERC_OHCOO_MDR00005-13 at COUTURIERC_OHCOO_MDR00009-10.

46.    At his deposition, Dr. Mena testified about his November 9, 2016 office visit notes, explaining that he meant the metallic object seen in the imaging had become embedded "some time ago" and "obviously the patient is not complaining of any problems relating to it." Ex. E, Mena Dep. Tr. at 146:24-148:10.

47.    Following the November 3, 2016 office visit with Dr. Mena, Plaintiff visited board-certified cardiologist Dr. Ghiath Mikdadi for an echocardiogram and electrocardiogram on

November 11, 2016.  Ex. M, Deposition of Ghiath Mikdadi dated November 13, 2021 ("Mikdadi Dep. Tr.") at 50:23-51:3; 90:10-24.

48.     Dr. Mikdadi testified that Plaintiff's echocardiogram results were "very unremarkable" and "essentially normal."  Ex. M, Mikdadi Dep. Tr. at 93:2-94:16.  He similarly testified that the electrocardiogram results were "normal."  *Id.* at 85:18-24; 87:2-9.

49.     Dr. Mikdadi consulted with Dr. Mena following Plaintiff's visit to his office, as reflected in Dr. Mena's office notes dated December 8, 2016, which report that the echocardiogram "was fine" and that Dr. Mikdadi "apparently" told Plaintiff to "leave [the metallic fragment] alone as it was not causing any problems." Ex. N, COUTURIERC_OHCCO_MDR00043-48 at COUTURIERC_OHCCO_MDR00045.

50.     During Plaintiff's visit with Dr. Mena on December 8, 2016, Plaintiff and Dr. Mena discussed various treatment options available to Plaintiff and agreed that Plaintiff would return to receive another CT scan in about 6 weeks.  *Id*.  At the time of this office visit, Plaintiff denied any shortness of breath or chest pain.  *Id.*

51.     On February 13, 2017, Dr. Mena's office advised Plaintiff that the results of his CT scan following his December 8, 2016 visit were "stable," *i.e.*, that the linear metallic foreign object had not moved or changed position; Plaintiff was advised to schedule another scan in three months. Ex. O, COUTURIERC_OHCCO_MDR00056.

52.     At his deposition, Dr. Mena testified that "there hadn't been any changes" between Plaintiff's October 13, 2016 scan and follow-up scan, reflecting that the metallic linear object was "stable" and did not require surgical intervention.  Ex. E, Mena Dep. Tr. at 160:11-161:9.

53.     Notwithstanding Dr. Mena's instruction, Plaintiff did not schedule a follow up CT scan until December 3, 2019—almost three years after his last office visit with Dr. Mena.  Ex. P, COUTURIERC_OHCCO_MDR00058-00060 at COUTURIERC_OHCCO_MDR00060.

54.     In reviewing the follow-up CT scan performed on Plaintiff on December 19, 2019, Dr. Mena concluded that the foreign metallic object originally visualized in the 2016 imaging was "unchanged" in position and thus "hasn't moved" and is "stable."  Ex. E, Mena Dep. Tr. at 166:14-167:1; 168:5-168:24.

55.     Plaintiff has not obtained or scheduled any medical imaging or testing since the above-referenced December 19, 2019 CT scan, notwithstanding Dr. Mena's recommendation that a follow-up scan be performed in 6 months.  Ex. B, Couturier Dep Tr. at 215:13-216:12 and 217:11-218:12; Ex. Q, Plaintiff's Objections and Answers to Defendants' First Requests for Admission at 4 (Response to Request for Admission No. 1).

### *Plaintiff's Alleged Injuries In This Case Are Unconfirmed*

56.     Plaintiff initiated the lawsuit on July 13, 2017 by filing a short-form complaint joining in the Master Complaint for Damages filed in the multidistrict litigation captioned *In Re: Bard IVC Filters Products Liability Litigation*, MDL 2641 (the "MDL"), from which this individual case was transferred.  (Rec. Doc. 1).

