## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CRAIG COUTURIER

      Plaintiff,

CASE NO. 2:19-cv-12497

JUDGE IVAN L.R. LEMELLE

      v.

C. R. BARD, INC. AND BARD
PERIPHERAL VASCULAR, INC.

MAGISTRATE JUDGE
DONNA PHILLIPS CURRAULT

      Defendants.

### DEFENDANTS' DISCLOSURE OF EXPERT WITNESSES

Pursuant to Fed. R. Civ. P. 26, Defendants C. R. Bard ("Bard") and Bard Peripheral Vascular, Inc. ("BPV" and collectively with Bard, "Defendants") disclose the following expert witnesses:

### EXPERT WITNESSES

I.    **Case-Specific Expert Witnesses**

    A.    **Beth Lee Greenbaum, Ph.D., M.Ed., CLCP, CRC**
                **Vocational & Life Care Planning, Inc.**
                **9804 Korma Court**
                **Potomac, MD 20854**

Dr. Greenbaum is a life care planner with over twenty years of experience.  Dr. Greenbaum received her Ph.D. from the University of Maryland in 1993 and is a Certified Rehabilitation Counselor and a Certified Life Care Planner with a Commission on Health Care Certification from the University of Florida. As a Certified Life Care Planner, Dr. Greenbaum regularly determines the rehabilitation needs of individuals with catastrophic injuries and assesses patients for future diagnostic testing and future health and medical costs. Dr. Greenbaum's opinions and testimony will be given to a reasonable degree of medical certainty based on her education, training and her experience, as well as the documents reviewed.

Dr. Greenbaum's qualifications and opinions and the bases of her opinions are disclosed in her report served contemporaneously with these Disclosures of Expert Witnesses. Dr. Greenbaum has reviewed records and material relevant to Mr. Couturier and offers case-specific opinions, including, but not limited to, Plaintiff's alleged injuries, Plaintiff's future care and services which may be needed, Plaintiff's self-maintenance abilities, and one-time or non-recurring and annual costs associated with Plaintiff's current and future care. Additionally, Dr. Greenbaum may respond to assumptions, opinions and testimony Plaintiff's expert(s) offer.  Dr. Greenbaum's qualifications, opinions and the bases of her opinions are disclosed in her case-specific expert report.

> **B.** **David S. Poll, M.D.**
> **Department of Cardiology**
> **Penn Medicine**
> **230 West Washington Square**
> **Philadelphia, PA 19106**

Dr. David S. Poll is a clinical cardiologist who is board certified in internal medicine, cardiovascular disease, and nuclear cardiology.  He received his M.D. from the University of Pennsylvania School of Medicine in 1979.  Dr. Poll is a physician at the Penn Heart and Vascular Center at Pennsylvania Hospital and also serves as a consultant for the National Board of Medical Examiners.   Dr. Poll has published papers and given presentations on matters involving cardiovascular disease and clinical cardiac, electrophysiology, and nuclear cardiology.

Dr. Poll may provide expert testimony relating to the diagnosis and management of pulmonary embolus and the indications or contraindications for prescription of IVC filters.  He may also testify regarding Plaintiff's medical treatment, his IVC filter, and the role, if any, the subject filter played in causing Plaintiff's alleged injuries and/or extending Plaintiff's life. Dr. Poll may respond to assumptions, opinions, and testimony Plaintiff's various experts offer as they relate to the same. Dr. Poll's qualifications, opinions and the basis of his opinions are disclosed in his case-specific expert report.

C.      **Timur Sarac, M.D.**
        **The Ohio State University School of Medicine**
        **Section of Vascular Surgery**
        **376 W. 10th Avenue**
        **701 Prior Hall**
        **Columbus, OH 43210**

Dr. Timur Sarac is a vascular surgeon who is board certified in vascular surgery and general surgery. He received his M.D. from State University of New York at Buffalo School of Medicine and subsequently completed his Residency and served as a Research Fellow in Surgery at University of Rochester. Dr. Sarac also completed a Fellowship in Vascular Surgery at University of Florida and a Fellowship in Endovascular Surgery at Texas Tech University. Dr. Sarac currently serves as Chief of Vascular Surgery, Founding Director of the Aortic Institute, and Professor of Surgery at The Ohio State University. Dr. Sarac previously served as Chief of Vascular Surgery, Program Director in Vascular Surgery, Professor of Surgery, and Co-Director of the Heart and Vascular Center at Yale University School of Medicine. Dr. Sarac serves on the American Board of Vascular Surgery and serves on the editorial boards for several peer-review industry journals.

Dr. Sarac may provide expert testimony relating to the diagnosis and management of pulmonary embolus and the indications or contraindications for prescription of IVC filters.  He may also testify regarding Plaintiff's medical treatment, his IVC filter, and the role, if any, the subject filter played in causing Plaintiff's alleged injuries and/or extending Plaintiff's life. Dr. Sarac may respond to assumptions, opinions, and testimony Plaintiff's various experts offer as they relate to the same. Dr. Sarac's qualifications, opinions and the basis of his opinions are disclosed in his case-specific expert report.

## II.     Non Case-Specific Expert Witnesses

### A.     Christine L. Brauer, Ph.D.
           Brauer Device Consultants, LLC
           7 Trail House Court
           Rockville, Maryland 20850

Dr. Brauer is an expert in the field of FDA/regulatory affairs. She holds a Ph.D. in Women's Health and Research Methods from the University of Maryland, and a Master's Degree in Microbiology and Molecular Biology from the University of Delaware. Dr. Brauer previously worked for the Federal Food and Drug Administration (FDA). From 1990 to 1994, she worked at FDA as a Scientific Reviewer in the Obstetrics and Gynecology Devices Branch, Office of Device Evaluation, Center for Devices and Radiological Health (CDRH), where she was responsible for the scientific and regulatory review, analysis, and evaluation of premarket notifications (510(k)) and premarket approval (PMA) applications, as well as for the scientific and regulatory review of investigational device exemptions ("IDE"). While at FDA, Dr. Brauer managed a team of scientific reviewers consisting of engineers, toxicologists, biologists, statisticians, nurses, and medical officers. She developed guidance documents for medical devices, and assisted in the classification and reclassification of several devices. She also participated in the review and evaluation of device recalls, medical device reports, and product labeling. Dr. Brauer was a member of the CDRH's Toxicology Risk Assessment Committee, CDRH's Ad Hoc Committee to Improve Science in CDRH, and the Advancement of FDA Science Committee.

