UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CRAIG COUTURIER,

     *Plaintiff*,

v.

BARD PERIPHERAL VASCULAR, INC.,
AND C.R. BARD, INC.,

     *Defendants.*

Case No. 2:19-cv-12497

JUDGE IVAN L.R. LEMELLE

MAGISTRATE JUDGE
DONNA PHILLIPS CURRAULT

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.     Introduction..............................................................................................................3

II.    Factual Summary. ....................................................................................................5

     A.     Plaintiff Suffered Serious Injuries After Receiving a Bard Eclipse Filter..............5

     B.     Defendants Knew the Eclipse Filter Suffered Higher Rates of Dangerous Failures than Other Available Filters...................................................................................6

     C.     Bard Defectively Designed the Eclipse and Failed to Warn Plaintiff's Physician of the True Magnitude of the Risks of Using the Defective Eclipse, Causing Plaintiff's Injuries. ...............................................................................................9

III.    Legal Standard. .....................................................................................................11

IV.    Argument. ..............................................................................................................12

     A.     The Evidence Creates Genuine Issues of Material Fact Regarding Causation......12

     B.     The LPLA Governs Plaintiff's Claims. ...............................................................14

     C.     The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Failure to Warn. .................................................................................15

     D.     The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Design Defect...................................................................................18

          1.     The Record Establishes a Defect and an Alternative Design. ...................18

          2.     Bard Has Not Conclusively Proven its Defense Under Comment k. ........20

     E.     The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Breach of Express Warranty. ...........................................................22

V.    Conclusion. ...........................................................................................................23

This matter is before the Court on Defendants' Motion for Summary Judgment (Rec. Doc. 122) and Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Rec. Doc. 122-2) [hereinafter Defs.' Mem.].  For the reasons set forth below, Defendants are not entitled to summary judgment on Plaintiff's claims cognizable under the Louisiana Products Liability Act: manufacturing defect, design defect, failure to warn, and breach of express warranty.  Plaintiff respectfully requests that the Court deny Defendants' motion with respect to those claims.

## I.    Introduction.

This is a products-liability action in which Plaintiff Craig Couturier seeks to recover damages for personal injuries caused by a Bard Eclipse inferior vena cava (IVC) filter implanted in his body, ostensibly to filter blood clots (thrombi) from his IVC and to thus prevent those clots from traveling from the lower portions of his body to his heart or lungs.  As a result of Defendants' manufacturing defect, design defect, failure to warn, and breach of express warranty, instead of filtering blood clots as intended, Plaintiff's filter tilted, perforated his IVC, fractured, a filter strut embolized to his heart, and another filter strut embolized to pulmonary artery of the right lung.

Mr. Couturier initially advanced the following 13 counts against Defendants:

- Count I:      Strict Products Liability – Manufacturing Defect
- Count II:     Strict Products Liability – Information Defect (Failure to Warn)
- Count III:    Strict Products Liability – Design Defect
- Count IV:     Negligence - Design
- Count V:      Negligence – Manufacture
- Count VII:    Negligence – Failure to Warn
- Count VIII:   Negligent Misrepresentation
- Count IX:     Negligence *Per Se*
- Count X:      Breach of Express Warranty
- Count XI:     Breach of Implied Warranty
- Count XII:    Fraudulent Misrepresentation

- Count XIII:     Fraudulent Concealment
- Count XIV:     Violation of Applicable Louisiana Law Prohibiting Consumer Fraud and Unfair and Deceptive Trade Practices

Am. Master Short Form Compl. for Damages for Individual Claims and Jury Demand ¶ 12 (Rec. Doc. 1) [hereinafter Short Form Compl.]; *see generally* Master Compl. for Damages for Individual Claims (Rec. Doc. 6-9) [hereinafter Master Compl.].  Plaintiff also seeks the imposition of punitive damages.  Short Form Compl. ¶ 12.

Defendants now move for summary judgment on all of Plaintiff's claims, arguing that: (1) Plaintiff cannot establish causation, Defs.' Mem. at 8–10; (2) Plaintiff advances theories of recovery impermissible under the Louisiana Products Liability Act (LPLA), *id.* at 12–13; (3) Plaintiff has no evidence to support his failure-to-warn claim, *id.* at 14–16; (4) Plaintiff has no evidence to support his manufacturing-defect claim, *id.* at 16–17; (5) Plaintiff has no evidence to support his design-defect claim, because Plaintiff cannot establish the existence of a defect or an alternative, and because Plaintiff's design-defect claim is barred under Restatement (Second) of Torts § 402A, Comment k, *id.* at 17–23; and (6) Plaintiff has no evidence to support his breach-of-express-warranty claim, *id.* at 23–24.

First, Plaintiff has offered ample expert testimony sufficient to establish causation. Second, Plaintiff withdraws any of his claims that are not cognizable under the LPLA, rendering Defendants' motion moot on this point.  Third, as already recognized by several other federal courts, the evidence amply demonstrates that Bard failed to adequately warn physicians and patients—including Plaintiff and his physician—of the risks of Bard's Eclipse filter.  Fourth, Plaintiff withdraws his claims based on manufacturing defect, rendering Defendants' motion moot on this point.  Fifth, Plaintiff has offered ample expert testimony to support the existence of a design defect, including the existence of a safer alternative design, and Defendants have failed

to offer sufficient evidence to conclusively establish that its Eclipse filter was "unavoidably unsafe" as required for the application of Comment k.  Finally, Plaintiff has adduced ample evidence of Defendants' breach of express warranty.  Defendants' motion should therefore be denied in its entirety.

