**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CRAIG COUTURIER,**

     *Plaintiff*,

v.

**BARD PERIPHERAL VASCULAR, INC.,**
**AND C.R. BARD, INC.,**

     *Defendants.*

**Case No. 2:19-cv-12497**

**JUDGE IVAN L.R. LEMELLE**

**MAGISTRATE JUDGE**
**DONNA PHILLIPS CURRAULT**

**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AND**
**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

     In accordance with LR 56.2, Plaintiff hereby controverts Defendants' statement of

material facts (Rec. Doc. 122-3) and includes a separate and concise statement of the material

facts which the Plaintiff contends present a genuine issue.

**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

***Plaintiff's Life-Threatening Condition Required an Inferior Vena Cava Filter Implant***

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**

1.      Plaintiff presented to the emergency room on May 6, 2011 with complaints of "headaches, nausea and vomiting" after having had headaches for a month, as well as "dark tarry stools" and "coffee-ground emesis." Ex. A, COUTURIERC_NOMC_MDR00677-00679; *see also* Ex. B, Deposition of Craig Couturier dated August 17, 2020 ("Couturier Dep. Tr."), at 149:2-12, 149:23-150:21; 150:25-151:17 (describing aforementioned symptoms).

**RESPONSE:  Uncontroverted.**

2.      On May 6, 2011, following a diagnosis of mastoiditis, labyrinthitis, and probable meningitis, Plaintiff received a tympanomastoidectomy, labyrinthectomy, and abdominal fat graft with obliteration of middle ear and mastoid as treatment; his post-operative diagnoses continued to be mastoiditis, labyrinthitis, and meningitis. Ex. C, COUTURIERC_NOMC_MDR00743-00744; *see also* Ex. B (Couturier Dep. Tr.) at 149:13-22; 162:6-163:4 (confirming diagnosis and describing procedure performed by Dr. Gerard Gianoli). An esophagogastroduodenoscopy of the plaintiff then "showed an upper gastrointestinal bleed from a Mallory-Weis tear." Ex. D, COUTURIERC_NOMC_MDR00684-685; *see also* Ex. B, Couturier Dep. Tr. at 152:11-152:22

(confirming gastrointestinal bleed diagnosis); Ex. E, Deposition of Dr. Jose Mena dated November

3, 2020 ("Mena Dep. Tr.") at 58:22-59:10 (confirming that before he had a filter implanted,

Plaintiff had, among other things, a "gastrointestinal bleed from a Mallory-Weiss tear in his

esophagus," "was bleeding and required multiple transfusions," and "was anemic"); Ex. D,

COUTURIER_NOMC_MDR00684-85 (Dr. Jose Mena's May 7, 2011 consultation with Plaintiff

noting "[u]pper gastrointestinal bleeding secondary to Mallory-Weiss tear and gastric ulcerations,"

among other things,  in the "Impression" section of his notes).

**RESPONSE:  Uncontroverted.**


3.      "[A] CT angiogram of the lungs performed on May 7, 2011 showed pulmonary

emboli in [Plaintiff's] left lower lobe." Ex. D, COUTURIER_NOMC_MDR00684-85; *see also*

Ex. E, Mena Dep. Tr. at 58:22-59:10 (confirming that Plaintiff had a "pulmonary embolus" before

he received an inferior vena cava filter).

**RESPONSE:  Uncontroverted.**


4.      Dr. Jose Mena conducted a consultation with respect to Plaintiff and the potential

implant of an inferior vena cava filter on May 7, 2011; his contemporaneous office notes indicate

the following:

> The patient has a pulmonary embolism postoperative day 1 after the
> labyrinthectomy, mastoidectomy and abdominal fat graft. He has also developed
> upper gastrointestinal bleeding secondary to a Mallory-Weiss tear and gastric
> ulcerations. The patient cannot be anticoagulated. He is already anemic and has
> had to be transfused.  Anticoagulating the patient will only exacerbate this and puts
> the patient at high risk for severe bleeding. The patient needs to be protected from
> further pulmonary emboli.  Duplex scan did not show any evidence of deep venous
> thrombosis, but this does not mean that he did not have one.  It is quite possible that
> the deep venous thrombosis is no longer there because it embolized. Should he
> develop another one, he would be at significant risk.

Ex. D, COUTURIER_NOMC_MDR00684-85.  It is on this basis that he concluded that "the safest course of action is to place an inferior vena cava filter at this time."  *Id.*

       **RESPONSE:  While Plaintiff does not controvert that Dr. Mena's notes are accurately quoted above, Plaintiff controverts any legal conclusion that placing a Bard Eclipse IVC filter was the safest course of action.  According to Plaintiff's expert Darren R. Hurst, MD, "[t]he risks associated with the Eclipse filter exceeded any benefit to the plaintiff.  A demonstrable benefit (i.e., reduced death) has not been established (via Bard's data, the medical literature, or otherwise) from the Eclipse filter or IVC filters generally or when prophylactically used in patients."  Ex. 1, Expert Report of Darren R. Hurst, MD, Nov. 30, 2020, at ¶ 4(b)(xi) [hereinafter Hurst Report].  According to Plaintiff's expert Derek Muehrcke, MD, "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier" and "[t]here is a lack of evidence to show the Bard filters or any IVC filters protect lives even in patients who have a contraindication to anticoagulation."  Ex. 2, Expert Report of Derek Muehrcke, MD, Nov. 1, 2020, at 10, 17 [hereinafter Muehrcke Report] (internal citation omitted).**

       5.     Dr. Jose Mena testified the following with respect to Plaintiff's indication for an inferior vena cava filter:

> The indication for an inferior vena cava filter in this gentleman was that he had had a pulmonary embolus. The most common place that it would be coming from is from the lower extremities. The patient had a Mallory-Weiss tear and gastric ulcers and had bleeding -- gastrointestinal bleeding from these problems that caused him to be anemic and required blood transfusion. And if we anticoagulated the patient, the risk of bleeding would be significant and was therefore contraindicated. And

> therefore, to protect him from further pulmonary embolus, I decided that the best course of action was to place an inferior vena cava filter.

Ex. E, Mena Dep. Tr. at 105:21-106:8; *see also id.* at 58:9-59:23 (describing Plaintiff's candidacy for an inferior vena cava filter because he had a "contraindication to anticoagulation," *i.e.*, he could not be on blood thinners given his "very high risk of continued bleeding," and had already had a pulmonary embolism, with a filter being placed to "prevent another embolus") and 111:11-15 (confirming that Plaintiff's "condition for proceeding with the [filter implant] procedure was pulmonary embolism and the contraindication to anticoagulants").

**RESPONSE: While Plaintiff does not controvert that Dr. Mena so testified, according to Dr. Hurst, "[t]he risks associated with the Eclipse filter exceeded any benefit to the plaintiff. A demonstrable benefit (i.e., reduced death) has not been established (via Bard's data, the medical literature, or otherwise) from the Eclipse filter or IVC filters generally or when prophylactically used in patients." Ex. 1, Hurst Report, ¶ 4(b)(xi). According to Dr. Muehrcke, "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier" and "[t]here is a lack of evidence to show the Bard filters or any IVC filters protect lives even in patients who have a contraindication to anticoagulation." Ex. 2, Muehrcke Report, at 10, 17 (internal citation omitted).**

6.      Dr. Mena further testified that he thought Plaintiff needed to be protected from further pulmonary emobli because "anytime you have a pulmonary embolus, you can have significant problems that can even be death"—so he wanted to "prevent another pulmonary embolus from occurring . . . and putting the patient in danger." Ex. E, Mena Dep. Tr. at 95:2-96:10; *see also id.* at 96:11-17 (explaining "it's a risk and can be fatal").

---

**RESPONSE:  While Plaintiff does not controvert that Dr. Mena so testified, according to Dr. Hurst, "[t]he risks associated with the Eclipse filter exceeded any benefit to the plaintiff.  A demonstrable benefit (i.e., reduced death) has not been established (via Bard's data, the medical literature, or otherwise) from the Eclipse filter or IVC filters generally or when prophylactically used in patients."  Ex. 1, Hurst Report, ¶ 4(b)(xi). According to Dr. Muehrcke, "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier" and "[t]here is a lack of evidence to show the Bard filters or any IVC filters protect lives even in patients who have a contraindication to anticoagulation."  Ex. 2, Muehrcke Report, at 10, 17 (internal citation omitted).**

## *A Risk-Benefit Determination Was Had and Informed Consent Given Prior to Filter Placement and Other Related Facts*

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**

7.      Dr. Mena confirmed that he performed a risk-benefit analysis in determining whether an inferior vena cava filter implant was appropriate for Plaintiff, as is his typical practice, and that he determined a filter was the "best option available" for Plaintiff. Ex. E, Mena Dep. Tr. at 96:18-97:25.

**RESPONSE:  While Plaintiff does not controvert that Dr. Mena so testified, according to Dr. Hurst, "[t]he risks associated with the Eclipse filter exceeded any benefit**

---

to the plaintiff.  A demonstrable benefit (i.e., reduced death) has not been established (via Bard's data, the medical literature, or otherwise) from the Eclipse filter or IVC filters generally or when prophylactically used in patients."  Ex. 1, Hurst Report, ¶ 4(b)(xi). According to Dr. Muehrcke, "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier" and "[t]here is a lack of evidence to show the Bard filters or any IVC filters protect lives even in patients who have a contraindication to anticoagulation."  Ex. 2, Muehrcke Report, at 10, 17 (internal citation omitted).

8.   Dr. Mena reported in his contemporaneous consultation notes dated May 7, 2011 that the "[r]isks and benefits were explained to the patient and his family," and "[t]hey voiced understanding and wished to proceed." Ex. D, COUTURIER_NOMC_MDR00684-85. Dr. Mena confirmed the contents of his contemporaneous notes at his deposition. Ex. E, Mena Dep. Tr. at 98:1-18 (testifying that, with respect to a risk-benefit discussion with Plaintiff, "if I put that in my consultation, then that's what I did"). Dr. Mena also testified that it is his custom and practice to explain risks. *Id*. at 99:3-20.

**RESPONSE:  By omitting and concealing information about the Eclipse's relatively high failure rates, Defendants did not fully inform Dr. Mena of the risk profile of the Eclipse filter.  As Dr. Mena testified:**

> **Q. . . . [D]o you see anywhere in that section of warnings [in the IFU] where Bard tells you that the use of the Eclipse filter carries with it a greater risk of fracture than other filters?  Is that in that section?**
> **A.  No.**

**Ex. 3, Deposition of Jose Mena, MD, Nov. 3, 2020, at 238:8–12 [hereinafter Mena Dep. Tr.]. Because Dr. Mena was not fully informed of the risk profile of the Eclipse filter, he was**

---

unable to conduct an adequate risk-benefit analysis when deciding to use the filter or to fully inform Plaintiff or his family of the full risks presented by the Eclipse.  As Dr. Hurst opined: "The Bard Eclipse IFU was inadequate for use by physicians in medical decision making . . . ."  Ex. 1, Hurst Report, at ¶ 4(b)(vi).

Dr. Hurst identified several ways in which the IFU failed to provide Dr. Mena the information he needed to fully analyze the risks and benefits of the Eclipse filter:

> 1. The IFU describes a myriad of possible risks following IVC filter placement, without providing clear information on the likelihood of those risks or the potential severity of new complications such as, for example, tilt, IVC penetration, adjacent organ penetration, or fragment embolization to the heart and lungs.
>
> 2. The IFU provides no clear recommendations for imaging follow-up of the device.
>
> 3. The IFU provides insufficient warning of the incidence and seriousness of the cascade of events of tilt, migration, fracture, and especially fractured component embolization to the heart and lungs that was characteristic of these devices and occurred with a higher frequency and more serious complications than the prior permanent SNF device and other filters available at the time.
>
> 4. Despite knowing that the Bard Eclipse retrievable filters were not designed or tested for permanent use, the IFU provides no timeline for removal of the device, claiming that the device is safe and appropriate for both temporary and permanent use.

Ex. 1, Hurst Report, at ¶ 4(b)(vi).  Dr. Muehrcke similarly opined:

> [A] prudent manufacturer would warn implanting physicians about its filters' performance. . . . Bard kept to itself information about the higher complication rates of its Recovery and G2 platform filters [including the Eclipse] as compared to other filters.  Further Bard did not instruct physicians to remove the filters after they were no longer needed to reduce the risk to patients in the case of retrievable filters. Nor did it tell implanting physicians to follow patients for complications Bard was aware were occurring given their internal documents. Bard failed to provide implanting physicians' information they needed to be as an informed intermediary. . . . Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates associated with the

> **Recovery and G2 filters [including the Eclipse] in comparison to the original predicate device, the Simon Nitinol Filter, and competitor filters. . . . *Bard had the opportunity to warn physicians about the higher risk of their filters in their IFU but chose not to*.**

**Ex. 2, Meuhrcke Report, at 14–16 (emphasis added).**

9.      Plaintiff, through his wife, provided all appropriate consent to the implant of an inferior vena cava filter following a discussion with Dr. Mena about the procedure. *See* Ex. F, COUTURIERC_NOMC_MDR00705-00708 (North Oaks Health System Patient Consent to Medical Treatment or Surgical Procedure and Acknowledgement of Receipt of Medical Information, completed for Plaintiff); Ex. B, Couturier Dep. Tr. at 173:16-178:20 (testifying that his wife signed the consent forms on his behalf, confirming his wife's signature on those forms, and agreeing he had no reason to dispute that Dr. Mena engaged in a discussion regarding the implant procedure before consent was given); Ex. E, Mena Dep. Tr. at 111:20-113:8 (testifying that the consent form was completed after a discussion with Plaintiff and that if Plaintiff's wife signed on his behalf, she would have had full authority to do so); Ex. G, Deposition of Melissa Couturier dated September 2, 2020 ("Spouse Dep. Tr.") at 84:16-86:6 (testifying she signed a consent form on her husband's behalf for Dr. Mena and authenticating her signature on that consent form); 89:11-90:19 (testifying that she understood she was providing informed consent on her husband's behalf by signing the consent form and did so after having a discussion with Dr. Mena).

