## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CRAIG COUTURIER | CASE NO. 2:19-cv-12497 |
| Plaintiff, | |
| | JUDGE IVAN L.R. LEMELLE |
| v. | |
| BARD PERIPHERAL VASCULAR, INC. AND C.R. BARD, INC. | MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT |
| Defendants. | |

**PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 18 TO PRECLUDE ANY EVIDENCE, TESTIMONY, REFERENCE OR ARGUMENT THAT BARD IS A BAD CORPORATE CITIZEN, THAT THE JURY SHOULD SEND A MESSAGE OR PUNISH BARD, OR THAT BARD PRODUCES BAD PRODUCTS (ECF NO. 208)**

Plaintiff responds in opposition as follows to Defendants C. R. Bard, Inc. and Bard Peripheral Vascular Inc.'s (collectively "Bard") Motion *in Limine* No. 18 to Preclude Any Evidence, Testimony, Reference or Argument that Bard is a Bad Corporate Citizen, that the Jury should Send a Message or Punish Bard, or that Bard Produces Bad Products (ECF No. 208) as follows:

### I.     STATEMENT OF ISSUES

Despite the misleading title of Bard's motion, the issues as actually raised in the motion are whether or not Plaintiff should be entitled to argue or introduce evidence as to Bard's

knowledge, intent, and motive with regard to decisions regarding warnings, product design, and marketing and whether or not the Court should exclude comparison to Bard's "substantially equivalent" predicate products in Bard's filter line, including as evidence of safer alternative design.

## II.      SUMMARY OF ARGUMENT

Although it is not entirely clear what Bard means by "corporate culture," Plaintiff's counsel does not intend to disparage Bard's corporate culture by saying "shame on the corporation" or saying that Bard is a "bad corporate citizen," and Plaintiff's counsel has no intention to ask the jury to "Send a message" to Bard. However, Plaintiff does intend to prove to the jury that Bard knowingly kept a flawed product on the market while it attempted to develop a new IVC filter. Further, comparison to Bard's other IVC filter products that were predicate devices for the Eclipse filter at issue and the basis for FDA clearance of the Eclipse and its predecessors as "substantially equivalent" to those other products is relevant to Plaintiff's failure to warn and design defect claims, particularly as evidence of safer alternative design.

## III.     STANDARD OF REVIEW

Motions *in limine* are disposed of "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) (district court's authority to rule on motions *in limine* is derived from its inherent authority to control the course of trials). Motions *in limine* fall within the ambit of trial court discretion. *Buford v. Howe*, 10 F.3d 1184, 1188 (5th Cir. 1994) ("This court reviews rulings on motions *in limine* for abuse of discretion."). "As is commonly understood, motions *in limine* serve the purpose of addressing threshold evidentiary concerns before trial begins." *Johnson v. State Farm Fire & Cas. Co.*, No. 07-1226, 2008 U.S. Dist. LEXIS 89215, at *3 (E.D. La. May 14, 2008). "Evidence should not be

excluded through a motion *in limine* unless it is clearly inadmissible on all potential grounds."
*Kelly v. Patel*, 2021 U.S. Dist. LEXIS 113210, at *3 (W.D. La. June 16, 2021).

## IV.    ARGUMENT AND AUTHORITIES

### A.    Bard's "corporate culture."

Although it is not entirely clear what Bard means by "corporate culture," Plaintiff does not intend to disparage Bard's corporate culture by saying "shame on the corporation" or saying that Bard is a "bad corporate citizen."  Bard's internal documents speak for themselves regarding what transpired within the company regarding the design, decisions regarding warnings, and marketing of Bard's IVC filters. In addition to Bard's internal documents, the testimony from Bard's former employees will show that Bard was more concerned with protecting themselves than they were about the safety of their product. This evidence goes directly to Plaintiff's claims for design defect and failure to warn.

### B.    Plaintiff is entitled to introduce evidence in support of Liability of Defendants' knowledge, intent, and motives.

As in other motions *in limine*, in this motion, Bard again improperly seeks to have a fact question determined by excluding relevant evidence based solely on the grounds that it is detrimental to Bard's case.

