**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **CRAIG COUTURIER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BARD PERIPHERAL VASCULAR, INC. AND C. R. BARD, INC.,**<br><br>**Defendants.** | **CASE NO. 2:19-cv-12497**<br><br>**JUDGE IVAN L.R. LEMELLE**<br><br>**MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT** |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Plaintiff's evidence, Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") moved the Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on Plaintiff's two remaining causes of action: (1) that the Eclipse Filter was unreasonably dangerous because of an inadequate warning or instruction under La. Rev. Stat. Ann. §§ 9:2800.54(B)(3), 9:2800.57; (2) that the Eclipse filter was unreasonably dangerous in design under La. Rev. Stat. Ann. §§ 9:2800.54(B)(2), 9:2800.56 (the "Motion"). The Court denied the Motion without prejudice. At the close of all evidence and before submitting the case to the jury, Bard renewed the Motion with the Court orally on July 21, 2021 as Plaintiff did not elicit evidence of each of the elements for either of his remaining claims and, accordingly, judgment as a matter of law should be granted on both of Plaintiff's claims. Bard now files this written brief in further support of the Motion, together with the powerpoint presentation given to the Court at the time of the oral motion and as requested by the Court, as Exhibit A.

## LEGAL STANDARD

"Judgment as a matter of law is proper if 'a party has been fully heard on an issue during a

jury trial and . . . a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018) (citing Fed. R. Civ. P. 50(a)). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris Cty.*, 197 F.3d 173, 179 (5th Cir. 1999). "There must be a conflict in substantial evidence to create a jury question." *Id.* "The decision to grant a directed verdict ... is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997) (citation and internal quotation marks omitted).

**PLAINTIFF'S BURDEN OF PROOF**

In order to prevail, Plaintiff was required to prove, during his case in chief, each of the following elements by a preponderance of the evidence:

1. **Actual injury from a reasonably anticipated use of the Eclipse Filter:** That Plaintiff was injured by a characteristic of the Eclipse Filter that made it unreasonably dangerous and such damage arose from a reasonably anticipated use of the product.

2. **Inadequate warning under the LPLA:** That at the time the Eclipse™ Filter left Bard's control, it possessed a characteristic that may cause damage; that Bard failed to use reasonable care in providing an adequate warning to Dr. Jose Mena about that characteristic that may cause damage; that the characteristic that may cause damage was not otherwise known to Dr. Mena irrespective of any warning; and that the allegedly inadequate warning was both the cause-in-fact and proximate cause of the Plaintiff's injuries or, in other words, that but for the Eclipse™ Filter and the inadequate warning Plaintiff would not have been injured and that had an adequate warning been provided, Dr. Mena would not have implanted the Eclipse™ Filter in Plaintiff. La. Rev. Stat. Ann. §§ 9:2800:57. In order to prove these elements, Plaintiff must show that Dr. Mena did, in fact, read (and rely upon) the warning or IFU in making his treatment decision for Plaintiff and Plaintiff must proffer a specific alternate warning that would have changed Dr. Mena's treatment decision. *Pustejovsky v. Pliva, Inc.*, 623 F. 3d 271, 277 (5th Cir. 2010)

3. **Design defect under the LPLA:** That at the time the Eclipse™ Filter left Bard's control, there existed an alternative design for the product that was capable of preventing the claimant's damage; that the design of the Eclipse™ Filter was unreasonably dangerous because the likelihood that the product's design would cause the Plaintiff's damage and the gravity of that damage outweighed the burden on the

> manufacturer of adopting the alternative design and the adverse effect, if any, of the alternative design on the utility of the product. La. Rev. Stat. Ann. §§ 9:2800:56. An adequate warning must be considered in evaluating the likelihood of damage when Bard has used reasonable care to provide the adequate warning to users and handlers of the product; to that end, known and disclosed risks associated with a particular medical procedure used a certain medical device cannot be considered a product defect. *Id.*; *McMillen v. Danek Medical, Inc.*, No. CIV. A. 95–1796, 1999 WL 1117104, *2-3 (E.D. La. July 16, 1999).

Plaintiff failed to meet his burden on either of his claims, and Bard is entitled to judgment as a matter of law.

## ARGUMENT

### I. PLAINTIFF FAILED TO PROVE ANY ACTUAL INJURY OR THAT ANY ALLEGED INJURY AROSE FROM A REASONABLY ANTICIPATED USE OF THE ECLIPSE FILTER.

To prove a claim for both failure to warn and design defect under the LPLA, Plaintiff must establish four elements: "(1) defendant manufactured the product at issue; (2) plaintiff's injury was proximately caused by a characteristic of the product; (3) this characteristic made the product unreasonably dangerous; and (4) plaintiff's injury arose from a reasonably anticipated use of the product by plaintiff or someone else." Order and Reasons at 12 (citing *Stewart v. Capital Safety USA*, 867 F.3d 517, 520 (La. 2017) (citing *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 260-61 (5th Cir. 2002)).). Plaintiff did not elicit sufficient evidence of an injury resulting from the Eclipse Filter or that such injury was the result of a reasonably anticipated use of the Eclipse Filter.

#### A. Plaintiff Did Not Establish Through Competent and Reliable Expert Testimony That He Was Injured By the Eclipse Filter.