57.     According to Plaintiff's verified Plaintiff Profile Form, Plaintiff attributes the following alleged injuries to the Filter: "afraid to perform physical activities such as playing football with his kids," "afraid the strut embedded near his heart will cause death," and "believes he suffers irregular heart beats ever since the IVC filter was placed in his vena cava."  Ex. R, Plaintiff Profile Form at 5.

58.     Despite these subjective fears, Plaintiff admits that no "health care provider ever told [him] orally or in writing that [his] symptoms related to bodily injury are related to the Bard IVC implanted in [him] in 2011." Ex. B, Couturier Dep. Tr. at 218:18-23.

59.     Plaintiff has never seen a psychiatrist, psychologist or any mental health professional regarding his alleged "mental anguish." Ex. B, Couturier Dep. Tr. at 82:16-83:16.

60.     Plaintiff admits he "is not claiming that there are physical activities that he is 'no longer able to perform'" as a result of the filter's implantation. Ex. S, Plaintiff's Objections and Answers to Defendants' First Interrogatories at 15 (Response to Interrogatory No. 21).

### *The Opinions of Plaintiff's Case-Specific Experts*

61.     Plaintiff designated two case-specific experts to opine on medical causation, Dr. Darren Hurst, an interventional radiologist, and Dr. Derek Muehrcke, a cardiothoracic surgeon. Ex. T, Plaintiff's Designation of Expert Opinion Testimony.

### Dr. Hurst's Opinion Testimony

62.     Dr. Hurst is a medical doctor. Ex. J, Hurst Dep. Tr. at 21:9-13.

63.     Dr. Hurst is not an expert in designing IVC filters. Ex. J, Hurst Dep. Tr. at 11:9-11.

64.     Dr. Hurst has never written any publications on IFUs for an IVC filter. Ex. J, Hurst Dep. Tr. at 11:3-5.

65.     Dr. Hurst is not an expert in drafting IFUs. Ex. J, Hurst Dep. Tr. at 11:6-8.

66.     Dr. Hurst testified that because Plaintiff had a "combination of a GI bleed and a pulmonary embolism," he was in "a life-threatening situation" prior to the implant procedure. Ex. J, Hurst Dep. Tr. at 28:22-25.

67.     He admits that he does not have any criticism of Dr. Mena's decision to implant a

retrievable IVC filter in Plaintiff in May 2011 in light of Plaintiff's medical condition.  Ex. J, Hurst

Dep. Tr. at 68:25-69:10.

68.     Dr. Hurst, testified that Dr. Mena did not position the Filter as directed in the IFU:

> Q. And so he placed it out of position, didn't he?
> MR. MARTIN: Objection. Form.
> A. He placed it in a position where the filter was -- the apex is at the level
>    of the renal veins. The parts of the device that engage in the cava are
>    below the level of the renal veins.
>    BY MR. STRATTON:
> Q. But that's not what this information -- instruction for use says, is it?
> A. That's correct. It does not.

Ex. J, Hurst Dep. Tr. at 49:22-50:8.

69.     Dr. Hurst testified that the tilt was 17 degrees and he would have removed it:

> Q. And so in your practice, if you had a filter that was deployed like this,
>    where it had 17 degrees of tilt and it had – was deployed in the wrong
>    place, you would have immediately removed it, wouldn't you have?
>    MR. MARTIN: Objection. Form.
> A. I would have considered removing it, yes.

Ex. J, Hurst Dep. Tr. at 50:22-51:13.  Dr. Hurst further conceded that a 17-degree tilt limits the

efficacy of the filter.  *Id.*

70.     Dr. Hurst agrees that all the complications that Plaintiff alleges occurred with his

filter were listed in the Eclipse™ IFU.  Ex. J, Hurst Dep. Tr. at 59:14-18.