Since leaving FDA in 1994, Dr. Brauer has worked as a consultant, advising clients on regulatory strategies, FDA regulations and policies, and preparing or aiding the preparation of 510(k), PMA, and IDE applications. She also has advised clients on FDA labeling requirements, post-approval requirements, complaint handling procedures, medical device reporting requirements, post-market surveillance activities, and product recalls. Dr. Brauer has also served

as either Vice President or acting Vice President for two medical device companies, overseeing regulatory affairs and/or clinical affairs. Dr. Brauer's curriculum vitae is attached as "Attachment A" to her report served in In re: Bard IVC Filters Products Liability Litigation, Case No. 2:15- md-02641-DGC, pending in the United States District Court for the District of Arizona ("the MDL").

Dr. Brauer is expected to testify that Bard was in compliance with FDA rules and regulations governing the submission of 510(k) applications for Bard's IVC filters, including the filter at issue in this case, and that the 510(k) applications submitted by Bard contained the requirements specified in 21 CFR § 807.87 and were consistent with FDA guidance document for IVC filters. Dr. Brauer is also expected to testify that the device labeling for Bard's IVC filters, including the device at issue in this case and including the device labeling submitted in the original 510(k) application for Bard IVC filter in this case, was complete and included the required information, including warnings, consistent with the regulatory requirements at the time of submission. She is expected to testify that the potential for tilting of the IVC filter, perforation of penetration of the IVC, filter fracture, and filter migration were clearly documented in the 510(k) applications.

Dr. Brauer is also expected to testify regarding Bard's clinical study of the G2™ ("G2") Filter System was in compliance with FDA rules and regulations governing the conduct of clinical studies. She is also expected to testify that Bard appropriately conducted investigations to understand the root causes of observed device migrations and limb fractures reported with its IVC filters, including the Recovery® ("Recovery") Filter and the G2 Filter/G2X/G2Express. She is also expected to testify that Bard had an active and open communication with FDA regarding the performance of its IVC filters, including the filter at issue in this case.

Dr. Brauer is also expected to testify concerning the adequacy of Bard's policies and procedures with respect to complaint handling and MDR reporting. She is also expected to testify concerning any 483 Letter or Warning Letter issued by FDA to Bard regarding Bard's IVC filters, as well as previous FDA inspections of Bard's facilities that did not result in a 483 Letter or Warning Letter.

Dr. Brauer is expected to testify that Bard's conduct with respect to the testing, marketing, and labeling of its IVC filters, including the filter at issue in this case, was reasonable and appropriate and in accord with applicable FDA rules and regulations, and Bard was not required to initiate a recall of any of its IVC filters, including the filter at issue in this case, under the applicable federal regulations when it did not. Dr. Brauer is further expected to offer opinions and testify consistent with her expert report(s) served in the Bard IVC filter MDL and consistent with her MDL deposition(s) and trial testimony. The grounds for Dr. Brauer's opinions include her education, training and experience, and her review of the available relevant documents and scientific literature. Dr. Brauer's opinions and testimony will be given to a reasonable degree of scientific and professional certainty based on her education, training, and experience, knowledge and review of documents. Defendants hereby incorporate by reference Dr. Brauer's Expert Reports served in the MDL and all their subparts and attachments thereto, as well as all supplements thereto.

**B.      Paul Briant, Ph.D., P.E.**
**Exponent**
**149 Commonwealth Drive**
**Menlo Park, CA 94025**

Dr. Briant is a mechanical engineer who specializes in mechanical engineering, solid mechanics, and finite element analysis of structures, including medical devices.  Dr. Briant received both his M.S. and Ph.D. in Mechanical Engineering from Stanford University, and his

B.S. in Mechanical Engineering from the Washington University in St. Louis.  Dr. Briant is a registered Professional Mechanical Engineer in the State of California.  Dr. Briant is the Principal Engineer at Exponent Failure Analysis Associates, where he assists companies in assessing the mechanical stresses and strains in their devices, developing and performing mechanical testing to evaluate their devices, and understands how those mechanical loads relate to fatigue and wear performance.  This work is done both when medical device companies are developing products and would like to assess a design, as well as to understand the causes of observed failures.  Such assessments involve analytical calculations, finite element-based stress analyses of in vivo and in vitro loading conditions, as well as laboratory bench testing.  Dr. Briant has published papers, book chapters, and given presentations on stress analysis, fatigue testing and analysis, and wear performance for medical devices.

Dr. Briant is a Finite Element Analysis and Biomechanical Engineering Expert and may offer testimony on mechanical engineering, solid mechanics, and finite element analysis ("FEA"); generally accepted methodology for design and failure testing for assessing mechanical strain or tilt of IVC filters and conclusions that may be reliably drawn from the results of such testing; the relationship between mechanical loads and fatigue and wear performance on IVC filters; and the state of the art methods in mechanical engineering, science, and testing.  Dr. Briant may also testify about the constituents of Bard IVC filters; the adequacy of the design of the Bard IVC filters; the fatigue testing Bard employed during the design process of its IVC filters; and the stress analyses Bard and its vendors performed, including the material constitutive equations used to represent the nitinol material and the loading conditions analyzed.  He may respond to assumptions, opinions, and testimony Plaintiff's engineering expert(s) offer.

Dr. Briant's opinions and testimony will be given to a reasonable degree of scientific certainty based on his education, training, his professional experience as a mechanical engineer; his medical and scientific research; analyses and testing Dr. Briant and others in the field have conducted of Bard IVC filters; the applicable industry standards and guidance documents; relevant medical and scientific literature and other materials he deems necessary.