## II.     Factual Summary.

### A.     Plaintiff Suffered Serious Injuries After Receiving a Bard Eclipse Filter.

Plaintiff Craig Couturier received an implanted Eclipse Filter in May 2011 after he diagnosed with a pulmonary embolism and gastrointestinal bleeding.  Pl.'s Statement of Material Facts in Opposition to Defs.' Mot. Summ. J. ¶ 1 [hereinafter Pl.'s SOF].  In October 2016, broken strut from the filter was found in Plaintiff's heart.  *Id.* ¶ 2.  In November 2016, another broken strut from the filter was found in Plaintiff's lung.  *Id.* ¶ 3.  As of December 2019, Plaintiff's filter has perforated his IVC in eight places, interacting with adjacent structures and organs.  *Id.* ¶ 4.

Plaintiff's fractured and perforating filter is symptomatic, causing him to suffer shortness of breath, irregular heartbeat, and hip pain.  *Id.* ¶ 5.  Plaintiff suffers serious and continued threats to his life posed by the Eclipse filter.  *Id.* ¶ 6.  Specifically, he is at risk of further penetration of adjacent organs such as the spine, duodenum, and aorta, which could result in symptomatic or life-threatening hemorrhage, infection, bowel perforation, bowel obstruction, leg pain, or back pain; at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body; and at risk of further penetration leading to pericardial tamponade, arrythmia and infection, which could be life threatening complications.  *Id.*  As a result, Plaintiff also suffers from anxiety that the filter fragment could, at any moment, lead to his death.  *Id.* ¶ 7.

**B.    Defendants Knew the Eclipse Filter Suffered Higher Rates of Dangerous Failures than Other Available Filters.**

The Bard IVC Filter litigation involves multiple versions of Bard's retrievable IVC filters—the Recovery, G2, G2X, Eclipse, Meridian, and Denali—that are intended to catch blood clots before they travel to the heart and lungs. *Id.* ¶ 8.  Each of these filters is a variation of its predecessor, *id.*, and each was marketed under a 510(k) clearance from the FDA, based on Bard's position (and FDA's determination) that each filter was "substantially equivalent" to a predicate device in Bard's IVC filter product line, starting with the Simon Nitinol Filter ("SNF"). *Id.* ¶ 9.  Bard's SNF had a well-established safety record and had been sold for years for permanent implantation only.  *Id.* ¶ 10.

To increase its share of the IVC Filter market, Bard developed and marketed the first retrievable IVC Filter—one that could be removed after a period of use, in addition to being implanted permanently—and called its new product the "Recovery" filter.  Unlike the Simon Nitinol filter, however, Bard's retrievable filter line—including the Eclipse filter at issue here—had a significant track record of adverse events involving "fracture" (breaking into pieces), "migration" (moving from where the physician implanted it), and "perforation" (puncturing the wall of the IVC).

Before Plaintiff received his filter, Bard knew of the following facts relating to its IVC Filters, including the Eclipse and its predicate devices (the Recovery, G2, and G2X):

- In Bard's sole clinical study for the Recovery filter, the filter in one of the 32 study patients fractured twice. After the fractures were reported, the Canadian Institutional Review Board suspended the study. Additional adverse events in this study included two tilted filters, one migration, and one perforation of the IVC.  *Id.* ¶ 11.

- Bard's 510(k) applications for the Recovery did not disclose that filters at the low end of the leg span specification only met the migration resistance test when the hooks were engaged, but that those hooks were not always engaged.  The failure of Recovery anchor hooks to engage was a marked difference from the SNF.  *Id.* ¶¶ 12–13.

---

- Comparative bench testing for migration resistance conducted in March 2004 demonstrated that the Recovery filter: (a) performed worse than the SNF at every caval diameter; (b) performed worse than almost all competitor devices at every caval diameter; and (c) failed Bard's own performance threshold for resistance at 28 mm. *Id.* ¶ 14.

- Two months after full market release of the Recovery, Bard's national sales training manager stated: "Tilt resistance should probably be downplayed." Its marketing director acknowledged: "We knew very little about the long-term clinical performance of this device when we launched it. After a year of commercialization, there are still many questions that need to be answered." *Id.* ¶ 15.

- In the first 12 months after full market release there were seven deaths resulting from migration of the Recovery filter to patients' hearts. *Id.* ¶ 16.

- By April 2004, Bard knew that the Recovery filter was designed in a way that did not account for how the IVC actually behaved. *Id.* ¶ 17.

- In the midst of the migration deaths from the Recovery filter, Bard initiated a Crisis Communication Plan which included a messaging instruction that "[c]omparison with other filters is problematic in many ways and we should avoid/downplay this as much as possible. When pressed, we simply paraphrase … that estimates based on the available data suggest that there is no significant difference in the rates of these complications between any of the devices currently marketed in the U.S., including the Recovery device." *Id.* ¶ 18.

- By May 2004, Bard determined that, based on complications, "[a]t a 95% confidence, there IS a significant difference between Recovery, Gunther Tulip, Bird's Nest and SNF." *Id.* ¶ 19.

- By July 9, 2004, Bard determined that the Recovery had a fracture rate that was tens of times higher than other filters on the market. *Id.* ¶ 20.