**RESPONSE:  Plaintiff and/or his wife were unable to provide all appropriate consent because "[t]he Bard Eclipse IFU was inadequate for use by physicians in medical decision making and consent of the patient," Ex. 1, Hurst Report, at ¶ 4(b)(vi); because the consent form used by Dr. Mena did not specify risks about the Bard Eclipse filter, but rather only advised of risks of receiving an IVC filter in general, Ex. 3, Mena Dep. Tr., at**

218:8–218:16; because the consent form used by Dr. Mena did not meet the standard of care, Ex. 4, Deposition of Derek Muehrcke, MD, Jan. 23, 2021, at 53:16–20 [hereinafter Muehrcke Dep. Tr.] (disagreeing with the statement that "the preoperative planning informed consent obtained from Mr. Couturier prior to the implant were within the standard of care," and further opining that "I don't think Dr. Mena was properly aware of all the complications of the filter"); and because the decision to consent was "done immediately," without adequate time to consider the decision to consent to the placement of the filter, Ex. 5, Deposition of Melissa Couturier, Sept. 2, 2020, at 210:4–7 [hereinafter Couturier Melissa Dep. Tr.].

10.     The consent form signed by Plaintiff's wife on Plaintiff's behalf included various risks associated with inferior vena cava implant procedures, including "heart problems" and "displacement of device requiring retrieval."  Ex. F, COUTURIERC_NOMC_MDR00705-00708; *see also* Ex. G, Spouse Dep. Tr. at 99:18-23 (testifying risks of the inferior vena cava procedure were included on the consent form). Mrs. Couturier further testified she had no reason to doubt that risks were part of the "informed consent process" for the implant procedure performed by Dr. Mena.  *Id.* at 96:18-97:4.

RESPONSE:  The consent form signed by Plaintiff's wife did not warn of all known complications of the Eclipse and did warn that those complications occur at much higher incidence with the Eclipse than with other devices.  Ex. 4, Muehrcke Dep. Tr., at 53:16–20 (disagreeing with the statement that "the preoperative planning informed consent obtained from Mr. Couturier prior to the implant were within the standard of care," and further

opining that "I don't think Dr. Mena was properly aware of all the complications of the filter").

11.    Mrs. Couturier testified that the Eclipse™ filter was implanted in her husband under "emergent conditions" and that Plaintiff's condition could be "life-threatening if he didn't get the treatment."  Ex. G, Spouse Dep. Tr. at 209:11-210:2.

**RESPONSE:  Plaintiff does not controvert that Mrs. Couturier so testified but denies that that the Bard Eclipse filter actually prevents pulmonary emboli or could have saved Mr. Couturier's life.  According to Dr. Hurst, "[t]he risks associated with the Eclipse filter exceeded any benefit to the plaintiff.  A demonstrable benefit (i.e., reduced death) has not been established (via Bard's data, the medical literature, or otherwise) from the Eclipse filter or IVC filters generally or when prophylactically used in patients." Ex. 1, Hurst Report, at ¶ 4(b)(xi). Dr. Muehrcke opined that "[t]he Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier" and "[t]here is a lack of evidence to show the Bard filters or any IVC filters protect lives even in patients who have a contraindication to anticoagulation." Ex. 2, Muehrcke Report, at 10, 17 (internal citation omitted).**

12.    On May 7, 2011, following the above-referenced consultation and execution of the appropriate consent forms, Dr. Jose Mena implanted an Eclipse™ inferior vena cava filter in the Plaintiff. Ex. H, COUTURIERC_NOMC_MDR00711-12 (procedure/operative report prepared by Dr. Jose Mena); Ex. E, Mena Dep. Tr. at 8:16-21 (confirming he treated Plaintiff with an Eclipse™ inferior vena cava filter on May 7, 2011).

**RESPONSE:  Uncontroverted.**

13.     Dr. Mena is a board-certified vascular and cardiothoracic surgeon who practices at Ochsner Health Center and, at the time of implanting the Eclipse in Plaintiff, had experience implanting inferior vena cava filters, including the Eclipse™, dating back to 2005. Ex. E, Mena Dep. Tr. at 49:18-50:8, 53:21-54:10, 55:14-22.

**RESPONSE:  Uncontroverted.**

14.     Dr. Mena testified that he implanted the Bard Eclipse™ inferior vena cava filter in Plaintiff "because that's what was available at the hospital."  Ex. E, Mena Dep. Tr. at 75:19-76:20.

**RESPONSE:  Had Dr. Mena been adequately warned about the risk profile of the Eclipse, he would not have implanted it and would have demanded a safer filter from the hospital.  Ex. 3, Mena Dep. Tr., at 228:16–25, 230:5–7, 236:6–12.**

15.     Since the Eclipse™ filter was implanted, Plaintiff has not been diagnosed with any blood clot, blood condition, or blockage in any of the arteries in the lungs. Ex. B, Couturier Dep. Tr. at 187:11-23; Ex. G, Spouse Dep. Tr. at 211:6-12.

**RESPONSE:  Uncontroverted.**

16.     Prior to the implant, Plaintiff never had any "direct contact or communications with anyone at Bard."  Ex. B, Couturier Dep. Tr. at 221:17-20.

**RESPONSE:  Uncontroverted.**

17.     Prior to implant, Plaintiff never reviewed Bard's website or patient brochures. *Id.* at 221:21-222:1.

**RESPONSE:  Uncontroverted.**


18.     Prior to implant, Plaintiff never "talk[ed] with any Bard sales representatives." *Id.* at 222:2-5.

**RESPONSE:  Uncontroverted.**


### The Instructions For Use For The Eclipse™ Inferior Vena Cava Filter Provided Explicit Warnings and Instructions

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**


19.     Dr. Mena acknowledged in his deposition that medical device manufacturers provide an Instructions for Use document (an "IFU") with the device which comes in the same box as the device.  Ex. E, Mena Dep. Tr. at 74:23-75:3.

**RESPONSE:  Uncontroverted.**


20.     Bard's Eclipse™ Filter is a venous interruption device "designed to prevent pulmonary embolism" and is "designated to act as a permanent filter," but "[w]hen clinically indicated, . . . may be percutaneously removed after implantation according to the instructions

provided under the Optional Removal Procedure" section of the IFU. Ex. I, February 2010 Eclipse™ (Femoral) Filter Instructions for Use (the "Eclipse™ IFU") at 1.

**RESPONSE:  Plaintiff does not controvert that Defendants have accurately quoted from the Eclipse IFU but denies that the Bard Eclipse filter is actually safe or effective at preventing pulmonary emboli.** *See* **Ex. 1, Hurst Report, ¶ 4(b)(xi); Ex. 2, Muehrcke Report, at 10, 17.**

21.     Eclipse™ IFU expressly states in bold the following after the Device Description:

**IMPORTANT:  Read instructions carefully before using the Eclipse™ Filter.**

Ex. I, Eclipse™ IFU, at 1 (bold in original).

**RESPONSE:  Uncontroverted.**

22.     The Eclipse™ IFU includes several indications for use "in the prevention of recurrent pulmonary embolism," including where there is "pulmonary thromboembolism where anticoagulants are contraindicated," "[e]mergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced," and "[c]hronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated." Ex. I, Eclipse™ IFU, at 1 (Section C).

**RESPONSE:  Plaintiff does not controvert that Defendants have accurately quoted from the Eclipse IFU but denies that the Bard Eclipse filter is actually safe or effective at preventing pulmonary emboli.** *See* **Ex. 1, Hurst Report, ¶ 4(b)(xi); Ex. 2, Muehrcke Report, at 10, 17.**

23.    The Eclipse™ IFU expressly states in bold the following in the Contraindications

for Use section:

**WARNING: If the vena cava diameter is greater than 28 mm, do not deploy
the Eclipse™ Filter.**

I, Eclipse™ IFU, at 1 (Section D) (bold in original). It then warns not to implant this filter in

"[p]atients with an IVC diameter larger than 28 mm." *Id.* These warnings are reiterated in Section

I (Directions for Use) of the IFU. *Id.* at 3.

**RESPONSE:  Uncontroverted.**


24.    The Eclipse™ IFU expressly states in bold the following, among other things, in

the Warnings section:

- **#4: "Do not deploy the filter unless IVC has been properly measured."**

- **#9: "When injecting contrast medium through the dilator, do not exceed the
  maximum pressure rating of 800 psi."**

- **#11: "Filter fractures are a known complication of vena cava filters.There
  have been some reports of serious pulmonary and cardiac complications with
  vena cava filters requiring the retrieval of the fragment utilizing
  endovascular and/or surgical techniques."**

- **#12: "Movement, migration or tilt of the filter are known complications of
  vena cava filters. Migration of filters to the heartor lungs has been reported.
  There have also been reports of caudalmigration of the filter. Migration may
  be caused by placement in IVCs with diameters exceeding the appropriate
  labeled dimensionsspecified in this IFU. Migration may also be caused by
  improper deployment, deployment into clots and/or dislodgement due to large
  clot burdnens."**

Ex. I, Eclipse™ IFU, at 2 (Section E) (bold in original). Warnings 11 and 12 are reiterated in the

Potential Complications section of the Eclipse™ IFU. *Id.* at 3; *see also infra* ¶ 24. Warning 8 is

reiterated in Section I (Directions for Use). *Id.*

**RESPONSE:  Plaintiff does not controvert that Defendants have accurately quoted from the Eclipse IFU.  However, the IFU offers only a brief description of "known complication[s]" found in IVC filters generally, while completely excluding any information relating to complications or rates of reported complications specific to the Eclipse filter or even to Bard's line of retrievable filters.**

25.     The Eclipse™ IFU further states in multiple places that the "retrieval hook" should be positioned "1 cm below the lowest renal vein," including in Section F (Precautions). Ex. I, Eclipse™ IFU, at 1, 2, 3 (Sections A, F, and I).

**RESPONSE:  Uncontroverted.**

26.     The Eclipse™ IFU makes clear to the implanter in the Precautions section that "[i]f misplacement, sub-optimal placement, or tilting of the filter occurs, consider immediate removal." Ex. I, Eclipse™ IFU, at 2 (Section F).

**RESPONSE:  Uncontroverted.**

27.     The Eclipse™ IFU states, again in bold, the following after the Precautions section:

**Standards and guidelines developed by the Society of Interventional Radiologists recommend that patients with filters (either permanent or retrievable) be tracked and receive "routine follow-up" subsequent to the placement of the device.**

Ex. I, Eclipse™ IFU, at 2 (Section F).

**RESPONSE:  Uncontroverted.**

28.   The "Potential Complications" section of the Eclipse™ IFU states that "[p]ossible complications include, but are not limited to, the following," and then includes, among other things:

- "Movement, migration or tilt of the filter are known complications of vena cava filters. Migration of filters to the heart or lungs has been reported. There have also been reports of caudal migration ofthe filter. Migration may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified inthis IFU. Migration may also be caused by improper deployment, deployment into clots and/or dislodgement due to large clot burdens";

- "Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardiac complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques";

- "Perforation or other acute or chronic damage of the IVC wall";

- "Distal Embolization"; and

- "Organ injury"

Ex. I, Eclipse™ IFU, at 3 (Section G). The "Potential Complications" section of the IFU ends as follows:

> **All of the above complications may be associated with serious adverse events such as medical intervention and/or death. There have been reports of complications including death, associated with the use of vena cava filters in morbidly obese patients. The risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ratio for a patient who is at risk of pulmonary embolism without intervention.**

*Id*. (bold in original; the Eclipse™ IFU also placed this warning in a larger font).

**RESPONSE:  Plaintiff does not controvert that Defendants have accurately quoted from the Eclipse IFU.  However, the IFU offers only a brief description of "known complication[s]" found in IVC filters generally, while completely excluding any information relating to complications or rates of reported complications specific to the Eclipse filter or even to Bard's line of retrievable filters.**

29.     The Eclipse™ IFU then states "[t]he risk/benefit ratio of any of these complications should be weighed against the inherent risk/benefit ratio for a patient who is at risk of pulmonary embolism without intervention." Ex. I, Eclipse™ IFU, at 3 (Section G).

**RESPONSE:  Plaintiff does not controvert that Defendants have accurately quoted from the Eclipse IFU.  However, the IFU offers only a brief description of "known complication[s]" found in IVC filters generally, while completely excluding any information relating to complications or rates of reported complications specific to the Eclipse filter or even to Bard's line of retrievable filters.**

*<u>Dr. Mena Does Not Remember Reading the Eclipse™ Instructions for Use Before Performing Plaintiff's Implant Procedure on May 7, 2011 and Relied on His Independent Knowledge of The Risks Associated With All Filters</u>*

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**

30.     Dr. Mena testified at his deposition that he could not remember whether he read the Eclipse™ IFU prior to implanting the filter in Plaintiff.  Ex. E, Mena Dep. Tr. at 67:6-67:10; 70:14-22; 74:9-12.

**RESPONSE:  Dr. Mena testified that he "probably did" read the Eclipse™ IFU prior to implanting the filter in Plaintiff.  Ex. 3, Mena Dep Tr., at 68:7-11.**

---

31.     Dr. Mena testified that although he generally reads an IFU when he implants a new device, he "can't tell you I've read 100 percent of them" because "[a] lot of time, the principles are the same thing. So you might use one IVC device, and it might -- the method of deployment is the same like another device, and so you practically deploy the same device. It's just a different design of the filter itself." Ex. E, Mena Dep. Tr. at 67:19-68:4. He then added as follows: "to be honest with you, I mean, there are not many IFUs I have to read." *Id.* at 70:18-19.

**RESPONSE:  Dr. Mena testified that he "probably did" read the Eclipse™ IFU prior to implanting the filter in Plaintiff.  Ex. 3, Mena Dep Tr., at 68:7-11.**

32.     When asked whether he read the Eclipse™ IFU before placing the device for the first time, Dr. Mena equivocally stated: "I probably did. But I can't remember, it's so long ago." Ex. E, Mena Dep. Tr. at 68:7-11.

**RESPONSE:  Uncontroverted.**

33.     When asked generally about his practice about reading an IFU prior to implanting a filter, Dr. Mena testified that he "sometimes" read the IFU but that "[m]any times I haven't put it in before but I've seen it deployed before and I don't have to." Ex. E, Mena Dep. Tr. at 68:18-25; *see also id.* at 74:13-22.