#### 1.    History and Evolution of the Eclipse Filter.

The Bard IVC Filter litigation involves multiple versions of Bard's IVC filters that are intended to catch blood clots before the clots travel to the heart and/or lungs.  Each of these filters is a variation of its predecessor and each was marketed under a 510(k) clearance from the FDA, based on Bard's position (and FDA's determination) that each filter was "substantially equivalent" to a predicate device in Bard's IVC filter product line, starting with the Simon Nitinol filter

("SNF").  The Bard Eclipse filter is a Class II medical device and was cleared for commercialization in the United States via the 510(k) process, which required the Eclipse to be substantially equivalent to its predicate device regarding safety and efficacy.[1]  The predicate device for the Eclipse filter was the Bard G2X filter, which was also cleared for commercialization via the 510(k) process based on its alleged equivalence to its predicate device, the Bard G2.[2]  The predicate device for the G2 filter was the Bard Recovery filter, which once again was cleared for commercialization via the 510(k) process based on its alleged equivalence to its predicate device, the Bard Simon Nitinol Filter.[3]

Bard was aware of the serious problems with its line of filters as early as December of 2004. It was discovered at that time that the Recovery Filter had substantially higher reported failure rates when compared to the SNF (upon which the Recovery Filter was predicated) and other filters manufactured by Bard's competitors.[4]  Specifically, Bard's Recovery was known to be:

- 4.6 times more likely to result in a death of the patient than all other filters on the market, including Bard's very own SNF;
- 4.4 times more likely to have a filter migration (movement) than all other filters on the market, including Bard's very own SNF;
- 4.1 times more likely to have an IVC perforation than all other filters on the market, including Bard's very own SNF; and
- 5.3 times more likely to have a filter fracture than all other filters on the market, including Bard's very own SNF.[5]

Bard's December 17, 2004, Health Hazard Evaluation ("HHE") provided: "[a]n analysis of reporting rates of serious adverse events for all inferior vena cava filters, as determined by

---

[1] Ex. 1, Eclipse Special 510(k) Submission Summary, BPV 17-01-00117000–00117002.

[2] *Id.*; Ex. 2, March 7, 2008 FDA Ltr. re: Special 510K notification G2 Express Filter System).

[3] *Ex. 3 Nov. 27, 2002 FDA Ltr. re: Recovery Filter 510(k) approval;* Ex. 4 July 25, 2003 FDA Ltr. re: Recovery Filter 510(k) submission packet and approval ("Recovery Retrievable 510(k) Clearance.

[4] Ex. 5, HHE, Dec. 17, 2004, BPVE-01-01019821.

[5] *Id.*

analysis of the MAUDE and IMS databases by a consultant, revealed that reporting rates for Recovery are significantly higher than other filters."[6]  The HHE also noted that "[r]eports of death, filter migration (movement), IVC perforation, and filter fracture associated with Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 higher, respectively, than reporting rates for all filters.  These differences were all statistically significant."[7]  Bard's Corporate Clinical Affairs Director, Dr. Ciavarella, thereafter concluded that Bard should consider warning consumers (*i.e.* implanting physicians) of the higher failure rates associated with the Recovery.[8]   Dr. Ciavarella spelled out precisely the life-threatening consequences of IVC filter failures:

> The consequences of reported adverse events associated with the Recovery IVC filter depend on the kind of event. Filter migration to the heart, especially when the filter is encased in thrombus, has been associated with sudden death. Filter fracture maybe asymptomatic but has been associated with fragment embolization to the heart causing syncope and/or arrhythmias.  IVC perforation is generally asymptomatic, but can lead to serious bleeding and, if occurring in conjunction with filter limb fracture, may be associated with fragment migration outside the IVC to nearby organs.[9]

Within three months after the G2 Filter was cleared for sale as substantially equivalent to the Recovery filter, Defendants knew of a concerning safety signal for IVC perforations that needed to be investigated—the reported perforation failure rate for the G2 Filter was approximately 14 times that of the SNF.[10]