To prevail under any LPLA claim, Plaintiff must prove his "damage was proximately caused by a characteristic of the product." *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 245 (E.D. La. 1996). In complex product liability cases and cases where medical causation issues exist that are "beyond the common knowledge of a lay person," "expert evidence [is required] to establish the existence of … alleged injuries or medical causation of such injuries." *Patton v.*

*Boston Sci. Corp*., No. CV 15-1976, 2018 WL 4760846, at *2-3 (W.D. La. Oct. 2, 2018); *see Weams v. FCA US L.L.C.*, No. CV 17-4-RLB, 2019 WL 960159, at *17 (M.D. La. Feb. 27, 2019) (citing *Stewart v. Capital Safety USA,* 867 F.3d 517, 520-21 (5th Cir. 2017)).

Plaintiff himself did not testify about a single injury or symptom he has *ever* experienced as a result of the Eclipse Filter or embolized fragment, and certainly did not testify that he is experiencing any ongoing issues; to the contrary, Plaintiff confirmed he has not had any symptoms or problems from the fragment. (Trial Tr. 282:105, 6-12) In fact, Plaintiff testified he only found out that the filter had an embolized fragment when he went to the emergency room for unrelated intestinal problems. (*Id*. 251:5-10) Plaintiff further testified that no physician has recommended to him that he have either the Eclipse Filter or fragment removed (*Id*. 286:3-10), and instead his physicians told him that the fragment was not causing him any problems or harm and was stable. (*Id*. 280:17-281:13, 282:20-23.) Plaintiff has had limited follow-up visits with Dr. Mena and at each visit he has denied symptoms such as shortness of breath and chest pain. (*Id.* 278:15-21, 710:24-711:25, 715:1-6.)

> Q…. And you were told to leave things alone if it wasn't causing any problems; right?
> **A. Yes.**
> Q. And you were not having any symptoms or problems from the piece of the strut, you know, that -- I think it was described as 2.5 centimeters; correct?
> **A. Correct. Not at the time.**
> Q. All right. And if we look forward from October of 2016, all the way through January of 2020 was when your deposition was taken, even to today, as far as you know the strut has not changed its position at all; correct?
> **A. Correct.**
> Q. And it has not caused any symptoms; correct?
> **A. I don't know.**
> Q. All right. And then if we look at 2017, I guess you saw Dr. Mena -- or let's see. You had a call with Dr. Mena and you told the office that you had no complaints or problems at the time; correct?
> **A. Yes.**
> Q. All right. And then you had another call on February 13th, 2017, and you said -- you

were told the strut was stable by Dr. Mena's office; right?
**A. Yes.**

(*Id.* 282:1-23). Plaintiff's medical records with Dr. Mena revealed he was not following Dr. Mena's recommended follow-up schedule; for example, when Dr. Mena suggested following up in 3 months, Plaintiff waited almost 3 years. (*Id.* 719:24-720:4.) Plaintiff further confirmed that neither the filter nor strut have restricted his work activities or motorcycle riding. (*Id.* 287:5-14)

Plaintiff's treating and implanting physician, Dr. Mena, confirmed that Plaintiff never complained of any symptoms associated with the filter or fragment—including chest pain or shortness of breath (*Id.* 710:24-711:25, 715:1-6), that the position of the filter and fragment remained stable and unchanged on CT imaging in 2017 and 2019 (*Id.* 715:15-17, 716:10-19, 717:3-4, 718:20-719:9), and that Dr. Mena never offered or recommended surgery or removal of the filter (*Id.* 718:9-12, 720:13-16).

And even Plaintiff's own expert, Dr. Hurst, confirmed that the fragment has been stable, hasn't moved, and has not caused any physical or other symptoms for Plaintiff. (*Id.* 837:7-10.) And Dr. Hurst further testified that the penetrations in the IVC filter are of no clinical significance unless and until the patient becomes symptomatic—which Plaintiff is not. (*Id.* 773:24-774:4).

In sum, where both Plaintiff's treating physician and retained expert confirmed Plaintiff is and has been stable and asymptomatic and even Plaintiff did not testify to any alleged injuries or symptoms, Plaintiff has not met his burden to establish an injury, through competent and reliable expert testimony.

**B. Dr. Mena's Implantation of the Device In Direct Contravention of the IFU Was Not a Reasonably Anticipated Use of the Eclipse Filter.**

"When a plaintiff [or another person] misuses a product, in direct contravention of a warning, his use will not be reasonably anticipated unless the plaintiff can show that the

manufacturer should have known that the product users were using the [product] in contravention of certain warnings." *Broussard v. Proctor & Gamble Co.*, 463 F. Supp. 2d 596 (W.D. La. 2006); *Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 308 (5th Cir. 1998). "'Reasonably anticipated use' is an objective standard which does not include uses clearly contrary to warnings." *Green v. BDI Pharm.*, 35291 ( La. App. 2 Cir 10/31/01), 803 So. 2d 68, 75.