71.     Dr. Hurst agrees that it is standard to not exceed 800 psi when injecting contrast

because "if you exceed a certain pressure, then, you know, there's risk of extravasation."  Ex. J,

Hurst Dep. Tr. at 42:12-22.

72.     Dr. Hurst agrees that the Eclipse™ IFU specifically indicates that a filter should

not be deployed unless the IVC has been properly measured.  Ex. J, Hurst Dep. Tr. at 42:2-5.

73.     Dr. Hurst agrees that the Eclipse™ IFU specifically indicates that the "Standards and guidelines developed by the Society of Interventional Radiologists recommend that patients with filters, either permanent or retrievable, be tracked and receive routine follow-up subsequent to the placement of the device." Ex. J, Hurst Dep. Tr. at 51:20-52:5.

74.     Dr. Hurst further opines that "Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates of fracture, embolization of fractured components, penetration, migration, including the known risk of death associated with the . . . Eclipse filters in comparison to the original predicate device, the Simon Nitinol Filter®, and competitor filters such as the Cook Gunther-Tulip filter[.]" Ex. U, Expert Report of Dr. Darren Hurst dated November 30, 2020 ("Hurst Exp. Rep.") at 14-15.

75.     Dr. Hurst opines that the Simon Nitinol and Gunther-Tulip filters as safer alternative filters that allegedly "would have significantly reduced the risk of the cascade of events of embedded filter, tilt, migration, fracture, embolization of fractured struts, and penetration of the IVC and adjacent organs/structures the plaintiff experienced." Ex. U, Hurst Exp. Rep., at 18-19.

76.     In the MDL proceeding in which general fact and expert discovery was conducted, Judge Campbell granted in part a motion in limine filed by Bard in which it sought, among other things, to limit Dr. Hurst's complication rate opinions. In particular, Judge Campbell ruled that Dr. Hurst was not allowed to (1) opine that Bard filters have higher complication rates than other IVC filters and have unacceptable risks of caudal migration, or (2) render opinions about Bard's internal knowledge, its internal testing and development practices, or the truthfulness of its representations in general. The MDL court found that, as here, "Dr. Hurst has not conducted any study of IVC filter complication rates," or "collected clinical data from his personal cases that reveal IVC filter complication rates, nor that his education and training revealed anything about

such rates." The MDL court further found that although Dr. Hurst testified about reviewing articles on complication rates and a report on an alleged "unacceptable risk" of caudal migration, he did not take any steps to verify their conclusions. The MDL court also determined no evidence exists that "Dr. Hurst has ever worked for a medical product manufacturer or the FDA, that he has expertise in internal corporate information gathering or decision making, or that he is trained in the design, testing, or labeling of medical devices." The MDL court thus held that there was no basis "upon which Dr. Hurst can render expert opinions about what happened internally at Bard – what it knew, what it did, or what it failed to do in the development and marketing of its IVC filters." The MDL court concluded that Dr. Hurst's proffered opinions are "outside the realm of his expertise and are not supported by sufficient facts and data or evaluated through reliable principles and methods." Ex. V, 2:15-md-2641-DGC (Rec. Doc. 9772).

77.     Dr. Hurst testified that Plaintiff "does not have any current symptoms" "related to the fracture, tilt, and penetration of his filter." Ex. J, Hurst Dep. Tr. at 70:4-8.

78.     Dr. Hurst opines that Plaintiff is at risk for "future complications" – the risk for development for all of which is "unknown" and ranges from "more than zero and less than 100 percent." Hurst Dep. Tr. at 70:3-75:3.

79.     Dr. Hurst has never spoken with Plaintiff, has never had any correspondence with Plaintiff, has never physically examine Plaintiff, nor has taken Plaintiff's medical history from him personally. Hurst Dep. Tr. at 25:11-23.

### Dr. Muehrcke's Opinion Testimony

80.     Dr. Muehrcke is a medical doctor. Ex. W, Deposition of Dr. Derek Muehrcke dated January 23, 2021 ("Muehrcke Dep. Tr.") at 6:18-19.