Dr. Briant's qualifications and opinions and the basis of his opinions are disclosed in his expert reports served in the Bard IVC filter MDL and are also expected to be consistent with his MDL depositions and trial testimony.  Defendants hereby incorporate by reference Dr. Briant's Expert Reports served in the MDL and all their subparts and attachments thereto, as well as all supplements thereto.

   **C.    Audrey Fasching, Ph.D., P.E.**
   **Anamet, Inc.**
   **26102 Eden Landing Road, Suite 3**
   **Hayward, CA 94545**

Dr. Fasching is a metallurgical engineer with more than twenty years' experience in the areas of failure analysis, welding, heat treatment, corrosion and materials selection. She is a Senior Materials Engineer at Anamet. She has conducted research and development studies on nitinol alloys and analyzed manufacturing and processing methods relating to medical devices made from nitinol. She has significant experience with investigation and analysis of nitinol failures.

Dr. Fasching has examined numerous Bard IVC filters, both exemplar filters and filters retrieved from patients, and has conducted microscopic examination on those filters. She is expected to testify about the properties and uses of nitinol in medical devices, industry standards for manufacture of medical grade nitinol, her observations of the surface conditions and fractures in filters she has examined, the likely sources of loading contributing to those fractures or not

contributing to those fractures, and the lack of scientific evidence that filter perforation leads to fracture. Finally, Dr. Fasching may respond to opinions and testimony offered by Plaintiff who provides opinions on filter design, materials, testing, manufacturing, or product failure issues

Dr. Fasching's qualifications and opinions and the basis of her opinions are disclosed in her expert reports served in the Bard IVC filter MDL, and are also expected to be consistent with her MDL depositions/trial testimony. In addition, Dr. Fasching is also expected to offer the opinions disclosed in Supplement 1 to the MDL report. Dr. Fasching's opinions and testimony will be given to a reasonable degree of scientific certainty based on her education, training, experience, and the materials she reviewed. Defendants hereby incorporate by reference Dr. Fasching's Expert Reports served in the MDL and all its subparts and attachments thereto, as well as all supplements thereto.

**D.      David W. Feigal, M.D.
11806 Barranca Road
Santa Rosa Valley, CA  93012**

Dr. Feigal is Board Certified in Internal Medicine and has a Master's Degree in Public Health in the fields of epidemiology and biostatistics. Dr. Feigal graduated from Stanford University Medical School in 1976; completed his internship and residency at the University of California, Davis in 1979; and earned an M.P.H. from the University of California, Berkeley in 1983. From 1992 to 2004, Dr. Feigal held several senior positions at the FDA, including serving as Director of the FDA's Center for Devices and Radiological Health, and was directly involved in evaluating significant new potential safety problems that could result in changes in product labeling, risk management plans or product withdrawal.

Dr. Feigal is an expert in clinical epidemiology and may offer testimony regarding the available resources for analysis of complications rates in IVC filters, including the SIR Guidelines and the limitations of those resources in accurately reporting rates, predicting rates, or comparing

rates of those devices. He may respond to assumptions, opinions, and testimony Plaintiff's various experts offer in relation to such analyses.

Dr. Feigal's opinions and testimony will be given to a reasonable degree of scientific certainty based on his education, training, his experience in the fields of epidemiology and biostatistics; his knowledge and review of the relevant scientific literature; review of deposition transcripts and exhibits thereto and other documents and materials the parties have produced in discovery, discovery responses, relevant medical and scientific literature; and other materials he deems necessary. Dr. Feigal may also review and offer comment or criticism in response to the opinions of other witnesses in this case.

Dr. Feigal's qualifications and opinions and the basis of his opinions are disclosed in his expert report served in the Bard IVC filter MDL and Supplement 1 to the MDL report. He may also provide testimony that was the subject of his previous MDL deposition and/or trial testimony. Defendants hereby incorporate by reference Dr. Feigal's Expert Report served in the MDL and all its subparts and attachments thereto, as well as all supplements thereto.

  **E. Clement J. Grassi, M.D., FSIR**
    **Baptist Hospital**
    **125 Parker Hill Avenue**
    **Roxbury, MA 02120**

Dr. Grassi is a medical doctor and is a Fellow of the Society of Interventional Radiology. He is certified in Radiology by the American Board of Radiology, and he holds a Certificate of Added Qualifications in Vascular and Interventional Radiology. From 1985 to 2001, Dr. Grassi held positions of Clinical Fellow, Instructor, and Assistant Professor of Radiology at Harvard Medical School. Dr. Grassi served as Chair for the Society of Interventional Radiology ("SIR") Standards of Practice Committee from 2005 to 2008 and has been an elected senior member of the SIR under the title of Fellow of the Society of Interventional Radiology since 1998. Dr.

Grassi has authored or co-authored 59 publications, some of which directly address IVC filters, their indications, contraindications, techniques for placement, complications, guidelines for standards of practice, including the first version of the SIR Guidelines, and reporting standards for research reporting. Dr. Grassi received his B.A. cum laude, in Biology from Harvard College in 1976, and his M.D. from Tufts University School of Medicine in 1980.

Dr. Grassi may provide expert testimony regarding the practice of interventional radiology as it relates to IVC filters; historical use, risks, and benefits of IVC filters; the health conditions that IVC filters are used to treat; the placement and retrieval of IVC filter devices; the well-known complications associated with all filter devices including the risk of death, recurrent PE, IVC occlusion, filter embolization, major access site thrombosis, as well as IVC penetration, migration, filter fracture, non-major access site thrombus, and insertion problems such as tilt; medical literature concerning filter embolization, migration, fracture, tilt and perforation, and the conclusions that may be reliably drawn from the results of such studies; the standard of care regarding patient follow-up after filter placement; and his experience with the Society of Interventional Radiology, specifically including the history and use of the Quality Improvement Guidelines and Practice Parameters relating to IVC Filters that the SIR has published. He may also testify about the medical literature related to IVC filters.  Dr. Grassi may also respond to assumptions, opinions, and testimony Plaintiff's various experts offer in relation to the same.