- By September 2, 2004, Bard knew of 32 Recovery filter fractures. Of those 32, nine fragments had traveled to the heart or lungs of patients, including three open heart surgeries to retrieve fragments. *Id.* ¶ 21.

- By December 2004, Bard determined that the Recovery filter had rates of complications as compared to all other filters, including the SNF, as follows: for deaths, 4.6 times higher; for migrations, 4.4 times higher; for IVC perforations, 4.1 times higher; and for fractures, 5.3 higher times higher.  Bard concluded that "[t]hese differences were all statistically significant." *Id.* ¶ 22.

- In January 2005, Bard's internal analysis revealed that "the data and [a consultant's] analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted." *Id.* ¶ 23.

---

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**        Page 7 of 25

- According to Bard's current Quality Engineering Manager for New Product Development, Natalie Wong, the Recovery was worse than the SNF with regard to filter-related deaths and filter fracture. *Id.* ¶ 24.

- On August 3, 2005, Bard's VP of Regulatory/Science reported the following comparison of the Recovery versus the SNF: 4500% greater rate of Recovery migrations; 16 deaths involving Recovery versus zero for SNF; and Recovery deaths consisted of 11 from migrations of the device to the heart and five from pulmonary emboli the Recovery was intended to prevent.  Bard also reported there were 68 Recovery fractures: 25 with metal struts embolizing to the heart or lungs and 4 requiring surgery to remove.  *Id.* ¶ 25.

- Despite advertising the G2 filter as being 12 times more resistant to fracture, Bard did not run a test for fracture resistance because it concluded that the resulting data "would still fall outside of the acceptable range" and it "didn't think the answer would support our design change."  *Id.* ¶ 26.

- Bard knew that comparatively, the SNF was a significantly safer device than the G2 filter. In December 2005, Dr. Ciavarella, Bard's Corporate Clinical Affairs Director, noted the complications with the G2 filter and stated: "The G2 is a permanent filter; we also have one (the SNF) that has virtually no complaints associated with it. 'Why shouldn't doctors be using that one rather than the G2?'" *Id.* ¶ 27.

- In December 2005, internal Bard reports determined that the "reported rate of fractures [was] judged to be serious (Critical R002 rating)." *Id.* ¶ 28.

- By February 2006, Bard determined the G2 filter was migrating caudally and a "high percentage of caudal migrations accompanied by significant filter tilting and limb displacement." Bard concluded the severity of these occurrences was "critical." *Id.* ¶ 29.

- By March 2, 2006, Bard determined the G2 filter propensity for caudal migration—the type of migration experienced by Plaintiff—represented an "unacceptable risk" of serious injury and death.  Nonetheless, Bard took no "preventative action" to warn physicians or patients about the "unacceptable risk." *Id.* ¶¶ 30–31.

- In March 2006, internal emails at Bard described "a terrible situation [with Bard's IVC filters] that was held together with scotch tape, smoke, mirrors, crying, etc." *Id.* ¶ 32.

- In August 2006, the medical monitor for Bard's clinical retrievability study for the G2 filter expressed significant concern regarding the rate of tilt in the study and suggested Bard consider redesigning the filter at that point. *Id.* ¶ 33.

- By June 2008, Bard had identified the need to make material improvements to the G2 filter to reduce migration, tilt, fracture, and perforation. *Id.* ¶ 34.

- By November 2008, Bard was aware that the G2 filter had significantly higher rates of caudal migration, tilt, and perforation than even the Recovery. *Id.* ¶ 35.

- As of August 2010, Bard had documented 172 fractures in G2, G2X, and Eclipse filters. Of those, 60 percent were discovered at retrieval – meaning most fractures continued not to be discovered without doctor invention. Bard also knew that both the number of fractures and rate of fractures had increased since the full market release of the G2. *Id.* ¶ 36.

- Bard knew that fracture, tilt, and perforation were caused by migration, including caudal migration—one of the product failures experienced by Plaintiff. *Id.* ¶ 37

- Bard knew the G2 and G2X filters had increased rates of caudal migration as compared to the Recovery. *Id.* ¶ 38.

- Bard was aware that the physician perception was that "design sacrifices" were made for its optional filters that led to higher rate of movement or migration, which Bard knew led to an increased risk of fracture. *Id.* ¶ 39.

- Bard's internal analysis demonstrated that the Recovery filter fractured 55 times more often than the SNF, that the G2 fractured more than 12 times as often as the SNF, and that the G2X fractured 10 times as often as the SNF, and the Eclipse, even after limited sales, fractured nearly 4 times as often as the SNF. *Id.* ¶ 40.

Even after Plaintiff's filter was implanted in May 2011, Bard continued to accumulate evidence of the Eclipse's defects—yet failed to alert patients such as Plaintiff that even though Bard had promoted the Eclipse as a "permanent" filter that could be "optionally" retrieved, the filter in fact could not be safely left in place. Bard's retrospective analysis of its filter fractures groups the G2, G2X, and Eclipse together, showing that the number of fractures and the cumulative fracture rate increased consistently over time. Thus, consistent with the later medical literature, Bard knew that its filters fractured at an increasing rate the longer they stayed in the body. *Id.* ¶ 41–42.