**RESPONSE:  Dr. Mena testified that he "probably did" read the Eclipse™ IFU prior to implanting the filter in Plaintiff.  Ex. 3, Mena Dep Tr., at 68:7-11.**

34.     Dr. Mena testified in deciding whether to implant a medical device, he "shouldn't rely on the IFU alone" and considers his knowledge, the medical literature, and his experience as well.  Ex. E, Mena Dep. Tr. at 69:24-71:12.

**RESPONSE:  Uncontroverted.**

35.     Dr. Mena testified that he was aware of the known complications of all inferior vena cava filters, including fracture, movement, migration, tilt, and perforation, before he implanted the Eclipse™ filter in Plaintiff, and that he was knowledgeable about these risks independent from the IFU for the Eclipse™. Ex. E, Mena Dep. Tr. at 62:17-64:9; 76:21-83:12.  Dr. Mena agreed that these complications applied to all IVC filters and not just Bard filters or the Eclipse filter specifically.  *Id*. at 61:25-64:3.

**RESPONSE:  Dr. Mena was not aware of the true nature of those complications, because Defendants omitted and concealed information about the Eclipse's relatively high failure rates.  As Dr. Mena testified:**

> **Q. . . . [D]o you see anywhere in that section of warnings [in the IFU] where Bard tells you that the use of the Eclipse filter carries with it a greater risk of fracture than other filters?  Is that in that section?**
> **A.  No.**

**Ex. 3, Mena Dep. Tr., at 238:8–12.  Plaintiff's experts have explained the numerous ways in which Bard failed to adequately convey the full nature of the risks associated with the Eclipse filter.  Dr. Hurst opined:**

> **1. The IFU describes a myriad of possible risks following IVC filter placement, without providing clear information on the likelihood of those risks or the potential severity of new complications such as, for example, tilt, IVC penetration, adjacent organ penetration, or fragment embolization to the heart and lungs.**

**2. The IFU provides no clear recommendations for imaging follow-up of the device.**

**3. The IFU provides insufficient warning of the incidence and seriousness of the cascade of events of tilt, migration, fracture, and especially fractured component embolization to the heart and lungs that was characteristic of these devices and occurred with a higher frequency and more serious complications than the prior permanent SNF device and other filters available at the time.**

**4. Despite knowing that the Bard Eclipse retrievable filters were not designed or tested for permanent use, the IFU provides no timeline for removal of the device, claiming that the device is safe and appropriate for both temporary and permanent use.**

Ex. 1, Hurst Report, at ¶ 4(b)(vi).  Dr. Muehrcke opined:

[A] prudent manufacturer would warn implanting physicians about its filters' performance. . . . Bard kept to itself information about the higher complication rates of its Recovery and G2 platform filters [including the Eclipse] as compared to other filters.  Further Bard did not instruct physicians to remove the filters after they were no longer needed to reduce the risk to patients in the case of retrievable filters. Nor did it tell implanting physicians to follow patients for complications Bard was aware were occurring given their internal documents. Bard failed to provide implanting physicians' information they needed to be as an informed intermediary. . . . Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates associated with the Recovery and G2 filters [including the Eclipse] in comparison to the original predicate device, the Simon Nitinol Filter, and competitor filters. . . . *Bard had the opportunity to warn physicians about the higher risk of their filters in their IFU but chose not to*.

Ex. 2, Meuhrcke Report, at 14–16 (emphasis added).

### *Dr. Mena Failed to Comply with Significant Aspects of the IFU*

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.  Specifically, Dr. Mena**

---

testified in the affirmative when asked whether he "follow[ed[ the instructions for use when you placed the filter" and whether he "follow[ed] the methodology" of which "the instructions for use informed you."  Ex. 3, Mena Dep. Tr., at 248:8–249:2.

36.     Dr. Mena conceded at his deposition that he did not measure Plaintiff's inferior vena cava prior to implanting the Eclipse™ filter in the Plaintiff, and the contemporaneous operative report similarly contains no such measurement. Ex. E, Mena Dep. Tr. at 117:10-118:3; Ex. D, COUTURIERC_NOMC_MDR00684-00685.

**RESPONSE:  Dr. Mena relied upon his experience to gauge the appropriateness of placement of the filter in Plaintiff's IVC with respect to the measurement Plaintiff's IVC, and concluded that "it was not too big to place."  Ex. 3, Mena Dep. Tr., at 117:10–18;** *see also* **Ex. 6, Deposition of Darren R. Hurst, MD, Feb. 8, 2021, at 43:14–20 [hereinafter Hurst Dep. Tr.]; Ex. 4, Muehrcke Dep. Tr., at 26:20–25 (testifying that Dr. Mena "said it looked okay, didn't look wide").  Furthermore, "[t]he implantation appeared to be placed in an IVC of appropriate size," based on measurements made by Dr. Muehrcke.  Ex. 2, Muehrcke Report, at 10; Ex. 4, Muehrcke Dep. Tr., at 30:1–6.**

37.     Dr. Mena conceded at his deposition that he could not remember the amount of pressure was used when injecting the contrast medium through the dilator and thus could not confirm if it was more or less than 800 psi; the contemporaneous operative report similarly contains no such reference, and necessarily it is unclear if 800 psi was exceeded or not. Ex. E, Mena Dep. Tr. at 120:13-18; Ex. D, COUTURIERC_NOMC_MDR00684-00685.

**RESPONSE:  Uncontroverted.**

38.     Dr. Mena's contemporaneous operative report states that the Eclipse™ filter was "passed over the guidewire and positioned at the level of L4," which Dr. Mena confirmed at his deposition means "the fourth lumbar vertebra," *i.e.*, "about where the . . . right and left iliac vein confluences to form the inferior vena cava." Ex. E, Mena Dep. Tr. at 120:19-121:8.

**RESPONSE:  Uncontroverted.**

39.     Even Plaintiff's expert, Dr. Darren Hurst, testified that Dr. Mena did not position the Eclipse™ filter as directed in the IFU with respect to the renal veins:

> Q. And so he placed it out of position, didn't he?
>        MR. MARTIN: Objection. Form.
> A. He placed it in a position where the filter was -- the apex is at thelevel of the renal veins. The parts of the device that engage in the cava are below the level of the renal veins.
>        BY MR. STRATTON:
> Q. But that's not what this information -- instruction for use says, isit?
> A. That's correct. It does not.

Ex. J, Deposition of Darren Hurst dated February 8, 2021 ("Hurst Dep. Tr.") at 49:22-50:8.

**RESPONSE:  Dr. Mena testified that he properly placed the Eclipse filter:**

**I wanted to make sure that the tip of the inferior vena cava filter was at or just below the level of the renal veins.  If it is a little bit above, it's not really that -- it's not bad. The reason why you don't want to put the inferior vena cava filter above the renal veins is that there is a certain percentage of all inferior vena cava filters will clot off, and then you've occluded the inferior vena cava.  And then if you place it above the renal veins, then you'll be occluding the drainage of blood from the renal veins. So with the top of the inferior vena cava filter around the renal veins, that's the ideal placement. It's not the only placement. And so when I deployed this and did my final vena cavagram, I was happy with the deployment.**

**Ex. 3, Mena Dep. Tr., at 130:3–18.  He further testified:**

> **Q. Do you believe that you placed the filter in the proper location?**
> **. . . .**

---

**A. Yes.**

**. . . .**

**Q. All right. And tell us -- tell us your basis for saying that the filter was placed in the proper location by you, Doctor.**

**. . . .**

**A. It was placed in the inferior vena cava with the top of the filter being at the level of the renal veins. And it did not show any -- it stayed in place; it did not migrate; it did not move. There was a little tilt to it, but it was not what I thought was excessive. And therefore, I thought it was very good placement.**

*Id.* at 247:21–248:10.  "The filter was properly deployed."  *Id.* at 249:9.  Dr. Muehrcke also explained that "[a] lot of people like to do that because it includes washing of the filter and removes the -- it takes away the clot to allow cleansing of the filters.  That's a controversial thing.  I personally go below the renal vein. Some people stick it in the renal veins."  Ex. 4, Muehrcke Dep. Tr., at 23:18–23.

40.     Dr. Mena conceded at his deposition that he implanted the Eclipse™ filter in a tilted fashion in Plaintiff, but then stated that "there's nothing I can do about that." Ex. E, Mena Dep. Tr. at 127:4-14.

**RESPONSE:  Dr. Mena testified that he did nothing to cause the filter to tilt and confirmed that "[t]he filter was properly deployed."  Ex. 3, Mena Dep. Tr., at 248:12–16, 249:9.  Dr. Hurst further explained that "it's the design of the device that centers the device in the inferior vena cava," but that "[d]espite design characteristics of these devices, they do not center and can end up tilted regardless of what the implanting physician does," and that therefore "Dr. Mena implanted the device appropriately" even though "[t]he device tilted when it was implanted."   Ex. 6, Hurst Dep. Tr., at 37:22–39:3.**

---

41.     Dr. Mena testified that he could not recall seeing Plaintiff for any follow-up after since the implantation surgery in 2011 at any time until 2016, and necessarily could not have had a discussion with him about potential removal of the filter, which was designed to be retrievable, post-implant.  Ex. E, Mena Dep. Tr. at 132:24-133:25; *see also* Ex. B, Couturier Dep. Tr. at 70:14-16 (testifying "I don't think I did, no" when asked if he visited with Dr. Mena post-implant in 2011).

**RESPONSE:  It is untrue that Dr. Mena necessarily could not have had a discussion with Plaintiff about potential removal of the filter simply because Dr. Mena did not see Plaintiff for an in-person follow-up appointment.  Dr. Mena's office engaged in several "telephone encounters" with Plaintiff, in which the office would "call with Dr. Mena's recommendations."  *See, e.g.*, Ex. 7, Deposition of Craig Couturier, Aug. 17, 2020, at 214:3–13 [hereinafter Couturier Craig Dep. Tr.].  Dr. Mena or his staff could have easily telephoned Plaintiff to have a discussion about removal of the filter.**

**_The Linear Metallic Object in Plaintiff's Right Ventricle Is Stable_**

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**

42.     On October 13, 2016, approximately five-and-a-half years after his implant surgery, Plaintiff presented at the emergency department with complaints of abdominal pain for

which his treaters determined were the byproduct of colitis.  Ex. K,

COUTURIERC_NOMC_MDR01049-01055 at COUTURIERC_NOMC_MDR01055.

**RESPONSE:  Uncontroverted.**


43.     During the aforementioned emergency room visit, a CT scan of the abdomen and

pelvis was performed, and the radiologist reviewing that scan reported that a "linear metallic

foreign body" was visualized "along the anterior aspect of the right ventricle and adjacent

pericardium." *Id.*

**RESPONSE:  Uncontroverted.**


44.     For the first time since the implant surgery in 2011, Dr. Mena met with Plaintiff on

November 9, 2016, about the findings seen on the above-referenced CT scan results. Ex. L,

COUTURIERC_OHCOO_MDR00005-13 at COUTURIERC_OHCOO_MDR00009-10; *see also*

Ex. E, Mena Dep. Tr. at 133:8-21 (explaining that he did not treat Mr. Couturier further after the

implant procedure until his 2016 presentation to the emergency room and colitis diagnosis).

**RESPONSE:  Dr. Mena met with Plaintiff on November 3, 2016, not November 9,**

**2016.  Ex. 3, Mena Dep. Tr., at 179:7–179:16 ("[T]he encounter date would be 11-3-2016,**

**and that was the first day that I saw the patient.").**


45.     During this November 9, 2016 office visit, Dr. Mena recommended that an

echocardiogram be undertaken to evaluate the foreign object embedded in the heart visualized on

the CT imaging, noted that he "thinks this is a chronic thing and it happened sometime ago," and

noted the potential options for next steps, including to "leave it alone [] since we think that this is

a chronic event and is not causing any problems at this time." *Id.*; Ex. L,

COUTURIERC_OHCOO_MDR00005-13 at COUTURIERC_OHCOO_MDR00009-10.

      **RESPONSE:  Dr. Mena met with Plaintiff on November 3, 2016, not November 9,**

**2016.  Ex. 3, Mena Dep. Tr., at 179:7–179:16 ("[T]he encounter date would be 11-3-2016,**

**and that was the first day that I saw the patient.").  Dr. Mena also testified that, despite the**

**apparent stability of the fractured strut,**

> **we don't know what's going to happen.  If I knew what was going to happen,**
> **I would tell them, listen, don't worry about this.  This is not going to move.**
> **But I can't -- I cannot tell for certain that that's not going to happen.**
> **Although, looking back at the CT scans and the imaging studies, since 2016 it**
> **has not moved, it's unlikely that it is going to move.  But can it?  Anything**
> **can happen.**

**Ex. 3, Mena Dep. Tr., at 188:4–15.  Also, Dr. Hurst has opined that "[t]he Bard Eclipse**

**Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated,**

**is significantly tilted, become embedded, has multiple penetrations of the IVC, is a**

**significant ongoing risk for future complications, and no longer provides safe and effective**

**protection from PE as designed."  Ex. 1, Hurst Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has**

**opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of**

**his Bard Eclipse filter deteriorating in his body" and that "[a] complex retrieval attempt to**

**try and take out the filter should be made."  Ex. 2, Muehrcke Report, at 17–18.**

      46.    At his deposition, Dr. Mena testified about his November 9, 2016 office visit notes,

explaining that he meant the metallic object seen in the imaging had become embedded "some

time ago" and "obviously the patient is not complaining of any problems relating to it." Ex. E,

Mena Dep. Tr. at 146:24-148:10.

**RESPONSE:  Dr. Mena met with Plaintiff on November 3, 2016, not November 9, 2016.  Ex. 3, Mena Dep. Tr., at 179:7–179:16 ("[T]he encounter date would be 11-3-2016, and that was the first day that I saw the patient.").**

47.     Following the November 3, 2016 office visit with Dr. Mena, Plaintiff visited board-certified cardiologist Dr. Ghiath Mikdadi for an echocardiogram and electrocardiogram on November 11, 2016. Ex. M, Deposition of Ghiath Mikdadi dated November 13, 2021 ("Mikdadi Dep. Tr.") at 50:23-51:3; 90:10-24.