On January 4, 2005, a Bard Remedial Action Plan observed: "In the MAUDE dataset, the RNF demonstrated: a consistent, statistically significant and potentially clinically important higher rate of reporting adverse events in the several analyzed categories. . . . the data and [a consultant's]

---

[6] *Id.*
[7] *Id.* at BPVE-01-01019822.
[8] *Id.* at BPVE-01-00245383.
[9] *Id.* at BPVE-01-00245381.
[10] Ex. 6, MAUDE Data Through Q3 2005, BPVE-01- 01510717–01510719.

analysis provided two significant signals that further investigation particularly in relation to migration and fracture is urgently warranted. . . . Of greatest concern were reports of migration and fracture."[11]   On April 19, 2005, Chris Ganser, Corporate V.P. of Regulatory Sciences and Head of Quality Assurance, reported to the CEO and COO of C.R. Bard the comparative MAUDE/IMS data which was compiled by Bard for IVC filter fatalities, fractures and migrations (through Q4 2004) showing a higher rate of migration and fatalities with the Recovery versus the SNF and competitor filters.   He also reported on a significantly greater number of fractures compared to SNF's 15 year marketing history.   This data was from Bard's own internal adverse event reports and actual sales data and revealed the following comparisons to the SNF which was Recovery's predicate device:   3300% greater rate of Recovery migrations (34 total); 14 deaths involving Recovery versus zero for SNF, including nine from migrations of the device to the heart and five from pulmonary emboli; and 51 Recovery fractures, 18 with metal struts embolizing to heart or lungs, and three requiring surgery to remove, including one open heart surgery.[12]   By July 2005, Bard's sales force discussed internally that the SNF, the predicate to RNF, was the "safest filter on the market."[13]   On August 3, 2005, Chris Ganser again reported to CR Bard CEO and COO, comparative MAUDE/IMS data for IVC filter fatalities, fractures and migrations compiled by Bard through the second quarter of 2005.   The data showed a higher rate of migration and fatalities with the Recovery versus the SNF and competitor filters, and significantly greater number of fractures compared to SNF's 15-year sales history.   Compared to the SNF, the data revealed: 4500% greater rate of Recovery migrations; 16 deaths involving Recovery versus zero for SNF, including 11 from migrations of the device to the heart and five from pulmonary emboli the

---

[11] Ex. 7, Remedial Action Plan, Jan. 4, 2005, BPVE-01-01019773-825 at 19777-78.
[12] Ex. 8, Email from Chris Ganser to T. Ring, April 19, 2005, BPVE-01-00434275-76.
[13] Ex. 9, Email Greer to Alpie and others, July 16, 2005, BPV-DEP-00005665-66 at 66.

Recovery was intended to prevent; and 68 Recovery fractures, 25 with metal struts embolizing to the heart or lungs and 4 requiring surgery to remove.[14]

Bard then developed a next generation Recovery filter, known first as the "G1A improved Recovery filter" and later as the "G2" filter, with the objective of addressing and minimizing problems of filter migration and filter arm fracture with the Recovery.[15]  Pre-release, there was a "statistically significant difference" between the performance of the G1A/G2 filter and that of the SNF in migration resistance testing when compared to the SNF – the G1A/G2 performing far worse than the SNF.[16]  On August 29, 2005, the FDA cleared the G2 device for market with a permanent indication only.[17]

Despite advertising the G2 as being 12 times more resistant to fracture, Bard did not conduct thorough testing to support that claim.  Bard's engineers did not conduct thorough testing because it concluded that data "would still fall outside of the acceptable range" and the engineers "didn't think the answer would support our design change as a viable option."[18]  By November 2005, Bard was aware of a concerning signal for perforations with the G2 that needed to be investigated.   On November 10, 2005, Chris Ganser, Bard's V.P. of Quality Assurance, Environmental Services & Safety, wrote: "It's obvious from the table below and the attached MAUDE summary that there are some major discrepancies regarding the number of complaints, units sold, rates, etc. for G2. Your first cut at MAUDE Analysis sends some signals for caval