Here, the IFU provided express direction to the implanting physician about proper use and implantation of the Eclipse Filter. Specifically, the IFU states: "Position the retrieval hook 1 cm below the lowest renal vein." (Ex. 0040-007.) "If misplacement, sub-optimal placement, or tilting of the filter occurs, consider immediate removal." (*Id.*)

In direct contravention of the IFU, Dr. Mena testified and the post-implant radiology films confirmed, that Dr. Mena did not follow the IFU instructions in implanting the device into Plaintiff and instead, implanted the device too high and at a tilt. (DX0648-17) Specifically, Dr. Mena testified that he implanted the device as he "had intended to do" with the "positioning … being the top of the IVC filter was at about the level of the renal veins"—instead of the top of the filter being located 1 cm below the lowest vein. (Trial Tr. 547:9-16.) And Dr. Mena also implanted the device at a tilt, and did not consider removing the filter. (*Id*. 552:6-12.) Plaintiff's retained expert, Dr. Hurst, confirmed that Dr. Mena's implantation of the device did not conform to the IFU:

> Q. … And Dr. Mena's approach, that is a different approach [to place the filter] at the confluence of the renal vein; correct?
> …
> Q. He does it differently from what's instructed in the instructions for use; correct?
> **A. Correct.**
> Q. He choose his own way; correct?
> **A. I don't know. Yes, it's his way. Yes, I can --**
> …
> Q. Okay. But you understand and agree that his way is not in keeping with the instructions for use; correct?
> **A. It is not what the instructions for use say, yes.**

> Q. And so, again, he placed it out of position, as compared to the instructions for use; correct?
> **A. According to the instructions for use, yes, it was 1 centimeter above.**

(*Id.* 867:4-22). And third, Dr. Sarac also confirmed that Dr. Mena's implant method did not follow the IFU and, in fact, fell below the standard of care. (Trial Tr. 1531:11-26) Objectively, Dr. Mena's placement of the filter did not conform with the express instructions contained in the IFU. That Dr. Mena believed the device wasn't "badly placed" (*Id*. 552:9-12) or that, in his opinion, his implantation was a reasonably anticipated use of the Eclipse Filter is irrelevant (547:20-23); the standard for reasonably anticipated use is an objective one—whether the device was implanted in accordance with the IFU, and, here, it was not.

Implantation of the Eclipse Filter in direct contravention of the IFU negates any finding that Plaintiff's use of the Eclipse Filter was a reasonably anticipated use or that any alleged injury resulted from a reasonably anticipated use. Plaintiff presented no evidence that Bard should have known that implanting physicians were disregarding the IFU or failing to implant the device in accordance with the IFU. Where the evidence presented objectively demonstrates that Dr. Mena implanted the Eclipse Filter in direct contravention of the IFU, Plaintiff cannot meet his burden to show any alleged injury occurred in connection with a reasonably anticipated use of the device and judgment as a matter of law is appropriate on both of Plaintiff's remaining claims.

## II. PLAINTIFF FAILED TO MEET HIS BURDEN TO PROVE INADEQUATE WARNING UNDER THE LPLA

To prove a claim for inadequate warning under the LPLA, Plaintiff must prove: that at the time the Eclipse™ Filter left Bard's control, it possessed a characteristic that may cause damage; that Bard failed to use reasonable care in providing an adequate warning to Dr. Jose Mena about that characteristic that may cause damage; that the characteristic that may cause damage was not otherwise known to Dr. Mena irrespective of any warning; and that the allegedly inadequate

warning was both the cause-in-fact and proximate cause of the Plaintiff's injuries or, in other words, that but for the Eclipse™ Filter and the inadequate warning Plaintiff would not have been injured and that had an adequate warning been provided, Dr. Mena would not have implanted the Eclipse™ Filter in Plaintiff. La. Rev. Stat. Ann. §§ 9:2800:57.

Put another way, when the learned intermediary doctrine applies, a plaintiff must show "(1) that the defendant failed to warn the physician of a risk associated with the use of product, not otherwise known to the physician, and (2) that the failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury." *Willett v. Baxter Intern., Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991). "Because the defective aspect of the product must cause the injury, the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e., that "but for" the inadequate warning, the treating physician would not have used or prescribed the product." Order and Reasons (citing *Willett*, 929 F.2d at 1098-99). Plaintiff failed to make the necessary evidentiary showing to prove his claim and Bard should be granted a directed verdict on Plaintiff's failure to warn claim.

**A. Nothing Would Have Changed Dr. Mena's Decision to Implant Eclipse Filter Into Plaintiff On May 7, 2011 Because IVC Filter Was Best Treatment Option Available for Plaintiff and the Eclipse Filter Was Only Available IVC Filter.**

As this Court has already found "[b]ecause the defective aspect of the product must cause the injury, the plaintiff must show that a proper warning **would have changed the decision of the treating physician**, i.e., that "but for" the inadequate warning, the treating physician would not have used or prescribed the product." Order and Reasons (citing *Willett*, 929 F.2d at 1098-99) (emphasis added). Plaintiff cannot meet this burden in light of Dr. Mena's testimony about his decision to implant the Eclipse Filter in Plaintiff on May 7, 2011.