81.     Dr. Muehrcke is not an engineer. *Id*. at 10:11-13.

82.     Dr. Muehrcke has never designed any IVC filters.  *Id*. at 10:14-16.

83.     Dr. Muehrcke has never drafted an IFU for an IVC filter.  *Id*. at 10:17-19.

84.     Dr. Muehrcke has never drafted an IFU for any medical device.  *Id*. at 10:23-25.

85.     Dr. Muehrcke has never drafted warnings for an IVC filter.  *Id*. at 10:20-22.

86.     Dr. Muehrcke has never drafted warnings for any medical device.  *Id*. at 11:1-3.

87.     Dr. Muehrcke agrees that the Eclipse™ IFU for the filter implanted in Plaintiff warned of migration, fracture, perforation, and embolization, as well as pulmonary and cardiac complications with vena cava filters requiring the retrieval of fragment utilizing the vascular and/or surgical techniques.  *Id*. at 56:15-59:20.

88.     Dr. Muehrcke testified that all filters (i.e., not just the Eclipse™ Filter implanted in Plaintiff) can fracture, migrate, embolize and perforate.  *Id*. at 13:24-14:25.

89.     Dr. Muehrcke also opines that Bard's instructions and warnings were inadequate because Bard "failed to notify the operating physicians and the implanted patients of the much higher complication rates[.]" Ex. X, Expert Report of Dr. Derek Muehrcke ("Muehrcke Exp. Rep.") at 15.

90.     Dr. Muehrcke's report does not, however, identify or opine on any specific design defect in the Eclipse™ filter.  *Id*. at 11.

91.     Dr. Muehrcke attributed Plaintiff's symptoms, including "fracture anxiety," shortness of breath and irregular heart racing to the "cardiac fragment" and alleged "scarring around the heart, around the fragment."  Ex. W, Muehrcke.  Dep. Tr. at 43:10-24; 46:2-8.

92.     Yet at the same time, Dr. Muehrcke acknowledges Plaintiff's "treating physicians have said that he is asymptomatic from his cardiac fragment."  *Id*. at 44:4-6.

93.     Dr. Muehrcke admits that the alleged foreign linear metallic object in Plaintiff's heart is stable. *Id*. at 64:9-10.

94.     Dr. Muehrcke attributes Plaintiff's subjective complaints of anxiety, shortness of breath and "heart racing" to his Filter based solely on the subjective deposition testimony of Plaintiff and his wife.  *Id*. at 43:10-14; 44:4-10; 63:16-18; 64:9-10.

95.      Dr. Muehrcke has never personally examined or communicated with Plaintiff.  *Id*. at 43:2-7.

96.     Dr. Muehrcke also agrees that, if a filter is implanted improperly, then there is an increased chance that there will be complications.  *Id.* at 26:16-19. He further conceded that a significant tilt at implant can lead to migration, perforation and fracture.  *Id.* at 21:19-22:4.

97.     While Dr. Muehrcke testified that Plaintiff "will be at risk of bleeding, pericardial tamponade, arrhthymias, infection, and death[,]" he concedes that "[i]t's impossible" to "put a percentage on that[.]"  *Id*. at 49:23-50:4.

98.     In his Expert Report, Dr. Muehrcke also opines that there is no proven efficacy of any IVC filter and that the Eclipse™ filter "placed the health and safety of [Plaintiff] at unnecessary risk with no meaningful medical benefit."  Ex. X, Muehrcke Exp. Rep. at 10.

### *The Opinions of Bard's Case-Specific Experts*

99.     Bard designated two case-specific experts to opine on medical causation, Dr. David Poll, a clinical cardiologist board certified in internal medicine, cardiovascular disease, and nuclear cardiology; and Dr. Timur Sarac, a vascular surgeon board certified in vascular surgery and general surgery. Ex. BB, Bard's Disclosure of Expert Witnesses.