Dr. Grassi's opinions and testimony will be given to a reasonable degree of medical certainty based on his education, training, his experience in the fields of vascular and interventional radiology; his knowledge and review of the relevant scientific literature; review of deposition transcripts and exhibits thereto and other documents and materials the parties have produced in discovery, discovery responses, relevant medical and scientific literature; and other

materials he deems necessary.  Dr. Grassi may also review and offer comment or criticism in response to the opinions of other witnesses in this case.

Dr. Grassi's qualifications and opinions and the basis of his opinions are disclosed in his expert report served in the Bard IVC filter MDL and are also expected to be consistent with his MDL deposition and/or trial testimony.  Defendants hereby incorporate by reference Dr. Grassi's Expert Report served in the MDL and all its subparts and attachments thereto, as well as all supplements thereto.

> **F.  Christopher S. Morris, M.D.**
> **Department of Radiology**
> **The University of Vermont Medical Center**
> **111 Colchester Avenue**
> **Burlington, VT 05401**

Dr. Morris is a board-certified Interventional Radiologist and holds a Certificate of Added Qualifications in Vascular and Interventional Radiology.  He is a Fellow of the Society of Interventional Radiology and a Fellow of the American College of Radiology and is also a diplomat of the American Board of Radiology in Vascular and Interventional Radiology, a subspecialty of Diagnostic Radiology.  Dr. Morris has over 25 years of clinical experience at the University of Vermont Medical Center in placement and retrieval of IVC filters, as well as the care and management of patients with IVC filters.  Dr. Morris received his M.D. from Case Western Reserve University School of Medicine in 1985.  Dr. Morris currently serves as a Professor of Radiology and Surgery at the Robert Larner, MD College of Medicine at the University of Vermont, and serves as Program Director for various radiology departments at the University of Vermont.

Dr. Morris will offer expert testimony regarding the practice of interventional radiology; the historical use, risks, and benefits of IVC filters; the health conditions that IVC filters are used to treat; alternate treatments for DVT and Pulmonary Embolism; standard of care regarding IVC

filter placement, retrieval and follow-up; and the medical literature related to IVC filters.  Dr.

Morris will also testify regarding his personal experience placing and retrieving IVC filters,

including Bard IVC filters, and specifically that Bard retrievable filters are safe and effective.  He

may respond to assumptions, opinions, and testimony Plaintiff's various experts offer as they

relate to the same. Additionally, Dr. Morris may respond to assumptions, opinions, and testimony

Plaintiff's medical expert(s) offer.

Dr. Morris's opinions and testimony will be given to a reasonable degree of medical

certainty based on his education and training; his experience in the fields of vascular and

interventional radiology; his knowledge and review of the relevant scientific literature; review of

deposition transcripts and exhibits thereto and other documents and materials the parties produced

in discovery, discovery responses, relevant medical and scientific literature; and other materials

he deems necessary.  Dr. Morris may also review and offer comment or criticism in response to

the opinions of other witnesses in this case.

Dr. Morris's qualifications and opinions and the basis of his opinions are disclosed in his

expert reports served in the Bard IVC filter MDL and are also expected to be consistent with his

MDL deposition and/or trial testimony.  Defendants hereby incorporate by reference Dr. Morris's

Expert Report served in the MDL and all its subparts and attachments thereto, as well as all

supplements thereto.

**G.    Ronald A. Thisted, Ph.D.**
**Office of the Provost**
**The University of Chicago**
**Levi Hall, Room 432**
**5801 South Ellis Avenue**
**Chicago, Illinois 60637**

Dr. Thisted is a Professor in the Department of Public Health Sciences, the Department

of Statistics, the Department of Anesthesia & Critical Care, the Undergraduate College, and the

Committee on Clinical Pharmacology and Pharmacogenomics at the University of Chicago. From 1999 through 2012, Dr. Thisted was the Chairman of the University of Chicago Department of Public Health Sciences (formerly known as the Department of Health Studies.  Dr. Thisted has published more than 110 original articles in peer reviewed scientific publications, including The New England Journal of Medicine, The Lancet, Circulation, Journal of the American Medical Association, and The Journal of the American Statistical Association.   He has written a book in the field of statistical computation, Elements of Statistical Computing. He has also written over 35 book chapters, comments, reviews and other publications.  Dr. Thisted received both his M.S. and Ph.D. in Statistics from Stanford University, and his B.A., magna cum laude, in Mathematics and Philosophy from Pomona College.

Dr. Thisted is expert in the fields of statistics, biostatistics, mathematics, and epidemiology and may offer testimony describing how risk is assessed in epidemiology and the use of biostatistical methods in assessing risk.  He may respond to assumptions, opinions, and testimony Plaintiff's various experts offer as they relate to the same.

Dr. Thisted's opinions and testimony will be given to a reasonable degree of scientific certainty based on his education and training; his professional experience in the fields of statistics, biostatistics, mathematics, and epidemiology; his knowledge and review of the relevant scientific literature; and analysis and testing Dr. Thisted and others in the field have conducted on IVC filters.

Dr. Thisted's qualifications and opinions and the basis of his opinions are disclosed in his expert report served in the Bard IVC filter MDL, and are also expected to be consistent with his deposition taken in the MDL and/or trial testimony.  Defendants hereby incorporate by reference

Dr. Thisted's Expert Report served in the MDL and all its subparts and attachments thereto, as well as all supplements thereto.