    **C.**    **Bard Defectively Designed the Eclipse and Failed to Warn Plaintiff's Physician of the True Magnitude of the Risks of Using the Defective Eclipse, Causing Plaintiff's Injuries.**

The Eclipse filter is essentially the same filter as Bard's G2X IVC filter. As Bard explained in its own 510(k) application summary, the only material difference between the G2X and the Eclipse "was an improvement of the surface finish of the filter raw material wire by

---

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**       Page 9 of 25

electropolishing the wire prior to forming the filter." *Id.* ¶ 43.  Bard electropolished the Eclipse filter, which made no changes to the filter's performance or complications, in order to make a name change to "break with the baggage associated with the previous versions despite the fact that the new iteration was the same as G2X in every way but one [electropolishing]." *Id.* ¶ 44.

The ostensible goal of this design change was to improve the fracture or corrosion resistance of the filter. *Id.* ¶ 45.  However, there was no evidence the change improved fracture resistance or corrosion resistance. *Id.* ¶ 46.  As Plaintiff's engineering expert Dr. McMeeking explains, the electropolishing did not improve the fatigue life of the Eclipse, and "[b]ecause no other attributes of the filter were changed when the G2 Express was redesigned as the Eclipse, design deficiencies represented by tilt, perforation and migration were left unaffected. Therefore, such design deficiencies of the Eclipse will be just as bad as those seen in the G2 family." *Id.* ¶ 47.  Those deficiencies include the propensity for the Eclipse to tilt, perforate, migrate, and fracture at higher rates than other IVC filters on the market the time (as explained by Plaintiff's epidemiological expert Rebecca A. Betensky, Ph.D.), which were the result of defects (as explained by Dr. McMeeking), which caused Plaintiff's injuries (as explained by Plaintiff's physician experts Drs. Hurst and Muehrcke).  *See generally* Ex. 1. Hurst Report; Ex. 2, Muehrcke Report; Ex. 10, McMeeking Report I, at 13–15; *see also* Ex. 11, McMeeking Report II, at 14–16; Ex. 57, Expert Report of Robert M. McMeeking, Ph.D., May 11, 2017, at 16 [hereinafter McMeeking Report III]; *See* Ex. 54, Expert Report of Rebecca Betensky, Ph.D., Jan. 27, 2017; Ex. 55, Expert Report of Rebecca Betensky, Ph.D., Mar. 3, 2017; Ex. 56, Expert Report of Rebecca Betensky, Ph.D., May 12, 2017.

Furthermore, Bard never warned patients or physicians that its filters, including the Eclipse, had a greater risk of complications and failures than its competitors' devices and the

SNF, and never advised patients like Plaintiff—who lived with Bard's "permanent" filter for years before discovering its failure in 2016—that there was any timeline by which they ought to have their filters removed, as explained by Plaintiff's expert in in vascular and interventional radiology Darren Hurst, M.D. *See generally* Ex. 1, Hurst Report. Bard's Instructions for Use ("IFU") for the Eclipse do not include warnings that Bard's filters migrated, fractured, tilted, and perforated patients' IVCs at rates significantly higher than competitor IVC filters and Bard's SNF, nor do they disclose that the filters caused an unreasonable risk of serious injury and death, as Bard had determined. Pl.'s SOF ¶ 56. Bard's failure to warn physicians, including Plaintiff's implanting physician, of important safety risks and issues associated with the Eclipse filter that a reasonable physician and patient would want to consider in deciding whether to use the G2X caused Plaintiff's injuries as explained by Plaintiff's physician experts Drs. Hurst and Muehrcke. *See generally* Ex. 1. Hurst Report; Ex. 2, Muehrcke Report.

## III.    Legal Standard.

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). As such, the court should view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixon Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).

When the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323. However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Should the movant meet its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith*

---

*Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538
(1986); *Lindsey*, 16 F.3d at 618. However, "a party cannot defeat summary
judgment with conclusory allegations, unsubstantiated assertions, or only a
scintilla of evidence." *See Sec. & Exch. Comm'n v. Arcturus Corp.*, 912 F.3d 786,
792 (5th Cir. 2019).

*Reyes v. Dow Chem. Co.*, No. 19-13734, 2021 U.S. Dist. LEXIS 78249, at *4–5 (E.D. La. Apr.

23, 2021) (Lemille, J.).

## IV.    Argument.

### A.    The Evidence Creates Genuine Issues of Material Fact Regarding Causation.

Defendants first argue that "Plaintiff cannot survive summary judgment because neither

Dr. Hurst nor Dr. Muehrcke can connect an alleged defect, negligence, or conduct by Bard to

Plaintiff's injuries." Defs.' Mem. at 9.  With respect to Dr. Hurst, Defendants claim that he

"does not . . . point to any defective condition in Plaintiff's Filter led to the significant tilt,

penetration, migration or fracture." *Id.*  With respect to Dr. Muehrcke, Defendants claim that he

"does not opine a specific design defect existed, let alone was the proximate cause of Plaintiff's

injuries." *Id.* at 10.  Neither claim is true.

It is true that an expert may rely on facts and opinions not otherwise
admissible if they are information of a type reasonably relied on by experts in that
particular field. Fed. R. Evid. 703. That may include reliance on the opinions of
other experts so long as it does not involve the wholesale adoption of another
expert's opinions without attempting to assess the validity of the opinions relied
on.

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 16-2740, 2021 U.S. Dist. LEXIS 18375, at

*14 n.30 (E.D. La. Feb. 1, 2021) (quoting M*ooring Capital Fund, LLC v. Phoenix Cent., Inc.*,

No. 06-cv-0006, 2009 U.S. Dist. LEXIS 117799, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12,

2009)).  Here, Drs. Hurst and Muehrcke did just that: they relied on and adopted the opinions of

Dr. McMeeking previously disclosed by Plaintiffs in *In Re Bard IVC Filters Products Liability*

*Litigation*, USDC for the District of Arizona, Case No. MD-15-02641-DGC.  Pl.'s SOF ¶¶ 48–49.