**RESPONSE:  Uncontroverted.**

48.     Dr. Mikdadi testified that Plaintiff's echocardiogram results were "very unremarkable" and "essentially normal." Ex. M, Mikdadi Dep. Tr. at 93:2-94:16. He similarly testified that the electrocardiogram results were "normal."  *Id.* at 85:18-24; 87:2-9.

**RESPONSE:  Dr. Mikdadi testified that he agreed with the statement: "having a piece of metal in your heart is not a normal condition."  Ex. 8, Deposition of Ghiath Mikdadi, MD, No. 13, 2020, at 119:4–8 [hereinafter Mikdadi Dep. Tr.].**

49.     Dr. Mikdadi consulted with Dr. Mena following Plaintiff's visit to his office, as reflected in Dr. Mena's office notes dated December 8, 2016, which report that the echocardiogram "was fine" and that Dr. Mikdadi "apparently" told Plaintiff  to "leave [the metallic fragment] alone as it was not causing any problems." Ex. N, COUTURIERC_OHCCO_MDR00043-48 at COUTURIERC_OHCCO_MDR00045.

**RESPONSE:  Dr. Mikdadi testified that "we don't know what would happen in the future" with respect to whether the metallic fragment would cause problems and that "if it can be removed with zero to no risk, I would be all for it."  Ex. 8, Mikdadi Dep. Tr., at 95:24–96:3, 119:23–120:8.  Dr. Mena also testified that, despite the apparent stability of the fractured strut,**

> we don't know what's going to happen.  If I knew what was going to happen, I would tell them, listen, don't worry about this.  This is not going to move. But I can't -- I cannot tell for certain that that's not going to happen. Although, looking back at the CT scans and the imaging studies, since 2016 it has not moved, it's unlikely that it is going to move.  But can it?  Anything can happen.

**Ex. 3, Mena Dep. Tr., at 188:4–15.  Dr. Hurst has opined that "[t]he Bard Eclipse Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has multiple penetrations of the IVC, is a significant ongoing risk for future complications, and no longer provides safe and effective protection from PE as designed."  Ex. 1, Hurst Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body" and that "[a] complex retrieval attempt to try and take out the filter should be made."  Ex. 2, Muehrcke Report, at 17–18.  Further, in accordance with Federal Rule of Civil Procedure 56(c)(2), Plaintiff objects that the purported fact about what Dr. Mikdadi "apparently" told Plaintiff cannot be presented in a form that would be admissible in evidence, because it is inadmissible hearsay relayed by Dr. Mena.**

50.     During Plaintiff's visit with Dr. Mena on December 8, 2016, Plaintiff and Dr. Mena discussed various treatment options available to Plaintiff and agreed that Plaintiff would return to

receive another CT scan in about 6 weeks. *Id*. At the time of this office visit, Plaintiff denied any shortness of breath or chest pain. *Id.*

**RESPONSE:  According to his wife, Plaintiff would discuss his shortness of breath during visits with Dr. Mena.  Ex. 5, Couturier Melissa Dep. Tr., at 167:12–168:22.**

51.     On February 13, 2017, Dr. Mena's office advised Plaintiff that the results of his CT scan following his December 8, 2016 visit were "stable," *i.e.*, that the linear metallic foreign object had not moved or changed position; Plaintiff was advised to schedule another scan in three months. Ex. O, COUTURIERC_OHCCO_MDR00056.

**RESPONSE:  Dr. Mena also testified that, despite the apparent stability of the fractured strut,**

> **we don't know what's going to happen.  If I knew what was going to happen, I would tell them, listen, don't worry about this.  This is not going to move. But I can't -- I cannot tell for certain that that's not going to happen. Although, looking back at the CT scans and the imaging studies, since 2016 it has not moved, it's unlikely that it is going to move.  But can it?  Anything can happen.**

**Ex. 3, Mena Dep. Tr., at 188:4–15.  Dr. Hurst testified that "this patient is at risk, enough so that I would monitor this fragment."  Ex. 6, Hurst Dep. Tr., at 75:13–14.  Dr. Hurst has also opined that "[t]he Bard Eclipse Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has multiple penetrations of the IVC, is a significant ongoing risk for future complications, and no longer provides safe and effective protection from PE as designed."  Ex. 1, Hurst Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body"**

and that "[a] complex retrieval attempt to try and take out the filter should be made."  Ex.
2, Muehrcke Report, at 17–18.

52.     At his deposition, Dr. Mena testified that "there hadn't been any changes" between
Plaintiff's October 13, 2016 scan and follow-up scan, reflecting that the metallic linear object was
"stable" and did not require surgical intervention.  Ex. E, Mena Dep. Tr. at 160:11-161:9.

**RESPONSE:  Dr. Mena also testified that, despite the apparent stability of the**
**fractured strut,**

> **we don't know what's going to happen.  If I knew what was going to happen,**
> **I would tell them, listen, don't worry about this.  This is not going to move.**
> **But I can't -- I cannot tell for certain that that's not going to happen.**
> **Although, looking back at the CT scans and the imaging studies, since 2016 it**
> **has not moved, it's unlikely that it is going to move.  But can it?  Anything**
> **can happen.**

**Ex. 3, Mena Dep. Tr., at 188:4–15.  Dr. Hurst testified that "this patient is at risk, enough**
**so that I would monitor this fragment."  Ex. 6, Hurst Dep. Tr., at 75:13–14.  Dr. Hurst has**
**also opined that "[t]he Bard Eclipse Filter in the plaintiff should be removed from the**
**plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has**
**multiple penetrations of the IVC, is a significant ongoing risk for future complications, and**
**no longer provides safe and effective protection from PE as designed."  Ex. 1, Hurst**
**Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of**
**deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body"**
**and that "[a] complex retrieval attempt to try and take out the filter should be made."  Ex.**
**2, Muehrcke Report, at 17–18.**

53.     Notwithstanding Dr. Mena's instruction, Plaintiff did not schedule a follow up CT scan until December 3, 2019—almost three years after his last office visit with Dr. Mena. Ex. P, COUTURIERC_OHCCO_MDR00058-00060 at COUTURIERC_OHCCO_MDR00060.

**RESPONSE:  Uncontroverted.**

54.     In reviewing the follow-up CT scan performed on Plaintiff on December 19, 2019, Dr. Mena concluded that the foreign metallic object originally visualized in the 2016 imaging was "unchanged" in position and thus "hasn't moved" and is "stable."  Ex. E, Mena Dep. Tr. at 166:14-167:1; 168:5-168:24.

**RESPONSE:  Dr. Mena also testified that, despite the apparent stability of the fractured strut,**

> **we don't know what's going to happen.  If I knew what was going to happen, I would tell them, listen, don't worry about this.  This is not going to move. But I can't -- I cannot tell for certain that that's not going to happen. Although, looking back at the CT scans and the imaging studies, since 2016 it has not moved, it's unlikely that it is going to move.  But can it?  Anything can happen.**

**Ex. 3, Mena Dep. Tr., at 188:4–15.  Dr. Hurst testified that "this patient is at risk, enough so that I would monitor this fragment."  Ex. 6, Hurst Dep. Tr., at 75:13–14.  Dr. Hurst has also opined that "[t]he Bard Eclipse Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has multiple penetrations of the IVC, is a significant ongoing risk for future complications, and no longer provides safe and effective protection from PE as designed."  Ex. 1, Hurst Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body"**

---

and that "[a] complex retrieval attempt to try and take out the filter should be made." **Ex. 2, Muehrcke Report, at 17–18.**

55.     Plaintiff has not obtained or scheduled any medical imaging or testing since the above-referenced December 19, 2019 CT scan, notwithstanding Dr. Mena's recommendation that a follow-up scan be performed in 6 months. Ex. B, Couturier Dep Tr. at 215:13-216:12 and 217:11-218:12; Ex. Q, Plaintiff's Objections and Answers to Defendants' First Requests for Admission at 4 (Response to Request for Admission No. 1).

**RESPONSE:  Uncontroverted.**


### _Plaintiff's Alleged Injuries In This Case Are Unconfirmed_

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.**


56.     Plaintiff initiated the lawsuit on July 13, 2017 by filing a short-form complaining joining in the Master Complaint for Damages filed in the multidistrict litigation captioned _In Re: Bard IVC Filters Products Liability Litigation_, MDL 2641 (the "MDL"), from which this individual case was transferred.  (Rec. Doc. 1).

**RESPONSE:  Uncontroverted.**

57.     According to Plaintiff's verified Plaintiff Profile Form, Plaintiff attributes the following alleged injuries to the Filter: "afraid to perform physical activities such as playing football with his kids," "afraid the strut embedded near his heart will cause death," and "believes he suffers irregular heart beats ever since the IVC filter was placed in his vena cava." Ex. R, Plaintiff Profile Form at 5.

**RESPONSE:  Uncontroverted that the Plaintiff Profile Form so states.**

58.     Despite these subjective fears, Plaintiff admits that no "health care provider ever told [him] orally or in writing that [his] symptoms related to bodily injury are related to the Bard IVC implanted in [him] in 2011."  Ex. B, Couturier Dep. Tr. at 218:18-23.

**RESPONSE:  According to the independent medical examination (IME) of Plaintiff conducted by Jennifer Lynn Cook, MD, the embolized filter strut "penetrating through the right ventricle into the pericardium" is currently causing damage as evidenced by thickening of the surrounding pericardium, and it is likely that the filter "currently tilted and penetrating through the wall of the IVC and interacting with surrounding internal structures . . . is the etiology of Mr. Couturier's shortness of breath and hip pain."  Ex. 9, Expert Report of Leigh Anne Levy, Dec. 4, 2020, at 60 [hereinafter Levy Report] (incorporating Dr. Cook's IME).**

59.     Plaintiff has never seen a psychiatrist, psychologist or any mental health professional regarding his alleged "mental anguish."  Ex. B, Couturier Dep. Tr. at 82:16-83:16.

**RESPONSE:  Uncontroverted.**

60.    Plaintiff admits he "is not claiming that there are physical activities that he is 'no longer able to perform'" as a result of the filter's implantation. Ex. S, Plaintiff's Objections and Answers to Defendants' First Interrogatories at 15 (Response to Interrogatory No. 21).

**RESPONSE:  Plaintiff "is no longer able to ride horses or play football with his kids" as a result of the filter's implantation.  Ex. 9, Levy Report, at 22.  Plaintiff is no longer able to work outside on projects such as "[s]plitting wood, building a porch, building fences, dog pens, [and] weed-eating."  Ex. 7, Couturier Craig Dep. Tr., at 94:24–95:6.  Plaintiff testified about the activities he is no longer able to perform:**

> **[I]t's playing football with the kids, it's wrestling with the kids, working outside, anything that I feel my heart rate increases.  I love to work outside. And I work with my hands, and I've had to cut back on that a lot.  We had to -- we used to have horses. We've gotten rid of the horses due to increased heart rate when I would ride.**

*Id.* **at 86:14–22;** *see also* **Ex. 5, Couturier Melissa Dep. Tr., at 164:15-167:3.**

### *The Opinions of Plaintiff's Case-Specific Experts Are Speculative*

**GENERAL OBJECTION:  Plaintiff objects to Defendants' editorialized summarization of their alleged facts, and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context.  Plaintiff further objects to the extent that Defendants seek to make arguments here that they have already made in their *Daubert* motions concerning the speculativeness of the opinions of Plaintiff's case-specific experts.**

61.     Plaintiff designated two case-specific experts to opine on medical causation, Dr. Darren Hurst, an interventional radiologist, and Dr. Derek Muehrcke, a cardiothoracic surgeon. Ex. T, Plaintiff's Designation of Expert Opinion Testimony.

**RESPONSE:  Uncontroverted.**


### Dr. Hurst's Opinion Testimony

62.     Dr. Hurst is a medical doctor.  Ex. J, Hurst Dep. Tr. at 21:9-13.

**RESPONSE:  Uncontroverted.**


63.     Dr. Hurst is not an expert in designing IVC filters. Ex. J, Hurst Dep. Tr. at 11:9-11.

**RESPONSE:  Uncontroverted.**


64.     Dr. Hurst has never written any publications on IFUs for an IVC filter.  Ex. J, Hurst Dep. Tr. at 11:3-5.

**RESPONSE:  Uncontroverted.**


65.     Dr. Hurst is not an expert in drafting IFUs.  Ex. J, Hurst Dep. Tr. at 11:6-8.

**RESPONSE:  Uncontroverted.**


66.     Dr. Hurst testified that because Plaintiff had a "combination of a GI bleed and a pulmonary embolism," he was in "a life-threatening situation" prior to the implant procedure.  Ex. J, Hurst Dep. Tr. at 28:22-25.

---

**RESPONSE:  Uncontroverted.**


67.     He admits that he does not have any criticism of Dr. Mena's decision to implant a

retrievable IVC filter in Plaintiff in May 2011 in light of Plaintiff's medical condition.  Ex. J, Hurst

Dep. Tr. at 68:25-69:10.

**RESPONSE:  Uncontroverted.**


68.     Dr. Hurst, testified that Dr. Mena did not position the Filter as directed in the IFU:

Q. And so he placed it out of position, didn't he?
    MR. MARTIN: Objection. Form.
    A. He placed it in a position where the filter was -- the apex is at the level
    of the renal veins. The parts of the device that engage in the cava arebelow
    the level of the renal veins.
    BY MR. STRATTON:
Q. But that's not what this information -- instruction for use says, is it?
A. That's correct. It does not.

Ex. J, Hurst Dep. Tr. at 49:22-50:8.

**RESPONSE:  :  Dr. Mena testified that he properly placed the Eclipse filter:**

**I wanted to make sure that the tip of the inferior vena cava filter was at or
just below the level of the renal veins.  If it is a little bit above, it's not really
that -- it's not bad. The reason why you don't want to put the inferior vena
cava filter above the renal veins is that there is a certain percentage of all
inferior vena cava filters will clot off, and then you've occluded the inferior
vena cava.  And then if you place it above the renal veins, then you'll be
occluding the drainage of blood from the renal veins. So with the top of the
inferior vena cava filter around the renal veins, that's the ideal placement.
It's not the only placement. And so when I deployed this and did my final
vena cavagram, I was happy with the deployment.**

**Ex. 3, Mena Dep. Tr., at 130:3–18. He further testified:**

**Q. Do you believe that you placed the filter in the proper location?
. . . .
A. Yes.
. . . .**

---

> **Q. All right. And tell us -- tell us your basis for saying that the filter was placed in the proper location by you, Doctor.**
> **. . . .**
> **A. It was placed in the inferior vena cava with the top of the filter being at the level of the renal veins. And it did not show any -- it stayed in place; it did not migrate; it did not move. There was a little tilt to it, but it was not what I thought was excessive. And therefore, I thought it was very good placement.**

*Id.* at 247:21–248:10.  Dr. Muehrcke also explained that "[a] lot of people like to do that because it includes washing of the filter and removes the -- it takes away the clot to allow cleansing of the filters.  That's a controversial thing.  I personally go below the renal vein. Some people stick it in the renal veins."  Ex. 4, Muehrcke Dep. Tr., at 23:18–23.