---

[14] Ex 10, Executive Summary, Aug. 3, 2005, BPV-17-01-00170083-84.
[15] Ex. 11, Hudnall, Mukherjee, Carr email chain, Aug. 25-26, 2004, BPVE-01-00008821; Ex. 12-A, Recovery Filter PowerPoint, Aug. 26, 2004, BPVE-01-00009466-85 at 69-70.
[16] Ex. 12-B, G1A Recovery Filter Femoral System Design Verification and Validation Report, BPV-17-01-00001134-153, 46.
[17] Ex. 13, G2 510(k) submission and Aug. 29, 2005 FDA clearance ltr.
[18] Ex. 14, Email chain between Graves and Simpson, March 23, 2006, BPVE-01-01225832.

perforation and deployment that have to be investigated expeditiously."[19]   *The reported perforation rate for the G2 in November 2005 was approximately ten times that of the SNF.*[20]   Bard was also aware by late 2005 that the G2 did not have increased migration resistance over the Recovery or the SNF and in fact appeared to have increased rates of caudal migration than both the Recovery and SNF, despite Bard's representations to the contrary.[21]   Regardless, Bard continued to market the G2 while the SNF, the original predicate device to the Recovery (which was the predicate device to G2), was experiencing "virtually no complaints."[22]

By February 15, 2006, a Bard HHE characterized the "Severity" of the migration problems with the G2 as "Critical" and stated that "the cases reported in the literature have not been as frequently associated with significant caudal movement (such as down to the iliac veins) or filter tilting and malpositioning as have been reported for the G2 filter" and noted a "high percentage of caudal migrations accompanied by significant filter tilting and limb displacement."[23]   Further, by March 2, 2006, Bard determined that the G2's propensity for caudal migration represented an "unacceptable risk" of serious injury and death.[24]

---

[19] Ex. 15, Email chain between Chris Ganser, Gin Schultz, Cindi Walcott, and others, November 7-14, 2005, BPVE-01-01510714-16 at 14.

[20] Ex. 6, Bard internal spreadsheet of Filter Sales and MAUDE data through Nov. 7, 2005/Q3 2005, BPVE-01-01510717 (showing "Caval Perforation" rates of .1336% for G2 and .0090% for SNF).

[21] Ex. 16, BPV-17-01-00001134-153, at 146, 151 (initial product performance specifications for migration resistance for G2 not equivalent to SNF); Ex. 17, Wong dep., at 146:13-23, 147:21-148:4 (Recovery and SNF were both more resistant to caudal migration than the G2 Filter); Ex. 18, Brauer 2017 Dep. at 249:19-250:6 (Based on internal Bard documents, in the first three to six months that the G2 was on the market it showed stability problems that were not an improvement over the SNF).

[22] Ex. 19, Email of Dec. 27, 2005 from Ciavarella, BPVE-01-00028224.  Dr. Ciavarella questioned why Bard was even selling the G2 Filter when Bard's own SNF "has virtually no complaints associated with it." *Id.*

[23] Ex. 20, HHE, Feb. 15, 2006, BPVEFILTER-01-00008355-57, at 55, 57.

[24] Ex. 21, G2 Caudal Migration Rpt., March 2, 2006, BPVE-01-00720835.

Bard continued to make minor inconsequential changes to the G2 filter in an effort to stay ahead of the coming criticism.[25] Bard went as far as to change the name of its line of filters to "break with the baggage" of the Recovery, G2, and G2X.[26] It is important to note that the only difference between the G2 and the Eclipse is the addition of a retrieval hook and electropolishing.[27] Also, Bard did not believe internally that electropolishing accomplished its singular purposed of reducing the likelihood of fracture.[28]

All of this history was known and/or available to Defendants prior to the placement of the Bard Eclipse into Mr. Couturier's vena cava in 2011. But none of this information was shared with the medical community and Bard never issued a recall of its defective filters.