Specifically, Dr. Mena testified that because of the internal bleeding and pulmonary embolism Plaintiff was experiencing on May 7, 2011 (Trial Tr. 627:5-16.), he determined that

implanting an IVC filter was the best course of treatment for Plaintiff in order to give him the best benefit while considering and weighing the possible risks (*Id.* 625:2-17); that—as a result of choices made by the hospital and not Dr. Mena and not Bard—the only available IVC filter at the hospital for Dr. Mena to implant into Plaintiff was an Eclipse Filter (*Id.* 634:2-8); and Dr. Mena implanted the Eclipse filter—after obtaining informed consent from Plaintiff's wife—because it was the only IVC filter available for him to implant in Plaintiff (*Id.* 662:10-663:8). In other words, Dr. Mena's testimony is that he never chose the Eclipse filter over any other available filter for Plaintiff (because no other filters were available); instead, he chose the best course of treatment for Plaintiff—implantation of an IVC filter—and the choice of which specific type of IVC filter was available to him in implementing that treatment plan was made for him by the hospital. Dr. Mena further testified that he relied on the hospital to stock the safest and best medical devices for patients in the hospital (*Id.* 629:17-19), and that he would not have started doing research or looking at statistics on May 7, 2011 just before implanting the filter in Plaintiff. (*Id.* 632:20-633:5.)

To be sure, Dr. Mena never testified that any information or alternate warning would have changed his treatment decision for Plaintiff on May 7, 2011. In fact, Dr. Mena testified that, as it relates to whether information about increased risk of complication between different IVC filters, the difference in risk between the filters would have only informed his decision about which filter to select if the difference were statistically significant; and Dr. Mena could not say whether a "3.5 to six times" increased risk was significant but did testify that a difference of 0.017 would not qualify as a significant difference. (*Id.* 632:5-8, 14-18, 725:14-22) In other words, Dr. Mena could not testify that the risk ratio statistics calculated by Betensky based on data through May 2011 would not have changed his treating decision—without this testimony, Plaintiff has no evidence to support proximate causation on his failure to warn claim (i.e., that a different warning would

have changed the treating physician's prescribing or implanting decision).

And for the avoidance of any doubt, Dr. Mena testified that even today—10 years later—he stands by his decision to implant the Eclipse filter in Plaintiff:

> Q. And what you decided at the time was putting an IVC filter in what was, by all means, the best option, correct?
> **A. Yes.**
> Q. No question, right?
> **A. No question.**
> Q. You totally agree with that, even today, correct?
> **A. Yes. Otherwise, I wouldn't have recommended it.**
> Q. Right. In looking back, even now, looking back 10 years ago, you stand by that decision, correct?
> **A. I do.**
> Q. You have no qualms about the decision you made, do you?
> **A. None**

(*Id*. 628:4-15.)

> Q. Let me say it again. You stand by the decision you made on May 7, 2011, to implant the filter, the IVC filter made by Bard, the Eclipse filter, correct?
> **A. I made the decision to implant an IVC filter, and the one that was available was the Eclipse.**
> Q. And you don't regret implanting that filter, do you?
> **A. No, I don't.**
> Q. You think it was the best choice for him?
> **A. I think the IVC filter was the best choice.**
> Q. And including that it was the Eclipse that day, correct?
> **A. Again, I had no choice. That was the only thing available.**

(*Id*. 633:18-24).

> Q. And you believed, again, the lowest risk for your patient on May 7, 2011, was to implant him with the filter that was available at the hospital, that is, the Eclipse filter, correct?
> **A. Yes.**
> Q. And again, even looking back over the last 10 years, you haven't changed your mind about that; you believe that was the lowest risk for him, correct?
> **A. Absolutely, yes.**

(*Id*. 635:10-18.) With Dr. Mena's unequivocal testimony that even with the benefit of 10 years of

hindsight, he stands by his decision to implant the Eclipse filter in Plaintiff on May 7, 2011, no reasonable jury could find that Plaintiff has met his burden that any information would have changed Dr. Mena's implanting decision and Plaintiff cannot establish the Eclipse warning was the proximate cause of any alleged injuries.

**B. The Evidence Demonstrates IFU Was Adequate as a Matter of Law.**

A warning is adequate as a matter of law if the warning contained a "clear and unambiguous reference to the injury plaintiff suffered" and the treating physician testifies unequivocally that the "warning was adequate to inform [them] of the risks involved" in prescribing the device. *Stahl*, 283 F.3d at 267.

Here, Plaintiff claims he was injured due to the Eclipse Filter tilting, fracturing, embolizing, and perforating his IVC. But again, each of these risks is expressly warned about in the IFU. Ex. 0040 ("Movement, migration or tilt of the filter are known complications of vena cava filters;" "Filter fractures are a known complication of vena cava filters;" "Perforation or other acute or chronic damage of the IVC wall" and "[d]istal embolization" are potential complications, as well as "Filter fractures are a known complication of vena cava filters. There have been some reports of serious pulmonary and cardia complications with vena cava filters requiring the retrieval of the fragment utilizing endovascular and/or surgical techniques"). And again, Plaintiff's own expert Dr. Hurst confirmed that the Eclipse IFU included "all complications that [he'd] ever seen for any IVC filters." (Trial Tr. 861:11-15.).

And Dr. Mena testified unequivocally he was "fully and adequately warned" about the risks and complications of the Eclipse Filter—"no question." (*Id*. 685:18-686:4.)