**100.** In his Expert Report, Dr. Sarac ultimately opined that to a reasonable degree of medical certainty no defect or action or inaction on the part of Bard caused or contributed to Plaintiff's alleged injuries or damages.  Ex. CC, Sarac Exp. Rep. at 40.

**101.** Dr. Sarac concluded that to the extent there is a linear metallic foreign body in Plaintiff's heart, it does not present him serious risk and indeed he is asymptomatic and "the device was clinically indicated for [Plaintiff] when it was implanted and performed as designed and intended in that [Plaintiff] has not suffered another pulmonary embolism since the device was implanted." *Id*.

**102.** Dr. Sarac supplied the expert opinion that "it is more likely than not" the implant procedure in May of 2011 "was not performed within the standard of care and in accordance with the IFU for the Eclipse devices, and was the cause of any resultant complication" and "Dr. Mena's surgical technique caused or at least contributed to any potential filter-related complication and [Plaintiff's] alleged injuries in this case."  *Id*. at 30.

**103.** Another problem with the placement of the filter that Dr. Sarac is critical of Dr. Mena about is the fact that Dr. Mena did not actually measure the size of Plaintiff's IVC in advance of implanting the filter to rule out a mega cava.   *Id*. at 22.  This is important because "[w]hen a patient has a mega cava or some type of aberrant anatomy, a tilt or migration of the filter can be more likely to occur."  *Id*. at 22.

**104.** According to Dr. Sarac, Dr. Mena implanted the filter incorrectly as it was "significantly tilted when he implanted it."  *Id*. at 30.  Dr. Sarac continues: "after implanting the filter in a tilted fashion, to the extent he realized what he had done, Dr. Mena should have immediately rectified the problem by removing the filter and placing another one."  *Id*. at 31.

**105.** Moreover, Dr. Sarac supplies the opinion that Dr. Mena failed to arrange for any follow-up with Plaintiff to monitor the filter and/or address potential removal of the IVC filter in the future. *Id*.

**106.** Dr. Sarac further opines Dr. Mena implanted the filter with "a number of technical issues including severe angulation, which left it prone to potential complications." *Id*. at 33. Ultimately Dr. Sarac supplies the opinion that to the extent "a linear metallic foreign body is in the right atrium, this was likely caused by the improper implantation of the device by Dr. Mena along with a failure to conduct adequate follow up in accordance with the standard of care." *Id*. at 40.

**107.** Dr. Sarac supplied a sworn deposition in this case testifying in line with his report's opinions. Ex. DD, Deposition of Timur Sarac dated March 15, 2021 ("Sarac Dep. Tr.") (Q: Dr. Sarac, do you stand by each and every one of your opinions that you've set forth in your expert report? Mr. Martin: For. Witness: Yes, ma'am. Q: Do you stand by each and every one of the opinions set forth in your expert report irrespective of whether you were asked about it today or not by plaintiff's counsel? Mr. Martin: Form. A: Yes, I do.") *Id*. at 275:8-12.

**108.** According to Dr. Sarac, all of the opinions that he testified to and set forth in his Expert report were "given to a reasonable degree of medical probability and/or certainty." *Id*. at 277:13-17.

**109.** Dr. Sarac testified as to Dr. Mena's May 7, 2011 implant of the Eclipse:

> Q. Is it your opinion that Dr. Mena's surgical technique cased or
>     contributed to that purported injury?
>     MR. MARTIN: Form.
> A. It is my concern.
> Q. And what do you mean by your concern?
> A. … But the – for something like that to happen within – within a couple
>     days of the filter being implanted, its usually a technical issue by the
>     implanting surgeon.

*Id*. at 271:7-18.

110.    At deposition, Dr. Sarac testified as the cause of Plaintiff's claimed injuries in the

following way:

> Q. Dr. Sarac, did you consider the Eclipse filter as a cause or contributor
>     to Mr. Couturier's claimed injuries in rendering your opinions in this
>     case?
> A. As part of my differential diagnosis –
> Mr. Martin: Objection.  Form.
> A: I considered all possibilities as – as would be the cause of the events
>     that happened in this case.
> Q: Did you determine that the Eclipse filter was not the cause of his
>     complaints?
> Mr. Martin: Object to form.
> A:     I did.