**H.**     **Donna-Bea Tillman, Ph.D., MPA, FRAPS**
               **Biologics Consulting Group**
               **400 N. Washington Street, Suite 100**
               **Alexandria, VA 22314**

Dr. Tillman has worked in the regulation of medical devices for over 26 years, including senior regulatory positions within the U.S. Federal Food and Drug Administration ("FDA"), Office of Device Evaluation, Center for Devices and Radiological Health, industry and as a consultant. Dr. Tillman earned her B.A., summa cum laude, in Engineering from Tulane University and went on to earn her Ph.D. in biometrical engineering from John's Hopkins University, and a Master's degree in Public Administration from the American University. Dr. Tillman was named a Fellow of the Regulatory Affairs Professional Society ("FRAPS") in 2012 in recognition of my significant contributions and leadership in the advancement of the regulatory affairs profession.

Dr. Tillman began her career at the FDA in 1994 in the Office of Device Evaluation Center, Devices and Radiological Health, where she spent the next 17 years. At the FDA, Dr. Tillman gained extensive experience in the scientific and regulatory review, analysis and evaluation of premarket notifications (e.g., 510(k) submissions), Investigational Device Exemption ("IDE") submissions, and Original Premarket Approval ("PMA") submissions, for a broad range of medical devices, including obstetrics and gynecology devices, pacing and neurological devices, and cardiovascular and respiratory devices. In 2001, Dr. Tillman was selected to be the Deputy Division Director for Cardiovascular and Respiratory devices, and for the next two years she oversaw the premarket review program for the respiratory and electrophysiology half of the division. As the Deputy Division Director, she was responsible for

providing final signature authority for all the 510(k) submissions that were submitted to the respiratory and electrophysiology part of the division, as well as responsibility to develop review policy for the 510(k) Program for the entire division.  In 2003, Dr. Tillman was selected to be the Deputy Office Director for the Office of Device Evaluation, and in 2004, she became the Director of the Office of Device Evaluation.  From 2004 to 2010, Dr. Tillman oversaw the entire device premarket review program (with the exception of in vitro diagnostic devices), and among other things, she was responsible for developing and implementing regulatory policies for the premarket review program, including the 510(k) Program.

Since leaving the FDA in 2010, Dr. Tillman has continued to work in regulatory affairs in industry and as a consultant, first joining Microsoft's Health Solutions Group in 2010, where she oversaw the premarket program as well as the post-market safety program, and later joining the Biologics Consulting Group as a Senior Consultant and Device Team Leader where she advises medical device companies about FDA regulatory requirements and assist with the preparation of Quality System documents and premarket submissions, including 510(k) submissions.

Dr. Tillman is a Regulatory Expert and may offer expert testimony concerning FDA regulatory requirements, FDA regulatory compliance, the FDA clearance process, and post-clearance monitoring requirements as they pertain to IVC filters, including but not limited to, medical device classification, premarket approval process, product testing and medical device reporting, device labeling and approved or cleared uses, post-market safety and reporting, and the FDA MAUDE Database.  Dr. Tillman may further testify about the specific steps Bard followed to obtain FDA clearance of its IVC filters; Bard's compliance with FDA post-clearance monitoring requirements, as well as with other governmental and industry standards and

practices; the adequacy of Bard's warnings as described in its IVC filter's Instructions for Use ("IFU"), including the filter at issue in this case, with respect to patients with pulmonary embolism and potential complications, including but not limited to, movement, migration, tilt, perforation, as well as the possible consequences of such complications, including death.  To the extent that evidence related to the FDA Warning and 483 Letters is admitted, Dr. Tillman may testify regarding the same.

Dr. Tillman's opinions and testimony will be given to a reasonable degree of scientific and professional certainty based on her education, training, and experience, knowledge and review of Bard's regulatory submissions for the G2 Filter and other Bard intravascular filters, Instructions for Use, scientific literature, and case-specific materials.  Dr. Tillman may also review and offer comment or criticism in response to the opinions of other witnesses in this case.

Dr. Tillman's qualifications and opinions and the basis of her opinions are disclosed in her expert reports served in the Bard IVC filter MDL, and in her supplemental report. Her opinions are also expected to be consistent with her depositions MDL depositions and/or trial testimony. Defendants hereby incorporate by reference Dr. Tillman's Expert Reports served in the MDL and all its subparts and attachments thereto, as well as all supplements thereto.

\* \* \* \*

Pursuant to Fed. R. Civ. P. 26(a)(2), Bard also hereby supplements its initial disclosures, as permitted under the Rule, by identifying the following non-retained expert witnesses:

## **<u>NON-RETAINED TREATER EXPERT WITNESSES</u>**

The following non-retained experts are or have been treating physicians of Plaintiff. Each physician may testify regarding his or her background, education and training, qualifications, and experience; his or her conversations with Plaintiff; his or her treatment and management of

Plaintiff's condition, including any diagnosis rendered, any analysis of pertinent medical records, medical charts, or other treatment documentation; his or her independent recollection of such treatment as set forth in his or her deposition, to the extent a deposition has been taken; his or her knowledge of and experience with the subject filter and IVC filters; and his or her opinions concerning the cause(s) and/or contributing cause(s) of Plaintiff's health condition(s), the need, if any, for future management of Plaintiff's health condition(s), and the reasonable and necessary medical interventions associated therewith as well as any opinions concerning Plaintiff's prognosis as it relates to the health condition(s) relevant to or associated with the inferior vena cava filter that was implanted in Plaintiff. Each physician may testify live or by deposition and offer testimony and opinions consistent with his or her deposition testimony. To the extent that any such physician has been deposed, Bard objects to each physician testifying beyond his or her deposition testimony.

1) **Ghiath Mikdadi, M.D.**
   **Heart Clinic of Hammond**
   **16033 Doctors' Blvd.**
   **Hammond, LA 70403**

Defendants reserve the right to supplement this designation as additional fact witness depositions are taken and additional records become available.