As discussed more fully *infra* Part IV.D., Dr. McMeeking explains how product failures in the Eclipse filter—tilt, migration, fracture, and perforation—are the result of defects in the design of the filter.  Drs. Hurst and Muehrcke then expanded on that underlying opinion by giving their own opinions that those defects caused Plaintiff's injuries.  Based on differential diagnoses, their experience, and their review of Plaintiff's medical records and imaging, Bard's internal documents, MDL expert reports, relevant medical literature, and various depositions, including those of Plaintiff and his physicians, Drs. Hurst and Muehrcke offered their own admissible, well-supported opinions that the defects generally identified by Dr. McMeeking specifically caused Plaintiff's filter to fracture with struts embolizing to his heart and lung, tilt, and perforate his IVC in eight places.  Pl.'s SOF ¶¶ 2–4.

Plaintiff's injuries were also manifestations of the risks that were known to Bard prior to the implantation of the Eclipse filter into Plaintiff (as shown *supra* Part II.B.) and were not adequately disclosed in Bard's warnings to physicians and patients, as supported by Dr. Hurst's testimony regarding the expectations of reasonable physicians and the information necessary to provide informed consent, Pl.'s SOF ¶ 57.

Furthermore, in their supporting memorandum, Defendants misconstrue several portions of Dr. Hurst's and Dr. Muehrcke's opinion testimony that warrant rebuttal.  Defendants contend that "Dr. Hurst opined Dr. Mena failed to properly position the Filter during the implant procedure."  Defs.' Mem. at 10.  On the contrary, Dr. Hurst opined that "Dr. Mena implanted the device appropriately."  Pl.'s SOF ¶ 50.  Defendants also claim that "Dr. Hurst also could not

point to a defect in the warning." Defs.' Mem. at 10. On the contrary, Dr. Hurst opined at length

about defects in the warning:

> 1. The IFU describes a myriad of possible risks following IVC filter placement, without providing clear information on the likelihood of those risks or the potential severity of new complications such as, for example, tilt, IVC penetration, adjacent organ penetration, or fragment embolization to the heart and lungs.
>
> 2. The IFU provides no clear recommendations for imaging follow-up of the device.
>
> 3. The IFU provides insufficient warning of the incidence and seriousness of the cascade of events of tilt, migration, fracture, and especially fractured component embolization to the heart and lungs that was characteristic of these devices and occurred with a higher frequency and more serious complications than the prior permanent SNF device and other filters available at the time.
>
> 4. Despite knowing that the Bard Eclipse retrievable filters were not designed or tested for permanent use, the IFU provides no timeline for removal of the device, claiming that the device is safe and appropriate for both temporary and permanent use.

Pl.'s SOF ¶ 56. Finally, Defendants argue that neither expert is "able to point to anything more

than speculative future injuries for Plaintiff." Defs.' Mem. at 11. However, the record shows

that Plaintiff is currently suffering from shortness of breath, irregular heartbeat, hip pain, and

anxiety—none of which are speculative. Pl.'s SOF ¶¶ 5, 7

In short, the jury may properly conclude on this record, after considering the testimony of

both experts and the evidence of Bard's knowledge about the Eclipse filter, that the defects in the

Eclipse's design, and Bard's failure to warn caused and/or substantially contributed to Plaintiff's

injuries.

**B.      The LPLA Governs Plaintiff's Claims.**

In a Louisiana products-liability action, the exclusive theories of liability permitted under

the Louisiana Products Liability Act (LPLA) are manufacturing defect, design defect, failure to

warn, and breach of express warranty.  La. Rev. Stat. § 9:2800.54(B).  Plaintiff therefore

withdraws any of his claims that are not cognizable under the LPLA.  Plaintiff also withdraws

his manufacturing-defect claims.

Plaintiff therefore advances the following five counts under three theories of recovery

cognizable under the LPLA:

- Design defect
  - Count III:  Strict Products Liability – Design Defect
  - Count IV:  Negligence – Design)

- Failure to Warn
  - Count II:   Strict Products Liability – Information Defect (Failure to Warn)
  - Count VII: Negligence – Failure to Warn)
  - 
- Breach of Express Warranty
  - Count X:    Breach of Express Warranty

Plaintiff respectfully submits that Defendants' motion is therefore moot with respect to:

- Count I:          Strict Products Liability – Manufacturing Defect
- Count V:         Negligence – Manufacture
- Count VIII:      Negligent Misrepresentation
- Count IX:        Negligence *Per Se*
- Count XI:        Breach of Implied Warranty
- Count XII:       Fraudulent Misrepresentation
- Count XIII:      Fraudulent Concealment
- Count XIV:      Violation of Applicable Louisiana Law Prohibiting Consumer Fraud and Unfair and Deceptive Trade Practices
- Claim for Punitive Damages

### C.   The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Failure to Warn.

Defendants next argue that Plaintiff cannot sustain his failure to warn claim.  Defs.' Mem

at 14–16.  On the contrary, the record firmly establishes both that Defendants' warnings were

inadequate, and that Defendants' failure to warn proximately caused Plaintiff's injuries.