69.     Dr. Hurst testified that the tilt was 17 degrees and he would have removed it:

Q. And so in your practice, if you had a filter that was deployed like this, where it had 17 degrees of tilt and it had – was deployed in the wrongplace, you would have immediately removed it, wouldn't you have?
MR. MARTIN: Objection. Form.
A. I would have considered removing it, yes.

Ex. J, Hurst Dep. Tr. at 50:22-51:13.

**RESPONSE:  Dr. Hurst testified that he "would have *considered* removing" the filter, not that he *would* have removed it.  Ex. 6, Hurst Dep. Tr., at 51:12–13 (emphasis added).  Furthermore, Dr. Hurst explained that "it's the design of the device that centers the device in the inferior vena cava," but that "[d]espite design characteristics of these devices, they do not center and can end up tilted regardless of what the implanting physician does," and that therefore "Dr. Mena implanted the device appropriately" even though "[t]he device tilted when it was implanted."   Ex. 6, Hurst Dep. Tr., at 37:22–39:3.**

---

70.    Dr. Hurst agrees that all the complications that Plaintiff alleges occurred with his filter were listed in the Eclipse™ IFU.  Ex. J, Hurst Dep. Tr. at 59:14-18.

**RESPONSE:  Dr. Hurst also testified that the IFU "doesn't warn that those complications are at much higher incidence than the complications for other devices available at the time." Ex. 6, Hurst Dep. Tr., at 60:17–21;** *see also* **Ex. 1, Hurst Report, ¶ 4(b)(i) ("Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates of fracture, embolization of fractured components, penetration, migration, including the known risk of death associated with the . . . Eclipse filters in comparison to the original predicate device, the Simon Nitinol Filter®, and competitor filters such as the Cook Gunther-Tulip filter.")**

71.    Dr. Hurst agrees that it is standard to not exceed 800 psi when injecting contrast because "if you exceed a certain pressure, then, you know, there's risk of extravasation." Ex. J, Hurst Dep. Tr. at 42:12-22.

**RESPONSE:  Uncontroverted.**

72.    Dr. Hurst agrees that the Eclipse™ IFU specifically indicates that a filter should not be deployed unless the IVC has been properly measured.  Ex. J, Hurst Dep. Tr. at 42:2-5.

**RESPONSE:  Uncontroverted.**

73.    Dr. Hurst agrees that the Eclipse™ IFU specifically indicates that the "Standards and guidelines developed by the Society of Interventional Radiologists recommend that patients

with filters, either permanent or retrievable, be tracked and receive routine follow-up subsequent to the placement of the device."  Ex. J, Hurst Dep. Tr. at 51:20-52:5.

      **RESPONSE:  Uncontroverted.**

74.     Dr. Hurst further opines that "Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates of fracture, embolization of fractured components, penetration, migration, including the known risk of death associated with the . . . Eclipse filters in comparison to the original predicate device, the Simon Nitinol Filter®, and competitor filters such as the Cook Gunther-Tulip filter[.]" Ex. U, Expert Report of Dr. Darren Hurst dated November 30, 2020 ("Hurst Exp. Rep.") at 14-15.

      **RESPONSE:  Uncontroverted.**

75.     Dr. Hurst opines that the Simon Nitinol and Gunther-Tulip filters as safer alternative filters that allegedly "would have significantly reduced the risk of the cascade of events of embedded filter, tilt, migration, fracture, embolization of fractured struts, and penetration of the IVC and adjacent organs/structures the plaintiff experienced."  Ex. U, Hurst Exp. Rep., at 18-19.

      **RESPONSE:  Uncontroverted.**

76.     In the MDL proceeding in which general fact and expert discovery was conducted, Judge Campbell granted in part a motion in limine filed by Bard in which it sought, among other things, to limit Dr. Hurst's complication rate opinions. In particular, Judge Campbell ruled that Dr. Hurst was not allowed to (1) opine that Bard filters have higher complication rates than other IVC filters and have unacceptable risks of caudal migration, or (2) render opinions about Bard's

internal knowledge, its internal testing and development practices, or the truthfulness of its representations in general. The MDL court found that, as here, "Dr. Hurst has not conducted any study of IVC filter complication rates," or "collected clinical data from his personal cases that reveal IVC filter complication rates, nor that his education and training revealed anything about such rates."  The MDL court further found that although Dr. Hurst testified about reviewing articles on complication rates and a report on an alleged "unacceptable risk" of caudal migration, he did not take any steps to verify their conclusions. The MDL court also determined no evidence exists that "Dr. Hurst has ever worked for a medical product manufacturer or the FDA, that he has expertise in internal corporate information gathering or decision making, or that he is trained in the design, testing, or labeling of medical devices." The MDL court thus held that there was no basis "upon which Dr. Hurst can render expert opinions about what happened internally at Bard – what it knew, what it did, or what it failed to do in the development and marketing of its IVC filters." The MDL court concluded that Dr. Hurst's proffered opinions are "outside the realm of his expertise and are not supported by sufficient facts and data or evaluated through reliable principles and methods." Ex. V, 2:15-md-2641-DGC (Rec. Doc. 9772).

**RESPONSE:  Bard overstates the MDL Court's holding—while Dr. Hurst could not testify as to the higher complication rates of Bard filters or Bard's internal knowledge, Judge Campbell upheld Dr. Hurst's testimony that if Bard filters experienced higher rates of complications, this information should have been disclosed by Bard.  *See* Defs.' Ex. V, at 6 (Rec. Doc. 122-25).  The Court found generally that "Dr. Hurst's training and years of experience as an interventional radiologist qualifies him to opine [as to what 'reasonable physicians and patients expect from medical device manufacturers and how the duty of**

informed consent bears on these expectations']." *Id.* at 8.  Dr. Hurst offers similar opinions in the present case.

77.     Dr. Hurst testified that Plaintiff "does not have any current symptoms" "related to the fracture, tilt, and penetration of his filter." Ex. J, Hurst Dep. Tr. at 70:4-8.

**RESPONSE:  Plaintiff does not controvert that Dr. Hurst so testified.  However, according to Dr. Cook, the embolized filter strut "penetrating through the right ventricle into the pericardium" is currently causing damage as evidenced by thickening of the surrounding pericardium, and it is likely that the filter "currently tilted and penetrating through the wall of the IVC and interacting with surrounding internal structures . . . is the etiology of Mr. Couturier's shortness of breath and hip pain."  Ex. 9, Levy Report, at 60.**

78.     Dr. Hurst opines that Plaintiff is at risk for "future complications" – the risk for development for all of which is "unknown" and ranges from "more than zero and less than 100 percent."  Hurst Dep. Tr. at 70:3-75:3.

**RESPONSE:  Dr. Hurst opines that "[t]he plaintiff's Bard Eclipse IVC filter and the subsequent failures described above have put him at a significantly increased risk of additional long-term complications," specifically including the following:**

> **a.     The Bard Eclipse Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has multiple penetrations of the IVC, is a significant ongoing risk for future complications, and no longer provides safe and effective protection from PE as designed.**

> **b.     If the device is left in place, the plaintiff is at additional risk for further penetration of adjacent organs such as the spine, duodenum, and aorta. Any and all of these penetrations could result in symptomatic or life-**

threatening hemorrhage, infection, bowel perforation, bowel obstruction, leg pain, or back pain.

     c.    If the device is left in place, there is significant risk of future fracture and embolization of fragments to the heart or lungs with subsequent complications including, arrhythmia, hemorrhage, pericardial tamponade, infection, and death.

     d.    The length of time the filter has been in the IVC, significant tilt, embedded apex, and the deterioration of the device and multiple fractures will require complex IR procedures to retrieve percutaneously. These procedures have the increased risk of IVC rupture, IVC tear, hemorrhage, device fracture, device embolization, and adjacent organ damage. Any and all of these potential complications could result in significant added morbidity or even death.

     e.    The device may not be able to be removed using IR procedures. It may require open surgical removal with the potential risk of IVC rupture, IVC tear, hemorrhage, device fracture, device embolization, surgical infection, IVC stenosis/thrombosis, and adjacent organ damage. Any and all of these potential complications could result in significant added morbidity or even death.

     f.    The future behavior of the fractured, embolized arm in the right ventricle is unknown. There is risk of cardiac wall penetration, migration, hemorrhage, pericardial tamponade, valve damage, and arrhythmias. Any and all of these complications could result in significant additional morbidity or even death. If the above complications occur, the patient may require removal of the foreign body/arm. This could be a percutaneous procedure or open surgical procedure. These procedures could result in arrhythmia, valve damage, cardiac perforation, or hemorrhage. Any and all of these complications could have significant additional morbidity or mortality.

     g.    The future behavior of the retained fragment in the right psoas muscle is unknown. There is a risk of future migration within the retroperitoneum, into the peritoneal cavity, spine, vascular system, or into the subcutaneous tissues of the back. Any and all of these migrations have additional risk of complications of infection, chronic pain, bowel perforation, back pain, radiculopathy, and/or migration to the heart or lungs. All of these potential complications could lead to additional surgical intervention, morbidity or even death.

     h.    The future behavior of the fractured, embolized arm in the right lower lobe superior segment pulmonary artery is unknown. The plaintiff is at risk for subsequent infection/abscess, hemorrhage, pleural effusion, migration, vessel thrombosis, and pneumothorax. Any and all of

**these complications could result in significant additional morbidity or
mortality.**

**Ex. 1, Hurst Report, ¶ 4(c)(i)(3) (endnotes omitted).**

Dr. Hurst testified that the specific quantification of the risks of these additional
complications was "unknown," *e.g.,* Ex. 6, Hurst Dep. Tr., at 72:2, but Dr. Hurst was able
to opine as to ranges of the probability of those risks for specific potential complications.
He testified that the risk of "further embolization of the lung fragment" is "more than zero
and less than 100 percent," *id.* at 71:18–72:3; that the risk of "a fragment in the ventricle"
is "about one percent lifetime risk, one to two percent," *id.* at 72:9–18; that the likelihood
that open surgical removal would be required is "from one percent to 30 percent," *id.* at
73:9–22; and that the "risk of infection, chronic back pain, diskitis, [or] osteomyelitis" is
"[l]ess than 100 percent and probably greater than one percent," *id.* at 74:18–75:2.

79.    Dr. Hurst has never spoken with Plaintiff, has never had any correspondence with
Plaintiff, has never physically examine Plaintiff, nor has taken Plaintiff's medical history from him
personally.  Hurst Dep. Tr. at 25:11-23.

**RESPONSE:  Uncontroverted.**

## Dr. Muehrcke's Opinion Testimony

80.    Dr. Muehrcke is a medical doctor. Ex. W, Deposition of Dr. Derek Muehrcke dated
January 23, 2021 ("Muehrcke Dep. Tr.") at 6:18-19.

**RESPONSE:  Uncontroverted.**

81.    Dr. Muehrcke is not an engineer.  *Id.* at 10:11-13.

---

**RESPONSE:  Uncontroverted.**

82.     Dr. Muehrcke has never designed any IVC filters.  *Id*. at 10:14-16.

**RESPONSE:  Uncontroverted.**

83.     Dr. Muehrcke has never drafted an IFU for an IVC filter.  *Id*. at 10:17-19.

**RESPONSE:  Uncontroverted.**

84.     Dr. Muehrcke has never drafted an IFU for any medical device.  *Id*. at 10:23-25.

**RESPONSE:  Uncontroverted.**

85.     Dr. Muehrcke has never drafted warnings for an IVC filter.  *Id*. at 10:20-22.

**RESPONSE:  Uncontroverted.**

86.     Dr. Muehrcke has never drafted warnings for any medical device.  *Id*. at 11:1-3.

**RESPONSE:  Uncontroverted.**

87.     Dr. Muehrcke agrees that the Eclipse™ IFU for the filter implanted in Plaintiff warned of migration, fracture, perforation, and embolization, as well as pulmonary and cardiac complications with vena cava filters requiring the retrieval of fragment utilizing the vascular and/or surgical techniques.  *Id*. at 56:15-59:20.

**RESPONSE:  Dr. Muehrcke also testified that "a prudent manufacturer would warn implanting physicians about its filters' performance," but that**

**Bard kept to itself information about the higher complication rates of its Recovery and G2 platform filters [including the Eclipse] as compared to other filters.  Further Bard did not instruct physicians to remove the filters after they were no longer needed to reduce the risk to patients in the case of retrievable filters. Nor did it tell implanting physicians to follow patients for complications Bard was aware were occurring given their internal documents. Bard failed to provide implanting physicians' information they needed to be as an informed intermediary.**

**Ex. 2, Muehrcke Report, at 14.**

88.     Dr. Muehrcke testified that all filters (i.e., not just the Eclipse™ Filter implanted in

Plaintiff) can fracture, migrate, embolize and perforate.  *Id*. at 13:24-14:25.

**RESPONSE:  Uncontroverted.**

89.     Dr. Muehrcke also opines that Bard's instructions and warnings were inadequate

because Bard "failed to notify the operating physicians and the implanted patients of the much

higher complication rates[.]" Ex. X, Expert Report of Dr. Derek Muehrcke ("Muehrcke Exp.

Rep.") at 15.

**RESPONSE:  Uncontroverted.**

90.     Dr. Muehrcke's report does not, however, identify or opine on any specific design

defect in the Eclipse™ filter.  *Id*. at 11.