> **2.     Important information available to Bard was not presented to Mr. Couturier's implanting surgeon and would have impacted his informed consent process and product selection.**

Dr. Mena, the implanting physician, likely reviewed the Eclipse IFU prior to Mr. Couturier's surgery; however, the risks referenced therein were not specific to the Eclipse.[29] The Eclipse IFU does not reference information regarding rate or frequency of complications, nor does the IFU inform physicians that the Eclipse poses greater risk than its competitors or Bard's own SNF.[30] Dr. Mena testified that knowing the rate and frequency of complications of a particular

---

[25] Ex. 22, Bard IVC filter medical articles.
[26] Ex. 23, Baggage email.
[27] Ex. 24 Randall depo at p 24.
[28] Ex. 25, Raji-Kubba depo at p 167.
[29] Ex. 26, Mena dep. at p 66- 68.
[30] With regard to fracture, in the "Warnings" and "Potential Complications" sections, the Instructions for Use ("IFU") for the Eclipse only provide "Filter fracture is a known complication of vena cava filters.  There have been reports of embolization of vena cava filter fragments resulting in retrieval of the fragment using endovascular and/or surgical techniques."  *See* Ex. 12 to Bard's MSJ at p 2.  The "Potential Complications" section refers to the listed complications as only "possible."  *Id.* at p 3.  The rate or frequency of complications is not further delineated.

device is important to the risk benefit analysis[31] and that if one device has a statistically significate rate of complications  higher than alternatives, it would affect the way he treats his patients.[32]  Dr. Mena did not know about the difference in complication rates for the Eclipse versus other filters and had he known, he would have not used the Eclipse filter.[33]

Based on the foregoing, the evidence demonstrating Bard's knowledge, intent, and motive with regard to decisions regarding warnings, product design, and marketing are relevant to Plaintiff's warning and design defect claims.  Plaintiff should not be prohibited from presenting evidence in support of his warning and design defect claims in trial.

**C.   Comparison to other products, particularly the Simon Nitinol Filter ("SNF"), is essential to Plaintiff's case and not improper.**

As discussed above, the Eclipse filter implanted into Mr. Couturier is part of a continuation of Bard's product line that began with the SNF.  Thus, comparison to the SNF is necessary to put Bard's design and warning (failure to warn) decisions in context.  Further, because Plaintiff has evidence that the SNF is a safer alternative design, the comparison is essential to Plaintiff's design defect case.

Plaintiff's expert, Dr. Darren Hurst, Board Certified in interventional and in diagnostic radiology, has opined that the Simon Nitinol Filter and the Cook Gunther Tulip Filter were safer alternative designs as compared to the Eclipse Filter.[34]

The Bard MDL Court rejected Bard's argument that the SNF cannot be a safer alternative, even to Bard's retrievable filters.  *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 U.S. Dist. LEXIS 20905, at *311 (D. Ariz. Feb. 8, 2018) ("The Court will not

---

[31] Ex. 27, Mena dep. at p 229-234.
[32] *Id.*
[33] *Id*.
[34] Ex. 29, Hurst dep. at p 64-65.

grant Defendants' request to preclude Dr. McMeeking from opining that the SNF is a safer device than Bard retrievable filters.").  Since then, Bard's argument that the SNF is disqualified as a reasonable alternative for Bard's optionally retrievable filters, including the G2, has been uniformly rejected. *See Isaac v. C. R. Bard*, No. A-19-CV-895-LY, 2021 U.S. Dist. LEXIS 59224, at *20 (W.D. Tex. Mar. 29, 2021) ("The Court finds that there is a material fact issue as to whether the Simon Nitinol Filter is a 'substantially different product' than the G2 Filter.  Bard marketed the G2 Filter as a permanent filter with the option of retrieval."); *Milton v. C.R. Bard, Inc.*, No. 5:14-cv-00351-TES, 2021 U.S. Dist. LEXIS 2338, at *13 (M.D. Ga. Jan. 6, 2021) (Dr. McMeeking allowed to testify that the SNF is a safer device, or a reasonable alternative design to the optionally retrievable G2X);[35] *McClarty v. C.R. Bard, Inc.*, No. 4:14-CV-13627-TGB-RSW, 2020 U.S. Dist. LEXIS 191056, at *12 – 17 (E.D. Mich. Oct. 15, 2020) (rejecting Bard's argument that the predecessor SNF Filter is a different product and not sufficiently similar to the alleged defective G2 filter to serve as a reasonable substitute); *Tinlin v. C.R. Bard, Inc. (In re Bard IVC Filters Prods. Liab. Litig.)*, No. MDL15-2641-PHX-DGC, 2019 U.S. Dist. LEXIS 64949, at *408 (D. Ariz. Apr. 16, 2019) ("Whether the retrievability of the Recovery makes it sufficiently unlike the SNF and other permanent filters to disqualify them as reasonable alternative designs is a question for the jury to decide."); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX-DGC, 2018 U.S. Dist. LEXIS 152604, at *290 (D. Ariz. Sep. 7, 2018) (denying Bard's motion *in limine* to exclude evidence of the SNF as a reasonable alternative to the G2/Eclipse in the *Hyde* case).