Q. And this is the -- I'll say, this is, again, Exhibit 40 in evidence already. This is the Eclipse Instructions for Use that would have come in the box that was opened in front of you in the cath lab; is that right?
**A. Yes.**

Q. And we know for sure that you didn't read it that day, correct?
**A. Yes.**
Q. So let's just take -- again, I think what you said in your deposition -- and you can correct me if I'm wrong -- **<u>is that you were fully aware of all the risks, and complications, and warnings, and precautions in this [the IFU] because it was gone over with you prior to this procedure, correct?</u>**
**A. Yes.**
Q. No question about it, right?
**A. No question.**

(*Id*. 667:24-668:7). Where the IFU contained "clear and unambiguous reference to the injury" Plaintiff suffered and Dr. Mena testified unequivocally that the "warning was adequate to inform [him] of the risks involved" in implanting the device, the warning is adequate as a matter of law under the LPLA and Bard is entitled to judgment as a matter of law.

**C. Dr. Mena Independently Knew of All of the Risks Plaintiff Experienced.**

To prove a failure to warn claim where the learned intermediary rule applies, Plaintiff must show the risks allegedly not warned about were not otherwise known to treating physician through some other source, for example his education, training, or experience. *Willett*, 929 F.2d at 1098. In other words, Plaintiff's failure to warn claim fails if Dr. Mena was independently aware of all of the alleged complications experienced by Plaintiff.

Here, Dr. Mena testified he was aware of all of the risks experienced by Plaintiff before the implant in 2011, since before 2005 and even as early as 1990, that fracture, tilt, and migration are "well-known complications of placement of [IVC] filters." (Trial Tr. 568:20-22, 671:21-672:15, 685:18-24.) Again, for the avoidance of any doubt, Dr. Mena testified:

Q. … you were fully warned about the risks and complications of the Bard filter, including the Eclipse, and all of the complications listed in the IFU, correct?
**A. I was aware of complications.**
Q. You were aware of it for many years, correct?
**A. Yes.**
Q. And even without reading the Eclipse Instructions for Use -- I'm saying IFU, but it's the Instructions for Use -- you knew about these risks and complications, correct?

**A. Yes.**
Q. You knew about them for many years, correct?
**A. Yes.**
Q. You were well aware of them from other sources, correct?
**A. Yes.**
Q. You were aware of them from your training, correct?
**A. Yes.**
Q. You were aware of them from your CME, continuing medical education?
**A. Yes.**
Q. You're aware of them from talking to colleagues, correct?
**A. Yes.**

(*Id*. 655:14-656:13.) Plaintiff has failed to identify any risks associated with the Eclipse Filter that were not warned about in the IFU that Dr. Mena did not already independently know about. As a result, Plaintiff's inadequate warning claim fails as a matter of law and directed verdict should be entered in Bard's favor.

**D. Dr. Mena Does Not Recall Reading the IFU.**

To establish causation on a failure to warn claim, the "plaintiff must show that a proper warning would have changed the decision of the [prescribing] physician, i.e., that but for the inadequate warning, the [prescribing] physician would not have used or prescribed the product." *In re Taxotere (Docetaxel) Prod. Liab. Litig. (Philips)*, 994 F.3d 704, 708 (5th Cir. 2021); *see In re Taxotere (Docetaxel) Prod. Liab. Litig. (Stewart)*, No. 16-2740, 2021 WL 1534481, at *1 (E.D. La. Apr. 19, 2021) (J. Milazzo granting summary judgment and dismissing claims because plaintiff pointed to no evidence that prescriber would have acted differently). To meet this burden, Plaintiff must first establish that the treating physician read and relied upon the warning, here the IFU. *See Hall v. Elkins Sinn, Inc.*, 102 F. App'x 846, 849-50 (5th Cir. 2004) (holding that where physician never read the warning, it "played no role in the events leading to Hall's injury"); *see also Pustejovsky v. Pliva, Inc.*, 623 F. 3d 271, 277 (5th Cir. 2010) (granting summary judgment where physician "did not recall ever reading the package insert for the drug"). As the Fifth Circuit found

in *Pustejovsky*, "[the physician's] lack of memory, of course, does not preclude the possibility that [they] had read these materials, but neither can it sustain [the plaintiff's] burden." 623 F.3d at 277.

Here, Dr. Mena testified that ***he does not remember when he read the IFU or if he read it at all*** (Trial Tr. 660:15-18), but that he certainly ***did not read*** the IFU right before the implant procedure on Plaintiff (*Id.* 660:11-14, 661:1-3).

> Q. … You do not recall ever reading the Eclipse IFU specifically, correct?
> **A. I cannot recall.**
> Q. Okay. You said, "I cannot picture me reading it," correct?
> **A. I cannot recall reading it.**
> Q. Okay. And you said, "I have no reason to believe that I did or didn't read it," correct?
> **A. Correct.**
> Q. And you said, "I can promise you, I can't remember if I read it," correct?
> **A. Correct.**
> Q. It would be pure speculation to say that you read it, correct?
> **A. Correct.**
> Q. At any time, correct?
> **A. Correct.**
> Q. All right. You don't recall ever again communicating with any Bard representatives about the Eclipse filter, correct?
> **A. I cannot.**
> Q. Okay. You don't recall ever calling Bard and asking any questions, correct?
> **A. I cannot.**

(*Id*. 663:21-664:18) And while Dr. Mena also testified that it is "more likely than not" that he read the Eclipse IFU "at some point" based on his typical practice to read the IFU the first time he implants a specific device (*Id.* 660:22-25), he could not give any timeframe for when he may have read the Eclipse IFU or even say how close to Plaintiff's implant that he may have read the IFU, if he did read it all. (*Id.* 661:4-6). But, in reality, this testimony is mere conjecture as Dr. Mena definitively testified that he could not recall reading the IFU and could not testify with any certainty whether he actually followed his typical practice of reading the IFU once with the Eclipse or not. (*Id.* 660:22-25.)