*Id*. at 283:9-22.

111.    Dr. Sarac was able to rule out the Eclipse filter as a cause or contributor to

Plaintiff's complaints.  *Id*. at 284:11-14.  Dr. Sarac further testified:

> Q: Dr. Sarac, is it your opinion that all of Mr. Couturier's claimed injuries, both physical
>
> or psychological, are not related to the IVC filter?
>
> A: That is correct.

*Id*. at 284:20-23

112.    According to Dr. Sarac, the Eclipse IFU covered the risk of penetration,

embolization, tilt and migration.  *Id*. at 269:1-18.

113.    In his Expert Report, another one of Bard's case specific experts, Dr. Poll, opined

that to a reasonable degree of medical certainty Plaintiff is stable clinically with reference to the

retained fragment in his right ventricle and it does not expose him to significant risk.  Ex. EE, Poll

Exp. Rep. at 6.

114.    Dr. Poll supplied the opinion in his Expert Report that the IVC filter performed as

designed, does not have inherent design defects and there is no evidence of any damage to the

Plaintiff's heart as a result of the Eclipse filter.   *Id*.

115.    Similar to Dr. Sarac, Dr. Poll supplies the expert opinion that Plaintiff's filter "could and should have been removed at such point post operatively and post-GI bleed that full anticoagulation could be administered.  Had the filter been promptly removed from Mr. Couturier, his fragment embolization would have been avoided."  *Id*. at 5.

116.    As to the Plaintiff's actions, Dr. Poll opined Plaintiff never sought medical advice for his claimed shortness of breath nor the occasional palpitations he reported in 2016 and "[o]ver the years he has had numerous encounters with the health care system during which these symptoms were not raised, evaluated or treated."  *Id*. at 4-5.

117.    At deposition, Dr. Poll testified he performed a differential diagnosis like he does with his own patients.  Ex. FF, Deposition of David Poll dated March 12, 2021 ("Poll Dep. Tr.") at 143:6-18.

118.    As to this differential diagnosis, Dr. Poll testified:

Q: And did you consider the Eclipse filter as a potential cause of Mr. Couturier's alleged complains?

A: I did consider it as a potential cause.

Q: And did you determine that the Eclipse filter was not the cause of his injuries or alleged injuries?

A: I determined that it was not the cause of his alleged injuries or symptoms.

...

Q: Were you able to rule out the Eclipse filter as a cause or contributor to Mr. Couturier's complaints?

A: I was.

*Id*. at 143:3-10.

**119.**     According to Dr. Poll, all of the opinions that he testified to and given in his report were "given to a reasonable degree of medical probability and/or certainty."  *Id*. at 140:25-144:20.

Dated: May 18, 2021

Respectfully Submitted:

**GREENBERG TRAURIG, LLP**

*/s/ Lori G. Cohen*
Lori G. Cohen (*pro hac vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
cohenl@gtlaw.com

Sylvia E. Simson (*pro hac vice*)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9275
simsons@gtlaw.com

-and-

**IRWIN FRITCHIE URQUHART
& MOORE, LLC**
KIM E. MOORE (#18653)
DAVID M. MELANCON (#23216)
KELLY JUNEAU ROOKARD (#30573)
ALISON A. SPINDLER (#34103)
BRIAN G. REANEY, II (#38382)
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: (504) 310-2100
Fax: (504) 310-2101
kmoore@irwinllc.com
dmelancon@irwinllc.com
kjuneau@irwinllc.com
aspindler@irwinllc.com
breaney@irwinllc.com

*Counsel for Defendants C. R. Bard, Inc. and
Bard Peripheral Vascular, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of May 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Lori Cohen*