## NON-RETAINED CORPORATE EXPERT WITNESSES

The following Bard and BPV employees, former employees, or independent contractors may be called to testify to offer opinions, some of which may constitute expert opinions on certain matters within their knowledge, experience, review of literature, and training, and may only be contacted through undersigned counsel for Defendants. They will be called to testify and refute Plaintiff's allegations and the opinions of Plaintiff's experts. This Disclosure does not include a complete or verbatim description of the possible expert testimony of the witnesses identified

therein. Rather, as is required by Fed. R. Civ. P. 26(a)(3)(C), the below and referenced descriptions only constitute a "summary" of the expert opinions the witnesses may offer. Defendants reserve the right to supplement and/or revise its disclosure expert "witnesses who do not provide a written report" (*See* Fed. R. Civ. P. 26(a)(2)(C)) as ordered by the Court, agreed to by the parties, and/or pursuant to the time to disclose expert testimony delineated in Fed. R. Civ. P. 26(a)(2)(D).

**Robert Carr**

Mr. Carr is currently Vice President of International at BPV. Mr. Carr previously held the position of Director of Research and Development with responsibility for IVC filters. Prior to joining BPV in 2002, Mr. Carr was employed by Nitinol Medical Technologies ("NMT"), where he was also responsible for that company's research and development of IVC filters. Mr. Carr may provide testimony regarding biomedical and biomechanical engineering generally, as well as testimony regarding the design, development, manufacture, testing, clearance, evolution, and use of Bard filters, specifically. Mr. Carr may also respond to and rebut claims made by the plaintiff. Mr. Carr may testify live or by deposition consistent with his prior deposition testimony and trial testimony, including in the MDL.

Additionally, Mr. Carr may testify regarding the fact that at the time Bard's IVC filters were developed and first sold, and even today, there was and still is a dearth of scientific information about the internal functioning of the IVC. As a result, Bard engineers had to make novel assumptions regarding the forces caused by both blood flow and clotting in the IVC, in order to test the device's migration resistance, potential for fracture, and other potential complications. Those assumptions were supported by expert clinical advisors, by animal testing, and by applicable scientific literature.

The FDA cleared the Recovery and G2 Filters to enter the market after a rigorous review and analysis of the data, trials, and testing of the products. Such testing included, but was not limited to, abdominal pressure and respiration simulation tests, cyclical arm and diaphragmatic tests, fatigue life simulations, radial strength tests, hook strength tests, weld integrity tests, simulated use testing, and migration resistance testing. The Recovery and G2 Filters passed all such tests. Mr. Carr also may testify about the design features of each of Bard's filters and the evolution of those designs. He may testify about NMT's and Bard's design and product verification and validation processes. He may testify about NMT's and Bard's bench and other testing of its filter products, including without limitation fatigue and migration related testing, the protocols for certain of those tests, the modifications to testing protocols for certain of those tests, and the results of certain of those tests, as well as the clinical trials relating to those filters.

Mr. Carr may also testify regarding the fact that, in the medical literature and medical community, it is understood that, as with all IVC filters, the use of Recovery and G2 Filters carries with it certain risks, including the risk of fracture, migration, perforation, tilt, and embolization, such that each doctor is to weigh the risks and benefits of implanting the device based on each individual patient's medical condition and treatment needs. The reported fracture, migration, perforation, and embolization rates of Bard's commercially-available filters remain below the guidelines established by the Society of Interventional Radiologists and Bard's action limits. Bard was and has been proactive in investigating reports of complications with its filters and analyzing whether the reported rate of complications for its products are in line with industry standards regarding reported rates, which it is and always has been. At all times, Bard has kept the FDA abreast of the information it has about complications and complication reporting rates with the

Recovery and G2 Filters. In fact, the FDA has praised Bard for its openness and transparency in sharing information about its products.

Mr. Carr may also testify regarding the evolution of the Bard filters, including the regulatory history of Bard's filters, rates of reported adverse events of Bard's filters, the fact that Bard is constantly evaluating the medical devices it sells, and it is constantly striving to improve the performance of those devices. As part of that process, Bard developed the G2, G2 Express, G2X, Eclipse™ ("Eclipse"), Meridian™ ("Meridian"), and Denali™ ("Denali") Filters. Mr. Carr may testify that, subsequent to the introduction of the G2 Filter, Bard introduced the G2 Express (aka G2X Filter) and then, the Eclipse, the Meridian,  and, more recently, the Denali Filters.  He will also testify regarding various IVC filter projects that Bard attempted over the years, including those such as the G3 and G2 Platinum.  He will also testify to the various timelines and challenges each filter generation and various projects that were not successful.  He will also testify regarding the challenges and Bard's knowledge relative to working within the IVC.

In addition, Mr. Carr may also testify regarding the consideration Bard gave to the issue that surface conditions may have played a role in filter fractures, including a discussion of testing Bard conducted to attempt to determine whether surface condition played any role in fracture. Such testing included fatigue testing, clinical testing, SEM review, material qualifications, and product verification testing including delivery, radial force, and fatigue testing.

Additionally, Mr. Carr may testify regarding the effect, if any, that in-dwell time may have on the incidence of fracture in filters. Such testimony may include discussion and analysis of medical literature and anecdotal reports on this topic.

Mr. Carr may also testify regarding his experience, analysis, and involvement with the study conducted in 2002 by Dr. Murray Asch. Specifically, Mr. Carr may testify that the Asch

study was approved by Mt. Sinai Hospital and by the Canadian Authority that is equivalent to the FDA, that Dr. Asch conducted his study in accordance with the requirements of his hospital and the Canadian authorities, that he selected the patients to receive Bard Recovery Filters, and that he determined when and which patients in the study would have their filters retrieved. Mr. Carr's testimony may also discuss that Dr. Asch implanted Recovery Filters in 60 patients and experienced one migration (Patient #9) and one fracture (Patient #33) which Bard investigated (with input from Dr. Asch). Mr. Carr may also testify that Bard provided Dr. Asch with all information that he, his hospital, or the Canadian authorities requested relative to these two events, that Dr. Asch was approved to continue the study, and that Dr. Asch reported excellent ease of implantation, lack of complications, and ease and success of retrieval. Mr. Carr may further testify regarding his experience, analysis, and involvement with the EVEREST clinical trial relating to the G2 Filter.