Firstly, Defendants' warnings about the risks associated with the Eclipse filter were legally insufficient.  At the time of implant, Dr. Mena expected that the Eclipse filter had a similar risk profile as other filters on the market at the time; that the Eclipse did not have greater risk of fracture than other filters; and that the Eclipse did not have a greater risk of fracture over time when placed as a permanent filter. Pl.'s SOF ¶ 53.  Dr. Mena expected that Defendants would have fully informed him, and wanted Defendants to fully inform him, of the risk profile of the Eclipse filter, including whether it had higher rates of fracture than other filters on the market at the time.  *Id.* ¶ 54.  Indeed, Bard's VP of Quality Assurance, Regulatory Affairs, and Medical Affairs agreed that Bard should have communicated to physicians and patients statistically significant findings that Bard's IVC filters had greater risks, complications, and malfunctions than the SNF and competitor filters.  P's SOF ¶ 55.  Natalie Wong, Bard's Quality Engineering Manager, also agreed.  *Id.*  Similarly, John McDermott, BPV's President from 1999 through 2008, testified that physicians would want to know this information and that it is important to their decision making.  *Id.*

As documented extensively in the summary judgment record and described in *supra* Part II.B., Bard had ample knowledge that its retrievable IVC filter line, up to and including the Eclipse filter, had non-obvious risks of injury that were not disclosed in Bard's warnings, namely that the Eclipse filter had significantly higher rates of fracture, migration, and perforation than Bard's SNF as well as competitor filters.  Regardless, Bard failed to provide this known information, concealing it from physicians and patients who needed it to make reasonable risk/benefit decisions.  By omitting and concealing information about the Eclipse's relatively high failure rates, Defendants did not fully inform Dr. Mena of the risk profile of the Eclipse filter or of the need to promptly remove the filter after placement.  *Id.* ¶ 56.

Several courts presented with a similar record have already rejected Bard's argument that Bard's warnings were legally sufficient because they merely warned of the possibility, without more detail as to likelihood, that a user might experience complications.  *See, e.g.*, *Booker v. C.R. Bard, Inc.*, 969 F.3d 1067, 1076–77 (9th Cir. 2020) (upholding denial of summary judgment for Bard on failure to warn claim involving G2 filter under Georgia law); *Keen v. C.R. Bard, Inc.,* No. 13-cv-5361, 2020 U.S. Dist. LEXIS 149880, at *34 (E.D. Pa. Aug. 17, 2020) (denying summary judgment in G2X filter case under Pennsylvania law); *Hyde v. C. R. Bard, Inc. (In re Bard IVC Filters Prods. Liab. Litig.)*, No. 15-md-2641-PHX-DGC, 2018 U.S. Dist. LEXIS 124995, at *411 (D. Ariz. July 26, 2018) (denying summary judgment in G2X filter case under Wisconsin law); *Jones v. C.R. Bard, Inc. (In re Bard IVC Filters Prods. Liab. Litig.)*, No. 15-md-2641-PHX-DGC, 2018 U.S. Dist. LEXIS 40020, at *335 (D. Ariz. Mar. 12, 2018) (denying summary judgment in Eclipse filter case under Georgia law); *Cason v. C.R. Bard, Inc.,* No. 12-1288, 2015 U.S. Dist. LEXIS 58918, 2015 WL 9913809, at *3–5 (N.D. Ga. Feb. 9, 2015) (denying summary judgment in G2 filter case under Georgia law); *Phillips v. C.R. Bard, Inc.,* No. 3:12-cv-344-RCJ-WGC, 2014 U.S. Dist. LEXIS 174506, at *24 (D. Nev. Dec. 16, 2014) (denying summary judgment in Recovery filter case under Nevada law).  *C.f. Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338 (M.D. Fla. 2015) (granting summary judgment on failure to warn claim under Florida law, where record contained no admissible expert testimony that warnings supplied with G2 filter were inadequate); *Ocasio v. C.R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 U.S. Dist. LEXIS 71742, at *14 (M.D. Fla. June 3, 2015) (same).

Secondly, Defendants' failure to warn proximately caused Plaintiff's injuries.  Dr. Mena's custom and practice is to read the IFU for any new medical device he implants.  *Id.* ¶ 51. Dr. Mena acted in conformity with that custom and practice by reading the IFU for the Eclipse

filter prior to the first time he implanted it. *Id.* ¶ 52. Because Dr. Mena was not fully informed of the risk profile of the Eclipse filter by Defendants, he was unable to communicate to Plaintiff the true risk of using the filter or the need to promptly remove the filter after implantation, and he was thus unable to obtain Plaintiff's informed consent to implantation. *Id.* ¶ 57. Because Dr. Mena was not fully informed of the risk profile of the Eclipse filter, he was unable to conduct an adequate risk-benefit analysis when deciding to use the filter. *Id.* ¶ 58. Had Dr. Mena known about the Eclipse's relatively high failure rates or increasing risk of fracture the longer it remained implanted, he would have informed Plaintiff of those risks and/or not used the filter. *Id.* ¶ 59. Had Dr. Mena informed Plaintiff's wife (who consented to the filter placement on his behalf) of the true risk profile of the filter, she might have changed her mind about whether to consent to the implantation. *Id.* ¶ 60.

Because there is a genuine dispute as to the material fact of whether Defendants' warnings were adequate and whether adequate warning would have affected Dr. Mena's decision to use the Eclipse, summary judgment should not be granted on Plaintiff's claims for failure to warn.