**RESPONSE:  Dr. Muehrcke opined in his report that "[t]he new G2 design lead to a**

**cascade of filter failures including caudal migration, tilt, perforation, and fracture," and**

**that "[t]he G2, G2x and Eclipse are essentially all the same filter design."  Ex. 2, Muehrcke**

**Report, at 11, 13.  Furthermore, Dr. Muehrcke noted in his report that he relied upon the**

**data and opinions set forth in the expert reports of Dr. Robert M. McMeeking, plaintiff's**

engineering expert, which were previously disclosed by Plaintiffs in *In Re Bard IVC Filters Products Liability Litigation*, USDC for the District of Arizona, Case No. MD-15-02641-DGC.  Ex. 2, Muehrcke Report, at 9.  Dr. McMeeking opined at length on the design defects of the Eclipse filter.  *See* Ex. 10, Expert Report of Robert M. McMeeking, PhD, Feb. 3, 2017, at 13–15 [hereinafter McMeeking Report I]; Ex. 11, Expert Report of Robert M. McMeeking, PhD, Mar. 2, 2017, at 14–16 [hereinafter McMeeking Report II].

91.     Dr. Muehrcke attributed Plaintiff's symptoms, including "fracture anxiety," shortness of breath and irregular heart racing to the "cardiac fragment" and alleged "scarring around the heart, around the fragment"  Ex. W, Muehrcke.  Dep. Tr. at 43:10-24; 46:2-8.

**RESPONSE:  Uncontroverted.**

92.     Yet at the same time, Dr. Muehrcke acknowledges Plaintiff's "treating physicians have said that he is asymptomatic from his cardiac fragment"  *Id*. at 44:4-6.

**RESPONSE:  Dr. Muehrcke, however, disagreed with those physicians, opining that "I wouldn't say he's asymptomatic," and emphasizing that "that's contradictory to what he and his wife say," (namely that Plaintiff suffers from "shortness of breath and racing heart rates and anxiety").  Ex. 4, Muehrcke Dep. Tr., at 44:6–7, 64:3–7.  Furthermore, according to Dr. Cook, the embolized filter strut "penetrating through the right ventricle into the pericardium" is currently causing damage as evidenced by thickening of the surrounding pericardium, and it is likely that the filter "currently tilted and penetrating through the wall of the IVC and interacting with surrounding internal structures . . . is the etiology of Mr. Couturier's shortness of breath and hip pain."  Ex. 9, Levy Report, at 60.**

93.     Dr. Muehrcke admits that the alleged foreign linear metallic object in Plaintiff's heart is stable. *Id*. at 64:9-10.

**RESPONSE:  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body" and that "[a] complex retrieval attempt to try and take out the filter should be made."  Ex. 2, Muehrcke Report, at 17–18.**

94.     Dr. Muehrcke attributes Plaintiff's subjective complaints of anxiety, shortness of breath and "heart racing" to his Filter based solely on the subjective deposition testimony of Plaintiff and his wife.  *Id*. at 43:10-14; 44:4-10; 63:16-18; 64:9-10.

**RESPONSE:  Dr. Muehrcke also bases his opinions regarding Plaintiff's injuries on his "review of Craig Couturier's medical records and radiology imaging."  Ex. 2, Muehrcke Report, at 1.**

95.     Dr. Muehrcke has never personally examined or communicated with Plaintiff. *Id.* at 43:2-7.

**RESPONSE:  Uncontroverted.**

96.     Dr. Muehrcke also agrees that, if a filter is implanted improperly, then there is an increased chance that there will be complications.  *Id.* at 26:16-19.

**RESPONSE:  Uncontroverted.**

97.     While Dr. Muehrcke testified that Plaintiff "will be at risk of bleeding, pericardial tamponade, arrthymias, infection, and death[,]" he concedes that "[i]t's impossible" to "put a percentage on that[.]"  *Id*. at 49:23-50:4.

**RESPONSE:  Dr. Muehrcke testified that "[i]t's impossible" to "put a percentage on" Plaintiff's "risk of bleeding, pericardial tamponade, arrthymias, infection, and death" because "[w]e don't know enough about these fractures" of Plaintiff's filter—not because the attribution of a percentage of risk is necessarily or always impossible.  Ex. 4, Muehrcke Dep. Tr., at 50:1–5.**

98.     In his Expert Report, Dr. Muehrcke also opines that there is no proven efficacy of any IVC filter and that the Eclipse™ filter "placed the health and safety of [Plaintiff] at unnecessary risk with no meaningful medical benefit."  Ex. X, Muehrcke Exp. Rep. at 10.

**RESPONSE:  Uncontroverted.**

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

### _Plaintiff Suffered Serious Injuries After Receiving a Bard Eclipse Filter_

1.      Plaintiff Craig Couturier received an implanted Eclipse Filter in May 2011 after he was diagnosed with a pulmonary embolism and gastrointestinal bleeding.  Ex. 1, Hurst Rep., at ¶ 3(a)(i)(1); _see also_ Ex. 2, Muehrcke Report, at 10; Ex. 9, Levy Report, at 3.

2.      In October 2016, broken strut from the filter was found in Plaintiff's heart.  Ex. 1, Hurst Report, at ¶ 3(a)(xiv)(2); _see also_ Ex. 2, Muehrcke Report, at 10 ("Mr. Couturier's Eclipse filter failed in a very dangerous manner. It sent a strut fracture to the heart, first noted on the 10/13/2016 CT scan of the abdomen."); Ex. 9, Levy Report, at 3, 60 ("There is radiologic evidence of two embolized arms of the IVC filter. One is . . . penetrating through the right ventricle into the pericardium.").

3.      In November 2016, another broken strut from the filter was found in Plaintiff's lung.  Ex. 2, Muehrcke Report, at 10 ("A chest x-ray from 11/15/2016 shows one of the embolized struts is in the right mid lung."); Ex. 9, Levy Report, at 6, 60 ("There is radiologic evidence of two embolized arms of the IVC filter. One is within the pulmonary artery of the right lung.").

4.      As of December 2019, Plaintiff's filter has perforated his IVC in eight places, interacting with adjacent structures and organs:

> The 2 o'clock strut is interacting with the duodenum, the 3 o'clock strut, the 5 o'clock strut interact with the right crus of the diaphragm, the 6 o'clock strut is interacting with the L2 vertebral body causing a reactive osteophyte, the 7 o'clock strut interacts with the right psoas muscle, and the distal portion has fractured. The 10 o'clock strut also perforated the IVC. Two 12 o'clock struts are perforating the IVC.

Ex. 2, Muehrcke Report, at 10–11.

5.      Plaintiff's fractured and perforating filter is symptomatic, causing him to suffer shortness of breath, irregular heartbeat, and hip pain.  Ex. 4, Muehrcke Dep. Tr., at 43:10–44:3 (explaining that "scaring around the heart" from the fractured and penetrating filter is causing shortness of breath and irregular heartbeat); Ex. 9, Levy Report, at 60 ("The surrounding pericardium is thickened suggesting damage from the foreign body. . . . The filter is currently tilted and penetrating through the wall of the IVC and interacting with surrounding internal structures. It is likely that this is the etiology of Mr. Couturier's shortness of breath and hip pain.").

6.      Plaintiff suffers serious and continued threats to his life posed by the Eclipse filter.  "[P]laintiff is at additional risk for further penetration of adjacent organs such as the spine, duodenum, and aorta. Any and all of these penetrations could result in symptomatic or life-threatening hemorrhage, infection, bowel perforation, bowel obstruction, leg pain, or back pain." Ex. 1, Hurst Report, at ¶ 4(c)(i)(3)(b) (endnotes omitted).  Plaintiff is at "risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body."  Ex. 2, Muehrcke Report, at 17.  Plaintiff's "filter is . . . unlikely to stop any clots going to his lungs.  Moreover, it's literally falling apart, and its struts are dangerously close to important abdominal structures." *Id.* at 18.  Plaintiff is "at risk of further penetration of right ventricular filter fragment which could lead to pericardial tamponade, arrythmia and infection.  These could be life threatening complications . . . ."  Ex. 9, Levy Report, at 60.

7.      As a result, Plaintiff also suffers from anxiety that the filter fragment is "something that's in my heart that doesn't belong there that could lead to my death."  Ex. 7,

Couturier Craig Dep. Tr., at 84:16–18; *see also* Ex. 2, Muehrcke Report, at 17 ("He continues to suffer from anxiety as result of his retained IVC filter and the cardiac fragment.").

### *The Eclipse Filter Suffered Higher Rates of Dangerous Failures than Other Available Filters*

8.      The Bard IFC Filter litigation involves multiple versions of Bard's retrievable IVC filters—the Recovery, G2, G2X, Eclipse, Meridian, and Denali—that are intended to catch blood clots before they travel to the heart and lungs.  Sugg. of Rem. & Transf. Order at 4 (Rec. Doc. 3).

9.      Each of these filters is a variation of its predecessor, *id.*, and each was marketed under a 510(k) clearance from the FDA, based on Bard's position (and FDA's determination) that each filter was "substantially equivalent" to a predicate device in Bard's IVC filter product line, starting with the Simon Nitinol Filter ("SNF").  *See, e.g.*, Ex. 12, Deposition of Robert Carr, Nov. 5, 2013, at 42:5–43:9; Ex. 13, Eclipse Clearance Letter.

10.      Bard's SNF had a well-established safety record and had been sold for years for permanent implantation only.  The Simon Nitinol Filter had only 8 fractures out of sales of 80,187 between launch in and May 2011.  Ex. 14, Chart of Filter Fracture Complaints, BPVEFILTER-01-00037664.  Early clinical studies demonstrated that migration of the SNF filter device was rare, with only 2 of 258, or 0.8%, migrations reported for patients who received the SNF between February 1988 and November 1990, while there were no reports of filter fractures observed.  Ex. 15, FDA Clinical Data Summary of the Simon Nitinol Filter, BPVE-01-00280772, at 72, 86; Ex. 16, Simon Nitinol Filter/Straight Line Technical File, BPVE-01-00066044, at 98–99.  Since these early clinical studies, there have been zero SNF migration deaths and a significantly lower number of Simon Nitinol migrations compared to Recovery, G2,

---

and Eclipse reported to Bard through May 2011. *See* Ex. 14, Chart of Filter Fracture

Complaints.

11.     In Bard's sole clinical study for the Recovery filter, the filter in one of the 32

study patients fractured twice. After the fractures were reported, the Canadian Institutional

Review Board suspended the study. Additional adverse events in this study included two tilted

filters, one migration, and one perforation of the IVC.  Ex. 17, Deposition of Murray Asch, May

2, 2016, at 26:8–15; Ex. 18, Murray R. Asch, MD, FRCPC, *Initial Experience in Humans with a*

*New Retrievable IVC Filter*, Radiology 2002; 225:835–844), at 839–40, 843; Ex. 19, Email from

George Cavagnaro to Doug Uelmen and Carol Vierling, April 18, 2002.

12.     Bard's 510(k) applications for the Recovery did not disclose that filters at the low

end of the leg span specification only met the migration resistance test when the hooks were

engaged, but that those hooks were not always engaged.  Ex. 20, Recovery Filter System Special

510(k) Submission (K022236), Nov. 27, 2002, BPV-17-01-00057953–55; Ex. 21, Recovery

Filter System Special 510(k) Submission, July 10, 2002, BPV-TRIAL-EXHIBIT-0293.

13.     The failure of Recovery anchor hooks to engage was a marked difference from

the SNF.  Ex. 22, Deposition of David A. Kessler, MD, Oct. 5, 2016, at 179:3–181:19.

14.     Comparative bench testing for migration resistance conducted in March 2004

demonstrated that the Recovery filter: (a) performed worse than the SNF at every caval diameter;

(b) performed worse than almost all competitor devices at every caval diameter; and (c) failed

Bard's own performance threshold for resistance at 28 mm.  Ex. 23, Characterization of

Recovery Filter Migration Resistance in Comparison to Competitive Product Phase 1, BPVE-01-

00276094, at 97–99.

15.     Two months after full market release of the Recovery, Bard's national sales training manager stated: "Tilt resistance should probably be downplayed." Its marketing director acknowledged: "We knew very little about the long-term clinical performance of this device when we launched it. After a year of commercialization, there are still many questions that need to be answered."  Ex. 24, Email chain between Janet Hudnall to David Rausch, Feb. 26–27, 2004, BPVE-01-00373887.

16.     In the first 12 months after full market release there were seven deaths resulting from migration of the Recovery filter to patients' hearts.  Ex. 25, Recovery Filter Detached Limbs—Patient Comparison Matrix, Nov. 1, 2005, BPV-17-01-00035618, at 15–39.

17.     By April 2004, Bard knew that the Recovery filter was designed in a way that did not account for how the IVC actually behaved.  Ex. 26, Deposition of Len DeCant, May 24, 2016, at 326:22–327:13, 328:2–329:8.

18.     In the midst of the migration deaths from the Recovery filter, Bard initiated a Crisis Communication Plan which included a messaging instruction that "[c]omparison with other filters is problematic in many ways and we should avoid/downplay this as much as possible. When pressed, we simply paraphrase . . . that estimates based on the available data suggest that there is no significant difference in the rates of these complications between any of the devices currently marketed in the U.S., including the Recovery device."  Ex. 27, Email from John Lehman, Apr. 15, 2004.

19.     By May 2004, Bard determined that, based on complications, "[a]t a 95% confidence, there IS a significant difference between Recovery, Gunther Tulip, Bird's Nest and SNF."  Ex. 28, Email from Wong to Uelemen, May 20, 2004, BPV-01-00511127.

20.     By July 9, 2004, Bard determined that the Recovery had a fracture rate that was tens of times higher than other filters on the market.  Ex. 29, Health Hazard Evaluation, July 9, 2004, BPV-17-01-00002145.

21.     By September 2, 2004, Bard knew of 32 Recovery filter fractures. Of those 32, nine fragments had traveled to the heart or lungs of patients, including three open heart surgeries to retrieve fragments.  Ex. 30, Remedial Action Plan, Sept. 2, 2004, BPV-17-01-00034860–87.

22.     By December 2004, Bard determined that the Recovery filter had rates of complications as compared to all other filters, including the SNF, as follows: for deaths, 4.6 times higher; for migrations, 4.4 times; for IVC perforations, 4.1 times higher; and for fractures, 5.3 higher times higher. Bard concluded that "[t]hese differences were all statistically significant."  Ex. 31, Health Hazard Evaluation, Dec. 17, 2004, BPVE-01-01019821.