---

[35] The G2X filter is part of the Bard G2 filter line and essentially the same as the G2 filter, but with an added snare hook that is meant to improve the retrievability of the filter.  *Milton v. C.R. Bard, Inc.*, 2021 U.S. Dist. LEXIS 2338, at *1 n.1.

In the *Hyde* MDL bellwether case, as in the present case, there was testimony from the implanting surgeon that in implanting Mrs. Hyde with a G2X or Eclipse,[36] he wanted a filter with a retrievability option. ***Hyde v. C. R. Bard, Inc. (In re Bard IVC Filters Prods. Liab. Litig.)***, No. MDL 15-02641-PHX-DGC, 2018 U.S. Dist. LEXIS 169922, at *731 (D. Ariz. Oct. 2, 2018). However, as the *Hyde* Court noted, the evidence suggested that the G2X and Eclipse filters were designed to be permanent filters, as was the SNF, and that Mrs. Hyde's filter could have remained in place if it had *not* fractured. *Id.* at 732. Regardless, the *Hyde* Court held the SNF was not disqualified as a safer alternative device. *Id.*

Comparison to the SNF is important and relevant to Plaintiff's failure to warn claim for the independent, additional reason that the implanting physician, Dr. Mena testified that he did not factor the Eclipse retrievability into his decision as to which filter to implant into Mr. Couturier.[37]

## V.    CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff prays that Bard's Motion *in Limine* be denied and for such further relief as Plaintiff may show himself justly entitled.

---

[36] There was disagreement regarding whether Mrs. Hyde was implanted with a G2X or an Eclipse, but that disagreement does not affect the discussion of the SNF as a safer alternative device.
[37] Ex. 28, Mena dep. at 76.

Dated:  June 24, 2021

Respectfully Submitted,

*/s/ Laura J. Baughman*

Laura J. Baughman (*pro hac vice*)
lbaughman@martinbaughman.com
Ben C. Martin (*pro hac vice*)
bmartin@martinbaughman.com
Cameron Earl Dean (*pro hac vice*)
cdean@martinbaughman.com
**MARTIN BAUGHMAN, PLLC**
3141 Hood Street, Suite 600
Dallas, TX 75219
Phone: 214-761-6614
Fax: 214-744-7590

- and -

Joseph R. Joy III (*pro hac vice*)
buzzyjoy@josephjoy.com
**JOSEPH JOY & ASSOCIATES**
P. O. Box 4929
900 South College Road
Suite 204
Lafayette, LA 70502
Phone: 337-232-8123
Fax: 337-235-5629

- and –

Sarah W. Hickman (#35823)
shickman@wagarhickman.com
Nelson W. Wagar, III (#13136)
cwagar@wagarhickman.com
**WAGAR HICKMAN, LLC**
1425 W. Causeway Approach
Mandeville, LA 70002
Phone: 985-888-8740
Fax: 985-888-8792

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing is being filed using the Court's CM/ECF system this 24th day of June 2021, which will automatically serve a copy to all known counsel of record via electronic mail.

*/s/ Laura J. Baughman*

Laura J. Baughman