Dr. Mena's vague testimony that it is more likely than not that he read the IFU at some point in time is insufficient to meet Plaintiff's burden to establish Dr. Mena actually read the IFU before implanting the device in Plaintiff. And there is ***zero evidence*** based on Dr. Mena's testimony that he relied upon anything he may (or may not) have read in the IFU in making the decision to implant the device. To the contrary, Dr. Mena repeatedly testified that his decision to implant the Eclipse filter in Plaintiff had nothing to do with the Eclipse IFU or even the Eclipse itself and everything to do with Dr. Mena believing that implantation of an IVC Filter was the best treatment for Plaintiff—based on his training and experience—given Plaintiff's condition, and the fact that the Eclipse Filter was the only IVC filter option available at the hospital for Dr. Mena to implant in Plaintiff on May 7, 2011. (*Id.* 627:5-628:13.) And again, not only does Dr. Mena never testify that any information would have actually changed his treatment decision for Plaintiff on May 7, 2011, but Dr. Mena stands by his decision to implant the IVC filter in Plaintiff:

> Q. And what you decided at the time was putting an IVC filter in what was, by all means, the best option, correct?
> **A. Yes.**
> Q. No question, right?
> **A. No question.**
> Q. You totally agree with that, even today, correct?
> **A. Yes. Otherwise, I wouldn't have recommended it.**
> Q. Right. In looking back, even now, looking back 10 years ago, you stand by that decision, correct?
> **A. I do.**
> Q. You have no qualms about the decision you made, do you?
> **A. None**

(*Id.* 628:4-15.)

Even if the Court were to find Dr. Mena's conjecture sufficient to establish he read the IFU (and it is not), without having even some idea of ***when*** Dr. Mena may have read the IFU, Plaintiff's evidence is still insufficient to establish causation. Plaintiff's hypothetical alternative warning is

based on risk ratio statistics from Betensky for the time period through May 2011. (*Id*. 529:14-19.) In other words, where Betensky's statistics are based on information through May 2011, Dr. Mena would need to have read a different warning in May 2011—a scenario Dr. Mena's testimony does not support. Dr. Mena testified he could not recall at all when he may have read the IFU, if he did at all. (*Id.* 661:4-6). If the one and only time Dr. Mena may have read the IFU was in early 2010—Betensky's statistics from May 2011 would have no bearing on whether a different warning would have changed Dr. Mena's implanting decision in May 2011 because Bard would not have had May 2011 information in early 2010. Without more definitive evidence from Dr. Mena about whether and when he read the IFU, Plaintiff simply does not have sufficient evidence to establish Dr. Mena would have changed his treating decision if a different warning had been given.

Moreover, Betensky's statistics and the timeline related to them simply don't match the temporal reality of Plaintiff's claims. Betensky's data is for the time period *through* May 2011—therefore it was impossible for Bard to have known the risk ratio statistics Betensky's testified to before the end of May 2011—which is weeks after the implant date. Moreover, Plaintiff has failed to elicit any evidence of when Plaintiff's device left Bard's possession. There is similarly no evidence of how long it would take to compile the data used by Betensky, perform the calculation performed by Betensky, and prepare and circulate such information to implanting physicians—and no evidence that such information would have reached Dr. Mena. Additionally, here, for the causal chain to continue unbroken, Plaintiff would have to prove that Dr. Mena would have obtained the information from Bard through some source, that Dr. Mena would have found such information statistically significant (which he already testified that the 0.017 difference was not), that the added information would have led Dr. Mena to ask the hospital to supply a different filter (*see* Trail Tr. 567:9-11, "if there is a problem with a specific device, I would certainly approach

the hospital, if it is a dangerous device, and ask them to change it"), that the hospital would have acquiesced to Dr. Mena's request (*see* Trial Tr. 628:16-25, "the hospital has a committee . . . that determines what devices should be in the hospital"), and that all of this would have taken place in time for an alternative device to be available at the hospital before Plaintiff's implant date. Yet Plaintiff elicited zero testimony from the hospital about how they consider physician requests for alternative medical devices, much less whether they would have been amenable to any hypothetical requests from Dr. Mena, and how long such a process would have taken. Plaintiff likewise elicited zero testimony about any purported risk ratio statistics for data through a date that preceded the date of implant (instead only provided data for the time period through May 2011—which includes a period after the date of implant), and how Dr. Mena may have responded to such data. In short, Plaintiff has not elicited sufficient evidence to connect all of the necessary steps to prove causation, (or an unbroken chain of events—the standard advanced by Plaintiff).

Under these circumstances, Plaintiff has not met his evidentiary burden and Bard is entitled to a directed verdict on Plaintiff's inadequate warning claim.