Mr. Carr may further testify about the procedures followed by Bard to inspect and confirm the quality of the various materials (including nitinol wire) used to manufacture the IVC filters. Mr. Carr may also testify regarding Bard's processes for verifying the integrity and design of component parts and products supplied by various other companies, Bard's materials verification processes, the selection and auditing of vendors, routine testing done as part of the manufacturing process, internal and external audits of Bard's plants, and the manufacturing plant's role in product complaint investigation.  Mr. Carr may also testify about Bard's interaction and relationship with certain doctors who have consulted with Bard about IVC filters. He may also testify concerning caudal migration associated with the G2 Filter, including reports that Bard received about caudal migration, investigations that Bard undertook concerning caudal migration, actions taken concerning caudal migration, and communications that Bard made concerning caudal migration.

He may also provide testimony that was the subject of his previous deposition testimony or the subject of declarations/affidavits he has submitted in this action or in the MDL. Mr. Carr's testimony on these matters will be consistent with his opinion that the Bard IVC filters were appropriately designed, evaluated, and tested.

**<u>Andre Chanduszko</u>**

Mr. Chanduszko is an employee of BPV working as a staff engineer with responsibilities related to the design, development, and testing of IVC filters. Prior to coming to BPV in 2004, he worked as a general engineer with NMT where he worked with the Simon Nitinol Filter and on the development and testing of what would become the Recovery filter. Mr. Chanduszko may provide testimony regarding biomedical and biomechanical engineering generally, as well as testimony regarding the design, development, manufacture, testing, clearance, evolution, and use of Bard filters, including rates of reported adverse events of Bard's filters. Mr. Chanduszko may also respond to and rebut claims made by the plaintiff. Mr. Chanduszko may testify live or by deposition consistent with his prior deposition testimony and trial testimony, including in the MDL.

Additionally, Mr. Chanduszko may testify regarding the fact that at the time the Recovery Filter was developed and first sold, and even today, there is a dearth of scientific information about the internal functioning of the IVC. As a result, Bard engineers had to make novel assumptions regarding the forces caused by both blood flow and clotting in the IVC in order to test the device's migration resistance, potential for fracture, and other potential complications. Those assumptions were supported by expert clinical advisors, by animal testing, and by applicable scientific literature. The FDA cleared the Recovery and G2 Filters to enter the market after a rigorous review and analysis of the data, trials, and testing of the products. Such testing included, but was not

limited to, abdominal pressure and respiration simulation tests, cyclical arm and diaphragmatic tests,, simulated use testing,  fatigue life simulations, radial strength tests, hook strength tests, weld integrity tests, and migration resistance tests. The Recovery and G2 Filters passed all such tests.

Mr. Chanduszko may testify regarding the physical and chemical properties of nitinol and the utility and significance of that product in the design of Bard filters. He may testify about the design features of each of Bard's filters and the evolution of those designs. He may testify about NMT's and Bard's design and product verification and validation processes. He may testify about NMT's and Bard's bench and other testing of its filter products, including without limitation fatigue and migration related testing, the protocols for certain of those tests, the modifications to testing protocols for certain of those tests, and the results of certain of those tests.

Mr. Chanduszko may also testify regarding the fact that, in the medical literature and medical community, it is understood that, as with all IVC filters, the use of Recovery and G2 Filters carries with it certain risks, including the risk of fracture, migration, perforation, tilt, and embolization.  He may further testify that the reported fracture, migration, perforation, tilt, and embolization rates of Bard's commercially-available filters remain below the guidelines established by the Society of Interventional Radiologists and Bard's action limits.  Upon receiving reports of fracture and migration, Bard was and has been proactive in investigating those reports and analyzing whether the risk of complications for its products is in line with industry standards, which it is and always has been. At all times, Bard has kept the FDA abreast of the information it has about complications and complication rates with its IVC Filters.

Mr. Chanduszko may testify to Bard's procedures for response to and investigation of complaints relating to its filter products, to tests conducted as a part of such investigations, and to the conclusions drawn from such investigations.

Mr. Chanduszko may also testify regarding the evolution of the Bard filters, including the fact that Bard is constantly evaluating the medical devices it sells, and it is constantly striving to improve the performance of those devices. As part of that process, Bard developed the G2, G2 Express, G2X, Eclipse, Meridian, and Denali Filters. Mr. Chanduszko may also discuss the effect, feasibility, and any risk or benefit to be gained by improvements in subsequent generation filters. In that regard, Mr. Chanduszko may testify that, subsequent to the introduction of the G2 Filter, Bard introduced the G2 Express (aka G2X Filter) and then, more recently, the Meridian, Eclipse and Denali Filters.  He will also testify regarding various IVC filter projects that Bard attempted over the years, including those such as the G3 and G2 Platinum.  He will also testify to the various timelines and challenges each filter generation and various projects that were not successful  He will also testify regarding the challenges and Bard's knowledge relative to working within the IVC.

Mr. Chanduszko may also testify regarding the consideration Bard gave to the issue that surface conditions may have played a role in filter fractures, including a discussion of testing Bard conducted to attempt to determine whether surface condition played any role in fracture. Such testing included fatigue testing, clinical testing, SEM review, material qualifications, and product verification testing including delivery, radial force, and fatigue testing.

Mr. Chanduszko may further testify about the procedures followed by Bard to inspect and confirm the quality of the various materials (including nitinol wire) used to manufacture the IVC filters. Mr. Chanduszko may also testify regarding Bard's processes for verifying the integrity and design of component parts and products supplied by various other companies, Bard's materials verification processes, the selection and auditing of vendors, routine testing done as part of the manufacturing process, internal and external audits of Bard's plants, and the manufacturing plant's

role in product complaint investigation. Mr. Chanduszko's testimony on these matters will be consistent with his opinion that the Bard IVC filters were appropriately designed, evaluated, and tested.

## John DeFord

Dr. DeFord is currently Senior Vice President of Science, Technology and Clinical Affairs of C. R. Bard. Dr. DeFord may testify regarding any and all aspects of the design, development, testing, clearance, evolution, and use of Bard filters, including Bard's policies and procedures for design, testing, and evaluation of IVC filters. Dr. DeFord may also provide testimony that was the subject of his deposition testimony, including his deposition specifically taken for preservation of testimony on August 15, 2019.