### D.   The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Design Defect.

#### 1.   The Record Establishes a Defect and an Alternative Design.

Defendants next argue that "Plaintiff has not alleged or identified any specific allegations as to how the Filter was defectively designed, nor do his case-specific experts identify or opine on any particular design defect in the Eclipse™ filter." Defs.' Mem. at 18. On the contrary, Plaintiff has, through Dr. McMeeking, put forth ample evidence of the defective design of Eclipse from an engineering standpoint. When designing the Eclipse filter, Defendants decided to electropolish the filter legs, ostensibly to improve fracture resistance. Pl.'s SOF ¶ 43–45.

However, there is no evidence that this change improved fracture resistance.  *Id.* ¶ 46.  As Dr.

McMeeking explains, the electropolishing did not improve the fatigue life of the Eclipse, and

"[b]ecause no other attributes of the filter were changed when the G2 Express was redesigned as

the Eclipse, design deficiencies represented by tilt, perforation and migration were left

unaffected. Therefore, such design deficiencies of the Eclipse will be just as bad as those seen in

the G2 family." *Id.* ¶ 47.  Furthermore, according to Dr. McMeeking, Bard, when designing the

Eclipse,

> fail[ed] to adhere to professional and industry standards in the engineering
> activities involved in the conceptualization, design and analysis of the filter.  For
> example, the attempts to identify all possible failure modes of the Eclipse filter
> were inadequate, and the Eclipse was not thoroughly tested prior to being
> marketed. In addition, the fact that the Eclipse filter was placed on the market
> despite knowledge by Bard and its employees of the many failures experienced by
> essentially identical filters is contrary to engineering professional, industry and
> government standards, which require design modifications to eliminate potential
> causes of failures when failure modes are discovered. In addition, it is clear that
> Bard did not use design and analysis methods that conformed to the state of the
> art in its industry at the time the Eclipse filter was designed.

*Id.* ¶ 61.  Dr. Muehrcke, in appropriate reliance on Dr. McMeeking's engineering expertise, then

opined that "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter

outweighed any benefits at the time it was implanted in Mr. Couturier," which ultimately caused

the filter to injury Plaintiff by "caudally tilting, perforating the IVC, fracturing, and embolizing a

fragment to the heart in a dangerous fashion," which  "placed the health and safety of Mr.

Couturier at unnecessary risk with no meaningful medical benefit."  In short, "[t]he Eclipse filter

does not perform, and in Mr. Couturier's situation, did not perform as a reasonable physician and

patient would expect." *Id.* ¶ 62.

Defendants next argue that Plaintiff has not produced adequate evidence of a safer

alternative design.  On the contrary, Plaintiff's experts have identified the Simon Nitinol filter as

a safer alternative permanent filter, and the Gunther Tulip filter as a safer alternative retrievable filter. *Id.* ¶¶ 63–64. As Dr. McMeeking reports: "[T]he design of the SNF is substantially better than those of the Recovery, G2 and similar Bard filters [including the Eclipse], with respect to migration, tilt, arm fracture and arm perforation, after considering the combination of attributes that are positive or negative in each case for each filter design"; "the SNF is a safer filter than the Recovery, G2 and similar Bard filters [including the Eclipse]." *Id.* ¶ 65.[1]

Because there is a genuine question as to the material facts of whether the Eclipse was defectively designed and whether a safer alternative design was available summary judgment on Plaintiff's claims for design defect is not appropriate.

### 2.    Bard Has Not Conclusively Proven its Defense Under Comment k.

Bard next argues that "Plaintiff's strict liability design defect claim is also barred by comment k to § 402A of the Restatement (Second) of Torts" because the Eclipse, though unavoidably unsafe, "was justified because the societal benefits of the device . . . exceeded its inherent risks given the scientific knowledge available at the time the Eclipse™ filter was marketed." Defs.' Mem. at 21–22. However, Bard has failed to offer sufficient evidence to conclusively establish that its G2 IVC filter was "unavoidably unsafe" as required for the application of "comment k."

To obtain summary judgment, the burden is on Defendant to prove that the Eclipse filter was incapable of being made safer as a matter of law. To prove this, Bard must show the design of the Eclipse was as safe as the best available testing and research permitted, and there was no

---

[1] In their memorandum, Defendants also rehash many of the same arguments already advanced in their motions to exclude the opinions of Drs. Hurst and Muehrcke. *See, e.g.*, Defs.' Mem. at 18 ("Plaintiff's purported evidence on alternative design is unreliable and otherwise incompetent."). In response, Plaintiff respectfully refers the Court to his arguments made in his oppositions to those motions.

feasible alternative design which accomplished the product's purpose with a lesser risk.  *See, e.g.*, *Toner v. Lederle Labs., a Div. of Am. Cyanamid Co.*, 732 P.2d 297, 305–06 (Idaho 1987); *accord, e.g., Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 732–33 (Fla. Dist. Ct. App. 1991) ("Thus, a product which is as safe as current testing and research permits should be protected. The reverse is also true; a product which is not as safe as current technology can make it should not be protected."); *West v. Searle & Co.*, 806 S.W.2d 608, 612 (Ark. 1991) (comment k only applies when there is no feasible design that accomplishes the product's purpose with lesser risk); *Bryant v. Hoffmann-La Roche, Inc.*, 262 Ga. App. 401, 404, 585 S.E.2d 723, 727 (2003) (same); *Pollard v. Ashby*, 793 S.W.2d 394, 400 (Mo. Ct. App. 1990) (same).[2]