23.     In January 2005, Bard's internal analysis revealed that "the data and [a consultant's] analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted."  Ex. 32, Remedial Action Plan, Jan. 4, 2005, BPVE-01-01019773, at 77–78.

24.     According to Bard's current Quality Engineering Manager for New Product Development, Natalie Wong, the Recovery was worse than the SNF with regard to filter-related deaths and filter fracture.  Ex. 33, Deposition of Natalie Wong, Oct. 18, 2016, at 77:10–78:12, 111:16–112:18 [hereinafter Wong Dep. Tr.].

25.    On August 3, 2005, Bard's VP of Regulatory/Science reported the following comparison of the Recovery versus the SNF: 4500% greater rate of Recovery migrations; 16 deaths involving Recovery versus zero for SNF; Recovery deaths consisted of 11 from migrations of the device to the heart and five from pulmonary emboli the Recovery was intended to prevent; Bard also reported there were 68 Recovery fractures: 25 with metal struts embolizing to the heart or lungs and 4 requiring surgery to remove.  Ex. 34, Executive Summary, Aug. 3, 2005, BPV-17 -01-00170083.

26.    Despite advertising the G2 filter as being 12 times more resistant to fracture, Bard did not run a test for fracture resistance because it concluded that the resulting data "would still fall outside of the acceptable range" and it "didn't think the answer would support our design change."  Ex. 35, Email chain between Micky Graves and Charlie Simpson, Mar. 23, 2006, BPVE-01-01225832.

27.    Bard knew that comparatively, the SNF was a significantly safer device than the G2 filter. In December 2005, Dr. Ciavarella, Bard's Corporate Clinical Affairs Director, noted the complications with the G2 filter and stated: "The G2 is a permanent filter; we also have one (the SNF) that has virtually no complaints associated with it. 'Why shouldn't doctors be using that one rather than the G2?'"  Ex. 36, Email chain between David Ciavarella, Cindi Walcott, and others, Dec. 20–27, 2015, BPVE-01-00028224.

28.    In December 2005, internal Bard reports determined that the "reported rate of fractures [was] judged to be serious (Critical R002 rating)."  Ex. 37, Email from G. Schultz to K. Shifrin and J. Hudnall, Dec. 19, 2005, BPVEFILTER-01-00002447.

29.     By February 2006, Bard determined the G2 filter was migrating caudally and a "high percentage of caudal migrations accompanied by significant filter tilting and limb displacement." Bard concluded the severity of these occurrences was "critical."  Ex. 38, Health Hazard Evaluation, Feb. 15, 2006, BPVEFILTER-01-00008355.

30.     By March 2, 2006, Bard determined the G2 filter propensity for caudal migration—the type of migration experienced by Plaintiff—represented an "unacceptable risk" of serious injury and death.  Ex. 39, G2 Caudal Migration report, Mar. 2, 2006, BPVE-01-00720835.

31.     Nonetheless, Bard took no "preventative action" to warn physicians or patients about the "unacceptable risk." Ex. 33, Wong Dep. Tr., at 155:10–25, 156:10–12, 179:4–7, 181:18–22.

32.     In March 2006, internal emails at Bard described "a terrible situation [with Bard's IVC filters] that was held together with scotch tape, smoke, mirrors, crying, etc." Ex. 40, Email from Jason Greer to Janet Hudnall, Mar. 16, 2006, BPVE-01-00946624.

33.     In August 2006, the medical monitor for Bard's clinical retrievability study for the G2 filter expressed significant concern regarding the rate of tilt in the study and suggested Bard consider redesigning the filter at that point.  Ex. 41, Medical Monitoring Adjudication Meeting Minutes, Aug. 28, 2006, BBA-00012802–21, at 803.

34.     By June 2008, Bard had identified the need to make material improvements to the G2 filter to reduce migration, tilt, fracture, and perforation.  Ex. 42, Bard PowerPoint Presentation, Ex. 534 to Ganser Dep., at 3–13; Ex. 43, G2 Platinum presentation, June 2008, BPVE-01-00624026, at 33.

35.     By November 2008, Bard was aware that the G2 filter had significantly higher rates of caudal migration, tilt, and perforation than even the Recovery. Ex. 42, Bard PowerPoint Presentation, Ex. 534 to Ganser Dep., at 3–13; Ex. 43, G2 Platinum presentation, June 2008, BPVE-01-00624026, at 33.

36.     As of August 2010, Bard had documented 172 fractures in G2, G2X, and Eclipse filters. Of those, 60 percent were discovered at retrieval – meaning most fractures continued not to be discovered without doctor invention. Bard also knew that both the number of fractures and rate of fractures had increased since the full market release of the G2.  Ex. 45, Filter Fracture Analysis, Aug. 2010, BPV-17-01-00170378, at 79, 81.

37.     Bard knew that fracture, tilt, and perforation were caused by migration, including caudal migration—one of the product failures experienced by Plaintiff.  Ex. 46, Binkert, et al., *Technical Success and Safety of Retrieval of the G2 Filter in a Prospective, Multicenter Study*, J. Vasc. Interv. Radiol. 2009; Ex. 38, Health Hazard Evaluation, Feb. 15, 2006, BPVEFILTER-01-00008355, at 55, 57; Ex. 47, Bard PowerPoint Idea POA Eclipse Anchor Filter, BPVE-01-02077858, at 58 ("This improvement in caudal migration resistance should reduce subsequent tilt, fracture, and penetration.")

38.     Bard knew the G2 and G2X filters had increased rates of caudal migration as compared to the Recovery.  Ex. 47, Bard PowerPoint Idea POA Eclipse Anchor Filter, at 58.

39.     Bard was aware that the physician perception was that "design sacrifices" were made for its optional filters that led to higher rate of movement or migration, which Bard knew led to an increased risk of fracture.  *Id.*

40.     Bard's internal analysis demonstrated that the Recovery filter fractured 55 times more often than the SNF, that the G2 fractured more than 12 times as often as the SNF, and that the G2X fractured 10 times as often as the SNF, and the Eclipse, even after limited sales, fractured nearly 4 times as often as the SNF.  Ex. 14, Chart of Filter Fracture Complaints.

41.     Bard's retrospective analysis of its filter fractures groups the G2, G2X, and Eclipse together and shows that both the number of fractures and the cumulative fracture rate increased consistently over time.  Ex. 48, Filter Fracture Analysis, May 2016, BPVEFILTER-01-00303182, at 82–86.

42.     Bard's retrospective analysis of its filter fractures was consistent with the later medical literature.  A 2009 study demonstrated that, after 180 days, Bard IVC filters began to fracture. Ex. 49, F.C. Lynch & S. Kekulawela, *Removal of the G2 Filter: Differences between Implantation Times Greater than and Less than 180 Days*, 20 J. Vasc. Interv. Radiol. 1200 (2009). A 2010 study demonstrated that Bard's filters had an increasing fracture rate over time and an expected fracture rate of approximately 25 percent at 50 months.  Ex. 50, W. Nicholson et al., *Prevalence of Fracture and Fragment Embolization of Bard Retrievable Vena Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade*, 170 Arch. Intern. Med. 1827 (2010).

43.     The Eclipse filter is essentially the same filter as Bard's G2X IVC filter.  As Bard explained in its own 510(k) application summary, the only material difference between the G2X and the Eclipse "was an improvement of the surface finish of the filter raw material wire by electropolishing the wire prior to forming the filter."  Ex. 51, Eclipse Application Summary, at 2.

44.     Bard electropolished the Eclipse filter, which made no changes to the filter's performance or complications, in order to make a name change to "break with the baggage associated with the previous versions despite the fact that the new iteration was the same as G2X in every way but one [electropolishing]." Ex. 52, Email from Filter Marketing to Bill Little, Apr. 27, 2010, BPVE-01-00580608.

45.     The ostensible goal of this design change was to improve fracture or corrosion resistance of the filter. Ex. 2, Muehrcke Report, at 11 ("The G2, G2x and Eclipse are essentially all the same filter design. The G2x has an added retrieval hook, and the Eclipse is electropolished ostensibly to help prevent fractures.").

46.     However, there was no evidence the change improved fracture resistance or corrosion resistance. Ex. 53, Deposition of Abithal Raji-Kubba, July 18, 2016, at 167:18–168:2.

47.     As Plaintiff's engineering expert Dr. McMeeking explains, the electropolishing did not improve the fatigue life of the Eclipse, and "[b]ecause no other attributes of the filter were changed when the G2 Express was redesigned as the Eclipse, design deficiencies represented by tilt, perforation and migration were left unaffected. Therefore, such design deficiencies of the Eclipse will be just as bad as those seen in the G2 family." Ex. 10, McMeeking Report I, at 13–15; *see also* Ex. 11, McMeeking Report II, at 14–16; Ex. 1, Hurst Report, at ¶ 4(b)(iii) ("The Eclipse filter is identical to the G2X filter in all aspects of design and manufacture, except for post-manufacturing electropolishing of the device. Therefore, the behavior of the device is identical to the predicate devices.").

### *Defendants Proximately Caused Plaintiff's Injuries*

48.     Dr. Hurst reviewed, agreed with, and adopted the opinions and bases therefor as set forth in, the expert reports of Drs. Thomas Kinney, Anne Christine Roberts, Sanjeeva Kalva,

Robert M. McMeeking, Rebecca A. Betensky, and Mark. J. Eisenberg, which were previously disclosed by Plaintiffs in *In Re Bard IVC Filters Products Liability Litigation*, USDC for the District of Arizona, Case No. MD-15-02641-DGC.  Ex. 1, Hurst Report, ¶ 2(f).

49.    Dr. Muehrcke read and relied upon the data and opinions set forth in the expert reports of Drs. Thomas Kinney, Anne Christine Roberts, Sanjeeva Kalva, Robert M. McMeeking, and David Kessler which were previously disclosed by Plaintiffs in *In Re Bard IVC Filters Products Liability Litigation*, USDC for the District of Arizona, Case No. MD-15-02641-DGC.  Ex. 2, Muehrcke Report, at 9.

50.    Dr. Hurst explained that "it's the design of the device that centers the device in the inferior vena cava," but that "[d]espite design characteristics of these devices, they do not center and can end up tilted regardless of what the implanting physician does," and that therefore "Dr. Mena implanted the device appropriately" even though "[t]he device tilted when it was implanted."  Ex. 6, Hurst Dep. Tr., at 37:22–39:3.

### ***Defendants Failed to Warn Plaintiff's Physician of the Risks of Using the Eclipse Filter***

51.    Dr. Mena's custom and practice is to read the IFU for any new medical device he implants.  As Dr. Mena testified:

> Q. . . . Do you read the instructions for use in connection with the different implants that you perform?
> A. If it's a new device, yes, I do.

Ex. 3, Mena Dep. Tr., at 67:2–5.

52.    Dr. Mena acted in conformity with that custom and practice by reading the IFU for the Eclipse filter prior to the first time he implanted it.  As Dr. Mena testified:

> Q. So the first time that you implanted the Eclipse inferior vena cava filter, would you have read the IFU?
> A. I probably did.
> . . . .

> Q. . . . Now, you read this [IFU] -- before you ever put in a particular filter, like Eclipse, I believe your testimony was that your normal and usual course would be that you would read that if you're putting in a new filter -- fair?
> . . . .
> A. Fair.

*Id.* at 68:7–10, 223:12–18.

53.     At the time of implant, Dr. Mena expected that the Eclipse filter had a similar risk profile as other filters on the market at the time: that the Eclipse did not have greater risk of fracture than other filters, and that the Eclipse did not have a greater risk of fracture over time when placed as a permanent filter.  As Dr. Mena testified:

> Q. . . . I believe your testimony was that you expected that whatever IVC filter that you were putting in would have a similar risk profile as any of the other filters on the market, right?
> . . . .
> Q.  Is that your testimony?
> A.  Yes.

*Id.* at 227:7–15.

> Q. . . . Do you expect a medical device that goes into a patient, that is meant to go into a patient permanently, for life, do you expect that filter to be as safe in year 20 or 30 as it was in year one?
> . . . .
> A. I would hope that it was.
> . . . .
> Q.  Do you expect it to become more breakable as the years go forward?
> . . . .
> A. I wouldn't expect it to become more breakable. I would hope that it would be just as structurally intact as when I put it in.  That's what I would hope.

*Id.* at 224:10–22.

54.     Dr. Mena expected that Defendants would have fully informed him, and wanted Defendants to fully inform him, of the risk profile of the Eclipse filter, including whether it had higher rates of fracture than other filters on the market at the time.  As Dr. Mena testified:

Q. . . . [W]ould you have wanted to know if the Eclipse filter had a higher risk profile than another filter on the market?  Would you have wanted to know that?

. . . .

A.  It would be good to know if it was -- if it was a significantly higher risk

. . . .

Q.  Do you expect the manufacturer to give you relevant information regarding the risks and the benefits of the product that they're selling you?

A.  Yes.

. . . .

Q.  If the Eclipse filter did carry a greater risk of fracture than other filters, wouldn't you have expected the manufacturer to tell you that there [in the IFU]?

. . . .

A.  Yes.

. . . .

Q.  Why would you have expected them to tell you if their filter, the Eclipse, carried a greater risk of fracture than other filters?

A.  Because we should know that.

Q.  And you -- for -- and when you are making the decision as to whether or not to use a filter and having that discussion with your patient, is that information that would be important to you, to know if there's a greater risk of fracture when you're reading this paragraph [in the IFU]?

. . . .

A.  If it's significantly different, yes, I would like to know.

*Id.* at 226:11–17, 233:23–234:1, 238:16–239:14.

55.     Defendants' own employees agree that Bard should have communicated to physicians and patients statistically significant findings that Bard's IVC filters had greater risks, complications, and malfunctions than the SNF and competitor filters.  Ex. 58, Deposition of Christopher Ganser, Oct. 11, 2016, at 68:9-69:10; 263:17–264:7; Ex. 59, Deposition of John McDermott, Feb. 5, 2014, at 142:18–144:1; 152:16–154:4; 166:9–168:18; 288:13–289:7; 290:15–291:18; Ex. 33, Wong Dep. Tr., at 84:21-87:25.