## III. PLAINTIFF FAILED TO MEET HIS BURDEN TO PROVE DESIGN DEFECT UNDER THE LPLA.

To prove a claim for design defect under the LPLA, in addition to the elements set forth in Section I, Plaintiff must also prove: that at the time the Eclipse™ Filter left Bard's control, there "existed an alternative design for the product that was capable of preventing" Plaintiff's alleged injury; that the design of the Eclipse™ Filter was unreasonably dangerous because the "likelihood that the product's design would cause the [Plaintiff's] damage and the gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design and the adverse effect, if any, of the alternative design on the utility of the product." La. Rev. Stat. Ann. § 9:2800:56. Further, an adequate warning must be considered in evaluating the likelihood of

injury when Bard has used reasonable care to provide the adequate warning to users and handlers of the product; to that end, known and disclosed risks associated with a particular medical procedure used a certain medical device cannot be considered a product defect. *Id.*; *McMillen v. Danek Medical, Inc.,* No. CIV. A. 95–1796, 1999 WL 1117104, *2-3 (E.D. La. July 16, 1999).

Plaintiff failed to present case-specific expert testimony to prove a design defect in *Plaintiff*'s filter, that a safer alternative design would have prevented Plaintiff's injuries, or that any evidence of a design defect that was not a known and disclosed risk in the IFU.

### A. Plaintiff Lacks Any Case-Specific Expert Testimony to Support Specific Causation for His Design Defect Claim.

Plaintiff lacks case-specific expert testimony to establish either a design defect in Plaintiff's filter or specific causation on his design defect claim. "Proof of causation has two components, general and specific." *Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2003 U.S. Dist. LEXIS 17770, at *6 (E.D. La. Oct. 7, 2003). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Autery v. GlaxoSmithKline, L.L.C.*, 496 F. App'x 388, 389 (5th Cir. 2012) (citation omitted).

Plaintiff's only case-specific expert that is testifying at trial is Darren Hurst.[1] Dr. Hurst is an interventional radiologist and not an engineer and, as a result, has been precluded from offering any testimony about the design of the Eclipse filter. With no case-specific expert to opine on design, Plaintiff has not and cannot meet his burden of proof to show that *Plaintiff's* filter had a design defect that caused injury to Plaintiff. Recognizing he lacks any design expert to opine on Plaintiff's filter specifically, Plaintiff attempts to satisfy his burden by having Dr. Hurst opine that

[1] Dr. McMeeking, Plaintiff's general design expert, was not disclosed as a case-specific expert here and as confirmed by his trial testimony, did not prepare an expert report specifically regarding Plaintiff and did not testify as to Plaintiff's case specifics. (Trial Tr. 1030:20-22, 1049:9-12).

no he was unable to identify any other (non-design) cause of Plaintiff's injuries. (*Id.* 783:4-7) Dr. Hurst's testimony is not sufficient to meet Plaintiff's burden; Plaintiff must have a case-specific expert to opine, to a reasonable degree of engineering certainty, that the filter implanted in him was defective and that such defect caused his filter to fracture and ultimately, Plaintiff's alleged injury. Dr. Hurst does not—and cannot—form the basis for Plaintiff to meet this burden. To be clear, neither Dr. Hurst nor Dr. McMeeking testified to a reasonable degree of engineering certainty that Plaintiff's filter was defective or that a design defect caused the alleged filter failure or to a reasonable degree of medical certainty that any filter failure caused Plaintiff's alleged injuries.[2] Instead, the only evidence in the record on the cause of Plaintiff's alleged injuries to a reasonable degree of medical certainty comes from Bard's expert, Dr. Timur Sarac, who testified that the cause of the alleged device failure and Plaintiff alleged injuries (if any) was improper placement of the device by Dr. Mena. (*Id.* 1531:6-1532:1, 1557:3-18) Specifically, Dr. Sarac identified significant concerns with placement – that placement was outside the standard of care, because the filter was placed too high, with "severe tilt" and without trying to remove it due to the tilt, short implant procedure time, not paying attention to the IV contrast, and not arranging follow-up despite knowing the device was improperly placed. (*Id.*) Without any evidence to support Plaintiff's burden and where the only evidence expressly negates Plaintiff's burden, Plaintiff's design defect claim fails as a matter of law.

**B. Plaintiff Failed to Present a Safer Alternative Design That Would Have Prevented His Injuries.**

"[T]he LPLA requires proof of an alternative design that ***would have prevented*** a plaintiff's injuries." *Savoy v.* Kroger Co, No. 2:17-CV-00897, 2020 U.S. Dist. LEXIS 2482, at *7-8 (W.D.

[2] Dr. Mena likewise testified he had no causation opinions "about what caused the fracture, the tilt, the migration." (Trial Tr. 655:2-8)

La. Jan. 7, 2020) (emphasis added). Here, Plaintiff presents the Simon Nitinol Filter ("SNF") and Gunther Tulip Filter as purported safer alternative designs to the Eclipse Filter implanted in Plaintiff. (Trial Tr. 213:8-21.) But neither of these purported safer alternatives satisfy Plaintiff's burden because Plaintiff cannot show that either alternative "would have prevented" his injuries or was even capable of preventing his alleged injuries, and neither of Plaintiff's experts actually testified that either the Simon Nitinol or Gunther Tulip would have prevented Plaintiff's alleged injuries.