## Chad Modra

Mr. Chad Modra was formerly Vice President of Quality Assurance at BPV, and is currently Staff Vice President of Operations at C. R. Bard, Inc. Mr. Modra may testify regarding any and all aspects of Bard's quality assurance processes that are in place or that have been in place for Bard's retrievable IVC filters. Mr. Modra may testify regarding Bard's processes and procedures for addressing complaints, including complaint handling, investigations, and MDR reporting for its IVC filters.  He may also testify to certain communications and inspections/audits with FDA. To the extent that evidence related to the FDA Warning and 483 Letters is admitted, Mr. Modra may offer testimony regarding the same.

Mr. Modra's testimony will be given based on his education, training, and his experience at BPV. Mr. Modra has agreed to testify at trial and will be sufficiently familiar with the case to provide meaningful deposition testimony regarding his opinions and their bases.

**<u>Mike Randall</u>**

Mike Randall is the former Director of Research and Development for BPV. Mr. Randall may testify about BPV's policies and procedures in place for its research and development of its products, including filters. He may testify regarding the testing, development, and design of Bard's IVC filters. He may also testify regarding the evolution of the Bard filters, including the fact that Bard is constantly evaluating the medical devices it sells, and it is constantly striving to improve the performance of those devices. He may also provide testimony that was the subject of his previous deposition testimony and trial testimony, including in the MDL.

Mr. Randall may further testify about the procedures followed by Bard to inspect and confirm the quality of the various materials (including nitinol wire) used to manufacture the IVC filters. He may also testify regarding Bard's processes for verifying the integrity and design of component parts and products supplied by various other companies, Bard's materials verification processes, the selection and auditing of vendors, routine testing done as part of the manufacturing process, internal and external audits of Bard's plants, and the manufacturing plant's role in product complaint investigation.

Additionally, Mr. Randall may testify regarding risks and complications with using IVC filters. Upon receiving reports of complications, Bard was and has been proactive in investigating those reports and analyzing whether the risk of complications for its products is in line with industry standards, which it is and always has been. At all times, Bard has kept the FDA abreast of the information it has about complications and complication rates with its IV filters.  He may also testify concerning caudal migration associated with the G2 Filter, including reports that Bard received about caudal migration, investigations that Bard undertook concerning caudal migration, actions taken concerning caudal migration, and communications that Bard made concerning caudal

migration.  He will also testify regarding various IVC filter projects that Bard attempted over the years, including those such as the G3 and G2 Platinum.  He will also testify to the various timelines and challenges each filter generation and various projects that were not successful.  He will also testify regarding the challenges and Bard's knowledge relative to working within the IVC.

## **RESERVATIONS**

1.      Defendants incorporate by reference any non-retained expert witness disclosure made or that will be made by Plaintiff.

2.      By disclosing any of the foregoing non-expert witnesses, Defendants do not concede that all testimony and opinions offered by the non-retained experts are admissible at trial and specifically reserves the right to object to the admissibility of any portion of their testimony.

3.      Defendants reserve the right to elicit testimony, either through direct examination or cross-examination, of all witnesses designated or identified by Plaintiff or Bard or who have been deposed in this litigation as an expert or person with specialized knowledge, training, or experience pursuant to FRE 702, 703, or 705, including retained or non-retained experts disclosed by Plaintiff.

4.      Defendants further reserve the right, as allowed by Rule 26(e) of the Federal Rules of Civil Procedure, to supplement this Disclosure of Expert Witnesses through the discovery process upon receiving additional discovery including, but not limited to, expert depositions, fact depositions, exhibits introduced in depositions, documents produced, newly identified, collected, and/or produced medical records, explant specimens, histology slides, testing, and any supplemental expert disclosures or reports by any party.

5.      Defendants reserve the right to disclose and call witnesses necessitated by Plaintiff's identification of certain witnesses and proposed evidence.

6.      Defendants reserve the right to disclose and call witnesses necessitated by depositions taken subsequent to the date of this submission including the depositions of Plaintiff's treating physicians, to the extent not yet completed, and Plaintiff's experts, which at this time are not yet complete.

7.      Defendants reserve the right to designate additional expert witnesses, substitute expert witnesses, and/or supplement this Disclosure, including but not limited to if Plaintiff supplement Plaintiff's expert disclosures or offer rebuttal experts.

8.      Defendants reserve the right to strike any and all of the experts of Plaintiff prior to deposition and/or trial.

9.      Defendants reserve the right to withdraw or de-designate any witness herein.

10.     By identifying an area of testimony or issue in this Disclosure or any of the expert reports referenced herein, Defendants do not waive, and expressly reserve, any and all objections to the relevancy and admissibility of evidence or testimony concerning that issue.

Respectfully submitted January 8, 2021

IRWIN FRITCHIE URQUHART
 & MOORE, LLC

*/s/ Kelly Juneau Rookard*
KIM E. MOORE (#18653)
DAVID M. MELANCON (#23216)
KELLY JUNEAU ROOKARD (#30573)
ALISON A. SPINDLER (#34103)
BRIAN G. REANEY, II (#38382)
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Phone (504) 310-2100
Fax (504) 310-2101
kmoore@irwinllc.com
dmelancon@irwinllc.com
kjuneau@irwinllc.com
aspindler@irwinllc.com
breaney@irwinllc.com

-and-

GREENBERG TRAURIG, LLP

Lori G. Cohen (*pro hac vice)*
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
cohenl@gtlaw.com

Sylvia E. Simson (*pro hac vice*)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9275
simsons@gtlaw.com

*Counsel for Defendants, C.R. Bard, Inc. and
Bard Peripheral Vascular, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2021, the foregoing motion was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Plaintiff's counsel by operation of the court's electronic filing system.

<u>*/s/ Kelly Juneau Rookard*</u>