Bard has failed to demonstrate the Eclipse is unavoidably unsafe as a matter of law. Moreover, it cannot possibly do so because there exist alternative designs for IVC filters, including the predicate to Bard's retrievable filter line—Bard's Simon Nitinol Filter (SNF).  *See, e.g.*, *Miller v. Stryker Instr.*, 2012 WL 1718825 (D. Ariz. Mar. 29, 2012) (holding comment k did not apply when the FDA found that the device was substantially similar to a predicate device); *Larsen v. Pacesetter Sys., Inc.*, 74 Haw. 1, 24–25, 837 P.2d 1273, 1286 (1992) (holding comment k did not apply to a pacemaker because "there were many different types of pacemakers available on the market, all of which were designed to perform the same function" as defendant's product).  As discussed *supra* Part IV.D., there were other safer alternative filters available at the time of Plaintiff's implant, including filters manufactured by Bard, that had lower risks of fracture, migration, perforation and death.  Thus, Bard cannot be immune from strict liability under Comment k because the Eclipse was *avoidably* unsafe.

---

[2] This standard also aligns with current secondary sources on the topic. *See, e.g.*, Am. L. Prof. Liab. 3d, § 17:34; 1 Frumer & Friedman, Products Liability § 8.07 (Matthew Bender, Rev. Ed.).

**E.**     **The Evidence Creates Genuine Issues of Material Fact Regarding Whether Bard Is Liable for Breach of Express Warranty.**

Defendants next argue that "[t]his case is devoid of any evidence to support an express warranty claim." Defs.' Mem. at 23. On the contrary, the record supports the existence of such a warranty on which Plaintiff relied. Plaintiff's has pled that "Bard expressly represented and warranted that Bard IVC Filters were safe; that they were well-tolerated, efficacious, fit for their intended purpose, and of marketable quality; that they did not produce any unwarned-of dangerous side effects; and that they was adequately tested," and that Bard breached that warranty in that Bard's filters, inter alia,  "[w]ere designed in such a manner so as to be prone to an unreasonably high incidence of fracture, perforation of vessels and organs, and/or migration," "[w]ere designed in such a manner so as to result in a unreasonably high incidence of injury to the vessels and organs of its purchaser," and "[w]ere not self-centering." Master Compl. ¶¶ 238, 239(a)–(b), (g). The facts bear this out.

The Eclipse IFU represents that the Eclipse "is designed to act as a permanent filter" and that "[t]he centering system allows the Eclipse Filter to be deployed with the retrieval hook centered and minimizes the potential for legs crossing." Pl.'s SOF ¶ 66. In response to Plaintiff's Requests for Admissions, Defendants have also admitted that they marketed the Eclipse for permanent placement. *Id.* ¶ 67.[3] Dr. Mena read the Eclipse IFU, which informed his consent discussion with Plaintiff's wife; he was able to communicate that the filter was able to be placed permanently, but was unable to communicate the true risks of such permanent placement.

---

[3] In their marketing materials to patients, Defendants also claimed that "[t]he Eclipse Vena Cava Filter is designed to be a permanent implant and does not have to be removed, repositioned, or replaced," and listed risks associated with implantable filters but failed to explain the relatively higher risks associated with the Eclipse as opposed to other filters on the market. Pll.'s SOF ¶¶ 68–69.

---

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**

*Id.* ¶¶ 56–58. Plaintiff, through his wife, relied on the representations made to Dr. Mena by Defendants through the IFU when she consented to placement of the filter at Dr. Mena's recommendation. *Id.* ¶ 70. Contrary to Defendants' representations, in Plaintiff's case, the Eclipse has not functioned as a permanent filter; instead, it has, as plaintiff pled in the Master Complaint, been prone to an unreasonably high incidence of fracture and perforation of vessels and organs and an unreasonably high incidence of injury to the vessels and organs of its purchaser. *Id.* ¶ 71; *see also id* ¶¶ 2–7.

Because there is a genuine dispute as to the material facts of whether Defendants made an express warranty on which Plaintiff relied, Defendants are not entitled to summary judgment on Plaintiff's express-warranty claim.

## V.    Conclusion.

For all the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment with respect to his claims that are cognizable under the LPLA.


Dated:  June 3, 2021                                Respectfully Submitted,

                                                    */s/ Ben C. Martin*
                                                    Ben C. Martin (*pro hac vice*)
                                                        bmartin@martinbaughman.com
                                                    Cameron Earl Dean (*pro hac vice*)
                                                        cdean@martinbaughman.com
                                                    **MARTIN BAUGHMAN, PLLC**
                                                    3141 Hood Street, Suite 600
                                                    Dallas, TX 75219
                                                    Phone: 214-761-6614
                                                    Fax: 214-744-7590

                                                    - and –

Joseph R. Joy III (*pro hac vice*)
   buzzyjoy@josephjoy.com
**JOSEPH JOY & ASSOCIATES**
P. O. Box 4929
900 South College Road
Suite 204
Lafayette, LA 70502
Phone: 337-232-8123
Fax: 337-235-5629

**Counsel for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing is being filed using the Court's CM/ECF system this 3rdd day of June 2021, which will automatically serve a copy to all known counsel of record via electronic mail.

*/s/ Ben C. Martin*
Ben C. Martin