56.     By omitting and concealing information about the Eclipse's relatively high failure rates, Defendants did not fully inform Dr. Mena of the risk profile of the Eclipse filter or of the

need to promptly remove the filter after placement.  *See generally* Defs.' Ex. I, Eclipse IFU, at 1.

As Dr. Mena testified:

> Q. . . . [D]o you see anywhere in that section of warnings [in the IFU]
> where Bard tells you that the use of the Eclipse filter carries with it a greater risk
> of fracture than other filters?  Is that in that section?
> A.  No.

*Id.* at 238:8–12.  Dr. Hurst opined:

> 1. The IFU describes a myriad of possible risks following IVC filter
> placement, without providing clear information on the likelihood of those risks
> or the potential severity of new complications such as, for example, tilt, IVC
> penetration, adjacent organ penetration, or fragment embolization to the heart
> and lungs.

> 2. The IFU provides no clear recommendations for imaging follow-up of
> the device.

> 3. The IFU provides insufficient warning of the incidence and seriousness
> of the cascade of events of tilt, migration, fracture, and especially fractured
> component embolization to the heart and lungs that was characteristic of these
> devices and occurred with a higher frequency and more serious complications
> than the prior permanent SNF device and other filters available at the time.

> 4. Despite knowing that the Bard Eclipse retrievable filters were not
> designed or tested for permanent use, the IFU provides no timeline for removal
> of the device, claiming that the device is safe and appropriate for both temporary
> and permanent use.

Ex. 1, Hurst Report, at ¶ 4(b)(vi).  Dr. Muehrcke opined:

> [A] prudent manufacturer would warn implanting physicians about its filters'
> performance. . . . Bard kept to itself information about the higher complication
> rates of its Recovery and G2 platform filters [including the Eclipse] as compared
> to other filters.  Further Bard did not instruct physicians to remove the filters after
> they were no longer needed to reduce the risk to patients in the case of retrievable
> filters. Nor did it tell implanting physicians to follow patients for complications
> Bard was aware were occurring given their internal documents. Bard failed to
> provide implanting physicians' information they needed to be as an informed
> intermediary. . . . Bard failed to notify the operating physicians and the implanted
> patients of the much higher complication rates associated with the Recovery and
> G2 filters [including the Eclipse] in comparison to the original predicate device,
> the Simon Nitinol Filter, and competitor filters. . . . *Bard had the opportunity to*
> *warn physicians about the higher risk of their filters in their IFU but chose not to*.

Ex. 2, Meuhrcke Report, at 14–16 (emphasis added).

57.     Because Dr. Mena was not fully informed of the risk profile of the Eclipse filter by Defendants, he was unable to communicate to Plaintiff the true risk of using the filter or the need to promptly remove the filter after implantation, and was thus unable to obtain Plaintiff's informed consent to implantation. *See* Ex. 60, Expert Report of Timur Sarac, MD, Jan. 8, 2021, at 21 (Defendants' expert discussing the informed-consent process, during which Dr. Mena did not inform Plaintiff of the higher relative risks of using the Eclipse as compared with other filters on the market, and did not discuss with Plaintiff the need for prompt retrieval of the filter). Further, as Dr. Hurst Opined: "The Bard Eclipse IFU was inadequate for use by physicians in . . . consent of the patient." Ex. 1, Hurst Report, at ¶ 4(b)(vi).

58.     Because Dr. Mena was not fully informed of the risk profile of the Eclipse filter, he was unable to conduct an adequate risk-benefit analysis when deciding to use the filter. As Dr. Hurst Opined: "The Bard Eclipse IFU was inadequate for use by physicians in medical decision making . . . ." *Id.*

59.     Had Dr. Mena known about the Eclipse's relatively high failure rates or increasing risk of fracture the longer it remained implanted, he would have informed Plaintiff of those risks and/or not used the filter. As Dr. Mena testified:

> Q. . . . If you had believed that the Eclipse filter was more prone to fracture than another filter, would you have chosen it over the other filter?
> . . . .
> A. I always want to put the safest thing in my patient.
> . . . .
> Q. Okay. And if you discovered that an IVC filter that -- if you discovered that an IVC filter was more unsafe than another filter on the market, would that be something that you would at least want to inform your patient of before you would use that filter?
> . . . .

---

**Plaintiff's Responses and Statement of Facts**                    Page 65 of 71

A.   Well, first of all, if the safety wasn't there,  then I'd bring it up to my -- to my hospital first so that they could change what they're providing for us to put in the patients.

. . . .

Q.   Yes.

A.   So that would be the first thing.  And – and that's what I would do. And absolutely, if there's a risk of whatever complications, I would want to tell the patient, yes.

. . . .

Q. . . . If you believed that the Eclipse filter, at the time you placed it, had a higher rate of fracture than other filters, would that have been important information for you to have?

. . . .

A.   Yes.

. . . .

Q.   And is that information that you would have at least wanted to provide to your patient?

. . . .

A.   Like I said earlier, yeah, I would tell the patient about it.  But on the other hand, if I was concerned that it was a really bad filter, the first place I would go to would be the hospital to change the filter out and get one that's safer.

. . . .

Q. . . . If you came into information that a filter that you were about to put in a patient was a less safe filter than another filter, it doesn't sound like you'd want to put it in.

. . . .

Q.  Is that true?

A. No, I don't want to put anything that's unsafe into my patients.

. . . .

Q. . . . If you knew that a filter had a substantially higher risk than another filter of breaking while in the body of your patient, would that be something -- would that be a filter that you would want to use?

. . . .

A.  No.

. . . .

Q.  Why not?

A.   Because it has a high risk, and I don't want to put -- I want to put the safest thing in my patient.

Q.  If you had known that the Eclipse filter had had a substantially higher risk of fracture than another filter, would you have wanted to put the Eclipse in?

. . . .

A.  No.

. . . .

Q.  If you had known that the Eclipse had a substantially higher rate of migration than other filters, would you have wanted to use the Eclipse?

. . . .

A.  No.

. . . .

Q.  And why is that?

A.  Again, because I want to put the safest thing in the patient.

Q. . . . If you knew that a particular IVC filter, such as the Eclipse, at the time you placed it in Mr. Couturier, if you knew that it carried a significantly greater risk of harm than another IVC filter, would you have implanted the device?

. . . .

A.  No.

Q. . . . If you had known that the Eclipse filter, which instructions for use says it is designed to act as a permanent filter, if you had known that the Eclipse filter was not safe for use as a permanent filter, would you have used it?

. . . .

A.  If it was not safe, if I considered it not safe, no, I wouldn't use it.

Ex. 3, Mena Dep. Tr., at 225:22–226:5, 228:16–229:6, 229:17–230:7, 230:12–20, 232:8–233:8, 236:6–12, 236:25–237:7.

Dr. Hurst concurs: "Had I been the plaintiff's implanting physician and aware of the safety issues that were known to Bard at the time of implantation of this device, I would not have used the Eclipse filter for the prevention of PE in my patients." Ex. 1, Hurst Report, at ¶ 4(b)(ix). Dr. Muehrcke also concurs: "Had I been Mr. Couturier's implanting physician and been aware of the safety issues that were known only to Bard at the time of implantation of the Eclipse device, I would not have used Bard filters including the Eclipse for the prevention of PE. No reasonably prudent physician would have." Ex. 2, Muehrcke Report, at 16.

60.    If Plaintiff's wife had been presented with the true risk profile of the Eclipse, she might have changed her mind about whether to consent to implantation. Ex. 5, Couturier Melissa Dep. Tr., at 127:23–128:1.

### *Defendants Defectively Designed the Eclipse Filter*

61.    Dr. McMeeking opined that when designing the Eclipse, Bard

---

fail[ed] to adhere to professional and industry standards in the engineering activities involved in the conceptualization, design and analysis of the filter.  For example, the attempts to identify all possible failure modes of the Eclipse filter were inadequate, and the Eclipse was not thoroughly tested prior to being marketed. In addition, the fact that the Eclipse filter was placed on the market despite knowledge by Bard and its employees of the many failures experienced by essentially identical filters is contrary to engineering professional, industry and government standards, which require design modifications to eliminate potential causes of failures when failure modes are discovered. In addition, it is clear that Bard did not use design and analysis methods that conformed to the state of the art in its industry at the time the Eclipse filter was designed.

Ex. 10, McMeeking Report I, at 14; *see also* Ex. 11, McMeeking Report II, at 15.

62.     Dr Muercke opined that "The Bard Eclipse filter was unreasonably dangerous and the dangers of this filter outweighed any benefits at the time it was implanted in Mr. Couturier," which ultimately caused the filter to injury Plaintiff by "caudally tilting, perforating the IVC, fracturing, and embolizing a fragment to the heart in a dangerous fashion," which  "placed the health and safety of Mr. Couturier at unnecessary risk with no meaningful medical benefit."  In short, "[t]he Eclipse filter does not perform, and in Mr. Couturier's situation, did not perform as a reasonable physician and patient would expect."  Ex. 2, Muehrcke Report, at 10.

63.     Dr. Hurst opined:

It is my opinion within reasonable medical and scientific certainty that if the implanting physician determined that the plaintiff needed a permanent filter, the Simon Nitinol filter, which was on themarket at the time of the filter implantation, was a safer alternative filter for the plaintiff because it would have significantly reduced the risk of the cascade of events of embedded filter, tilt, migration, fracture, embolization of fractured struts, and penetration of the IVC and adjacent organs/structures the plaintiff experienced. . . . Alternatively, the Gunther Tulip filter, which is a retrievable filter that was on the market at the time of filter implantation, was a safer alternative filter for the plaintiff because it would have significantly reduced the risk of the cascade of events of embedded filter, tilt, migration, fracture, embolization of fractured struts, and penetration of the IVC and adjacent organs/structures the plaintiff experienced.

Ex. 1, Hurst Report, ¶ 4(b)(ix).

64.     Dr. Muehrcke Opined:  "none of the Bard permanent-but-retrievable filters were equal to the predicate SNF in safety."

65.     Dr. McMeeking reports: "[T]he design of the SNF is substantially better than those of the Recovery, G2 and similar Bard filters [including the Eclipse], with respect to migration, tilt, arm fracture and arm perforation, after considering the combination of attributes that are positive or negative in each case for each filter design"; "the SNF is a safer filter than the Recovery, G2 and similar Bard filters [including the Eclipse]."  Ex. 57, McMeeking Report III, at 16.

### *Defendants Breached Their Express Warranties to Plaintiff*

66.     The Eclipse IFU represents that the Eclipse "is designed to act as a permanent filter" and that "[t]he centering system allows the Eclipse Filter to be deployed with the retrieval hook centered and minimizes the potential for legs crossing."  Defs.' Ex. I, Eclipse IFU, at 1 (Rec. Doc. 122-12); *see also* Ex. 6, Hurst Dep. Tr., at 80:19–81:2.

67.     In response to Plaintiff's Request for Admission No. 7, Defendants have admitted that "Bard Peripheral Vascular, Inc. marketed the Eclipse IVC filter and that the FDA cleared the device for both permanent and temporary placement, that the device was therefore indicated for such uses, and that, after the FDA cleared the device for both uses, it was marketed for those uses." Ex. 62, Defs.' Objections and Responses to Pl's 1st Written Discovery Requests.

68.     In marketing materials, Defendants claimed that "[t]he Eclipse Vena Cava Filter is designed to be a permanent implant and does not have to be removed, repositioned, or replaced," and listed risks associated with implantable filters, does not explain the relatively higher risks associated with the Eclipse as opposed to other filters on the market.  Ex. 61, BPV-17-01-00142907.

69.     In response to Plaintiff's Interrogatory No. 17, Defendants identified BPV-17-01-00142907 as representative of marketing materials for the Eclipse filter.  Ex. 62, Defs.' Objections and Responses to Pl's 1st Written Discovery Requests.

70.     Plaintiff, through his wife, relied on the representations made to Dr. Mena by Defendants through the IFU when she consented to placement of the filter at Dr. Mena's recommendation.  Ex. 5, Couturier Melissa Dep. Tr., at 81:20–84:10 (agreeing that she "ultimately decided to accept Dr. Mena's recommendation and proceed with the implant of the IVC filter").

71.     Contrary to Defendants' representations, in Plaintiff's case, the Eclipse has not functioned as a permanent filter; instead, it has, as plaintiff pled in the Master Complaint, been prone to an unreasonably high incidence of fracture and perforation of vessels and organs and an unreasonably high incidence of injury to the vessels and organs of its purchaser.  Dr. Hurst has opined that "[t]he Bard Eclipse Filter in the plaintiff should be removed from the plaintiff, as it has fractured/deteriorated, is significantly tilted, become embedded, has multiple penetrations of the IVC, is a significant ongoing risk for future complications, and no longer provides safe and effective protection from PE as designed."  Ex. 1, Hurst Report, ¶ 4(c)(i)(3)(a).  Dr. Muehrcke has opined that Plaintiff "continues to be at risk of deadly cardiac complications as a result of his Bard Eclipse filter deteriorating in his body" and that Plaintiff's "IVC filter is nonfunctional as a result of its tilt, and unlikely to stop any clots going to his lungs.  Moreover, it's literally falling apart, and its struts are dangerously close to important abdominal structures.  A complex retrieval attempt to try and take out the filter should be made . . . ."  Ex. 2, Muehrcke Report, at 17–18. Dr. Cook has reported that "[t]here is radiologic evidence of two embolized arms of the IVC filter. One is within the pulmonary artery of the right lung. The second is penetrating through the

right ventricle into the pericardium. There is evidence of motion of this arm when the heart beats. The surrounding pericardium is thickened suggesting damage from the foreign body. . . . The filter is currently tilted and penetrating through the wall of the IVC and interacting with surrounding internal structures." Ex. 9, Levy Report, at 60.

72.     Contrary to Defendants' representations, in Plaintiff's case, the Eclipse has not functioned as a self-centering filter; instead, it tilted upon placement, not because it was improperly placed, but because of its defective design.  Dr. Hurst explained that "it's the design of the device that centers the device in the inferior vena cava," but that "[d]espite design characteristics of these devices, they do not center and can end up tilted regardless of what the implanting physician does," and that therefore "Dr. Mena implanted the device appropriately" even though "[t]he device tilted when it was implanted."   Ex. 6, Hurst Dep. Tr., at 37:22–39:3.