Specifically, Dr. Hurst testified that all IVC filters have the "potential to tilt, migrate, perforate, fracture" and, even still, he continues to implant IVC filters in his patients. (*Id.* 876:9-18.) Dr. McMeeking concurred—testifying that "all [IVC filters] have the risk of tilt, perforation, migration, movement, and fracture." (*Id.* 1093:24-1094:6). While Plaintiff's experts contend the Eclipse Filter has higher complication rates, Plaintiff cannot satisfy his burden of proving safer alternative design by showing the proposed alternatives merely have lower complication rates—"having higher complication rates does not negate the fact that these alternative filters still put patients at risk of the same injuries as the Eclipse filter." Order and Reasons at 18-19 (Rec Doc 303).

Moreover, both Drs. Hurst and McMeeking previously criticized the very filters they claim could have been alternatives here. Dr. McMeeking previously testified that both the Gunther Tulip and Simon Nitinol filters were defective in design, but that he was not giving any opinion on whether any proposed alternative designs "could or would have made a difference for" Plaintiff and ultimately deferred to Dr. Hurst as to whether such devices could constitute a safer alternative

for Plaintiff from a medical perspective.[3] (*Id.* 1090:4-15, 1150:21-1151:9, 1092:1-10) And Dr. Hurst testified that both the Gunther Tulip and SNF filter have "unacceptably high" rates of complication and are both "poor performers." (Trial Tr. 822:18-21). In other words, Plaintiff's only two experts opining on an alleged alternative design believe the alternative devices they point to are defective and present unacceptably high complication rates. This testimony does not meet Plaintiff's burden to establish that the alternative devices would or could have prevented Plaintiff's alleged injuries.

Again, instead, the only testimony directly addressing Plaintiff's causation burden comes from Bard's expert, Dr. Sarac, who testified clearly that the proposed alternative filters would ***not*** have "prevented the complications that ensued in this case." (*Id.* 1528:15-1529:7)

In sum, Plaintiff's design defect claim fails because Plaintiff did not elicit evidence of a safer alternative design that ***would have prevented*** his alleged injuries—an essential element of his design defect claim.

### C. Plaintiff Failed to Present Evidence of a Design Defect That Was Not a Risk Warned About in the IFU.

"Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury [allegedly] occurred." *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir. 2000); *see Green-Johnson v. Enter. Rent a Car*, 2008 U.S. Dist. LEXIS 27804, at *9 (E.D. La. Apr. 7, 2008) (dismissing design defect claim on summary judgment where plaintiff failed to identify "any specific product defect" in the air bag causing it not to deploy). "Known and disclosed risks associated with a particular medical procedure using a certain product cannot be considered a product defect." Order and Reasons (citing *McMillen v. Danek Medical, Inc.*, No.

[3] Dr. McMeeking also briefly speculated about alternative design features—as opposed to an alternative device that was available—but there was no testimony that any of his alternative design features were actually feasible, there was no prototype, no testing, and no formal assessment of any such features. (*Id.* 1087:8-23, 1088:18-20.)

95-1796, 1999 WL 1117104, at *2-3 (E.D. La. July 16, 1999)).

Plaintiff's general design expert contends the design was defective for various reasons which, in turn, caused the Eclipse filter to tilt, fracture, perforate the IVC, and embolize. But, at bottom, these opinions amount to nothing more than a restatement of the very risks warned about in the IFU. Ex. 0040 ("Movement, migration or tilt of the filter are known complications of vena cava filters;" "Filter fractures are a known complication of vena cava filters;" "Perforation or other acute or chronic damage of the IVC wall" and "[d]istal embolization" are potential complications). Furthermore, Plaintiff's own expert Dr. Hurst confirmed that the IFU warned of every known complication of IVC filters, including fracture, tilt, perforation, and migration. (Trial Tr. 861:11-15 (Hurst confirming the IFU included "all complications that [he'd] ever seen for any IVC filters.")). Plaintiff's design defect claims fails where he has failed to elicit any evidence of a design defect that is not simply a known risk of IVC filters generally and a risk that was disclosed in the Eclipse Filter IFU.

**CONCLUSION**

In sum, for the reasons set forth herein and argued before the Court on July 21, 2021, Bard respectfully requests the Court grant a directed verdict in favor of Bard on Plaintiff's two remaining claims.

Dated: July 22, 2021

Respectfully Submitted:

**IRWIN FRITCHIE URQUHART & MOORE, LLC**

*/s/ Lori G. Cohen*
Kim E. Moore (#18653)
David M. Melancon (#23216)
Kelly Juneau Rookard (#30573)
Alison A. Spindler (#34103)
Brian G. Reaney, II (#38382)

400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: (504) 310-2100
Fax: (504) 310-2101
kmoore@irwinllc.com
dmelancon@irwinllc.com
kjuneau@irwinllc.com
aspindler@irwinllc.com
breaney@irwinllc.com

-and-

**GREENBERG TRAURIG, LLP**

Lori G. Cohen (*pro hac vice*)
Sean P. Jessee (*pro hac vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
cohenl@gtlaw.com
jessees@gtlaw.com

Sabrina R. Gallo (*pro hac vice*)
333 SE, 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
gallos@gtlaw.com

Joseph P. Griffith (*pro hac vice*)
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
Telephone: (214) 665-3600
griffithj@gtlaw.com

Sylvia E. Simson (*pro hac vice*)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9275
simsons@gtlaw.com

*Counsel for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of July 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Lori G. Cohen*